## IN THE UNITED STATES DISTRICT COURT
## FOR SOUTH DAKOTA

| | |
|---|---|
| RELIANCE TELEPHONE OF GRAND FORKS INCORPORATED, a North Dakota corporation, | Civil No. 4:24-cv-04098-ECS |
| and | |
| RELIANCE SYSTEMS INC., a Nevada corporation, | |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| YANKTON COUNTY, SOUTH DAKOTA, | |
| and | |
| NETWORK COMMUNICATIONS INTERNATIONAL CORP., a Texas corporation, | |
| Defendants. | |

This Memorandum is submitted on behalf of Plaintiffs Reliance Telephone of Grand Forks Incorporated ("Reliance Telephone") and Reliance Systems Inc. ("Reliance Systems") (collectively, "Plaintiffs"), in support of their Motion for Partial Summary Judgment on their claims against Defendant Network Communications International Corp. ("NCIC"). The evidence establishes that NCIC tortiously interfered with Plaintiffs long-standing business relationships with Yankton County, South Dakota ("Yankton"). The evidence also establishes that NCIC made false and disparaging statements about Plaintiffs throughout the marketing and selling of its services to Yankton, in violation of the Lanham Act. NCIC's succeeded with its wrongful actions.

Yankton terminated its business relationships with Plaintiffs and instead entered into a new contractual relationship with NCIC.

Fully aware of Plaintiffs existing business relationships and contracts, NCIC knew that it would have to induce Yankton to improperly terminate those business relationships. NCIC's sales representative told his supervisor, "Yankton *will need to break* their 5-year automatic renewal with Reliance...." (Emphasis added.) NCIC drafted the termination letter for Yankton. The termination letter contained multiple false statements, including the material and significant false assertion that Plaintiffs were illegally charging Yankton rates in excess of what Federal Communication Commission ("FCC") regulations permitted. NCIC made no attempt to determine whether there was any merit to this false statement before making it.

Over the following weeks and months, Plaintiffs endeavored to defend themselves against this false accusation (and others), NCIC repeatedly ensured that the false statement was front-and-center before Yankton's decisionmakers. NCIC drafted multiple communications for Yankton, repeating the false accusation. NCIC even told Yankton that Plaintiffs were "lying" when Plaintiffs provided evidence they were not violating the law. In a remarkable display of candor, NCIC's president admitted to the employees involved in its unlawful efforts, "We will probably be ok if we don't try to get more to terminate early.😊😊" (Emojis in original.) NCIC's director of marketing agreed with the president's assessment.

No genuine dispute of any material fact exists regarding the elements of Plaintiffs' claims for tortious interference with business relationships and violation of the Lanham Act. Plaintiffs therefore are entitled to partial summary judgment on each of those claim elements. The only issues remaining for trial should be the amount of Plaintiffs' damages under each cause of action; their entitlement to an award of punitive damages for NCIC's tortious interference; and whether NCIC

2

willfully and intentionally violated the Lanham Act. This Court should grant Plaintiffs' motion for partial summary judgment in its entirety.

## SUMMARY OF UNDISPUTED MATERIAL FACTS[1]

Reliance Telephone provides telecommunications services to correctional facilities. Reliance Systems, in 2023, provided text messaging services to correctional facilities. Among Plaintiffs' clients was Yankton. Plaintiffs had been providing telecommunications services to Yankton, in one form or another, pursuant to oral and written agreements since 2010. In 2020, Plaintiffs each signed new written agreements to provide telecommunications and other related services to Yankton for the benefit of, and use by, its county jail inmates. The initial term of these agreements was five (5) years, until December 2025. PSUF 1-2, 4-8.

Yankton was satisfied with its long-standing business relationships with each of the Plaintiffs. Its long-time county sheriff and jail administrator were pleased with Plaintiffs' services and how they were provided, as well as their responsiveness to any issues or technical problems that arose. Both would have continued to use Plaintiffs services. The long-term business relationships Plaintiffs enjoyed with Yankton were consistent with Plaintiffs experiences with other customers. The average length of Plaintiffs' business relationships with clients has been about eighteen (18) years. PSUF 4, 9-11.

NCIC is a direct competitor of each of the Plaintiffs. PSUF 3. Beginning at least in early 2023, NCIC began targeting Plaintiffs' customers in the upper Midwest. As part of its efforts to market and sell its services as a replacement to Plaintiffs, NCIC told Plaintiffs' clients that Plaintiffs were charging telecommunications rates in excess of those permitted by FCC

---

[1] Plaintiffs summarize the salient undisputed material facts in this section. They incorporate generally their Statement of Undisputed Material Facts ("PSUF").

regulations. NCIC certainly told Yankton and Davison counties – existing customers of Plaintiffs – that Plaintiffs were charging <u>illegal</u> rates and engaging in other improper behavior. *See generally* PSUF 12-65.

NCIC's assertions of illegal conduct by Plaintiffs were made in writing to Yankton and Davison counties. NCIC made no attempt to determine whether these claims were true before making them. In fact, NCIC knew that based on its review of screenshots of webpages of Reliance Telephone, Plaintiffs were compliant with FCC regulations. PSUF 45-46. NCIC has no evidence that Plaintiffs in fact were charging illegally high rates. PSUF 44-49.

NCIC first approached Yankton to solicit its business in early 2023. As part of its solicitation efforts, NCIC contrived to have the Yankton County sheriff "win" an all-expense-paid, three-day fishing holiday at a lake in Texas within days of first visiting Yankton's facility and without ever having met the then-sheriff in person. NCIC's director of marketing described it as "Completely coincidental" that Yankton's sheriff received the free weekend prize "literally a couple of days after [he] first sent him a proposal [to become a NCIC customer]. PSUF 12-15, 21-22.

NCIC knew Plaintiffs had existing business relationships with Yankton from the beginning of its efforts to induce Yankton to become an NCIC customer. NCIC knew that it would have to convince Yankton to breach its existing contracts with Plaintiffs. Yankton gave NCIC copies of its then-existing contracts with Plaintiffs. NCIC knew they would have to be terminated and that there was no provision in them allowing early termination. PSUF 16-19. NCIC's director of Midwest sales told his supervisor, "Yankton *will need to break* their 5-year automatic renewal with Reliance. …" PSUF 18 (emphasis added). PSUF 18. In a remarkable display of candor, NCIC's president

later told his director of marketing and Midwest sales director, "We will probably be ok *if we don't try to get more to terminate early*.☻☻" PSUF 20 (emphasis added; emojis in original).

As part of its concerted efforts to end Plaintiffs' long-standing business relationships with Yankton, NCIC drafted multiple termination letters and other communications that Yankton sent to Plaintiffs. NCIC created the charge of illegal pricing in the termination letter that was repeated in the response letters it prepared for Yankton. It did so without making any attempt to determine if that was in fact the case. Instead, it relied on select screenshots from Reliance Telephone's website and made the claim even though the website pages indicated Plaintiffs were compliant with FCC regulations.[2] Yankton relied on NCIC for the accuracy of the assertions made; it conducted no independent analysis to determine its truthfulness.[3] PSUF 23-37, 44-49.

NCIC desired to cause Plaintiffs' customers not to do business with Plaintiffs. As a direct competitor, NCIC held animus toward Plaintiffs and their president. NCIC's president and sales leaders communicated about their desire to physically harm Plaintiffs' owner and their professional reputation and standing in the industry. NCIC threatened to disrupt Plaintiffs' businesses by filing complaints with various state and federal entities and agencies accusing Plaintiffs of charging unlawful and illegal rates. NCIC wanted to make it difficult for Plaintiffs to sell their businesses. PSUF 50-56.

When Plaintiffs responded to Yankton in response to the NCIC-concocted assertion of charging illegal rates, NCIC told Yankton's decisionmakers that Plaintiffs were "lying." PSUF 41.

---

[2] The charge of illegal rate-charging was directed toward Plaintiffs generally, despite the fact that Reliance Systems was not subject to FCC regulation for any of the services it provided at the time. PSUF 2, 47. Thus, insofar as NCIC alleged that Reliance Systems was charging illegal rates, that assertion certainly was without basis.

[3] Yankton admitted that the written agreements with Plaintiffs did not allow for early termination, did not require the provision of full-size iPad devices to inmates, and that it has no documentation to support its claim of dissatisfaction with Plaintiffs' support services contained in its termination letter. PSUF 28-32.

NCIC repeatedly pushed the false claim of illegal rate-charging to Yankton, via multiple emails over weeks of communications. PSUF 38-41, 50-53.

Despite Plaintiffs attempts to counter and correct NCIC's false statements of illegal conduct, Yankton terminated its long-term business relationships with each of the Plaintiffs in October 2023. Yankton's based its decision to terminate its contracts and relationships with Plaintiffs on NCIC's statements alleging Plaintiffs were charging illegal rate. As a result of its successful efforts to get Yankton to breach its agreements with Plaintiffs, NCIC obtained a multi-year agreement with Yankton replacing Plaintiffs as the provider of telecommunication services to Yankton. PSUF 42-43. NCIC intentionally robbed Plaintiffs of a loyal and satisfied customer of more than thirteen (13) years.

## ARGUMENT

Under Federal Rule of Civil Procedure 56:

> A party may move for summary judgment, identifying each claim or defense – or *the part of each claim* or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a) (emphasis added). The moving party can show its entitlement to summary judgment in two ways: by producing undisputed evidence in support of its claim, or by showing that the nonmoving party lacks sufficient evidence in opposition to the moving party's claim. *See, e.g., Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018). Summary judgment is appropriate unless, "the nonmoving party … come[s] forward with specific facts showing that there is a genuine issue for trial." *Marlow v. City of Clarendon*, 78 F.4th 410, 417 (8th Cir. 2023) (citation omitted). A principal purpose of Rule 56 is to dispose of undisputed elements of claims. *See Bedford*, 880 F.3d at 996.

6

Here, viewing the evidence in the light most favorable to NCIC, there is no genuine dispute as to nearly all of the elements necessary for Plaintiffs to establish their claims against NCIC. The Court, therefore, should grant partial summary judgment in favor of Plaintiffs.

**I.**    **Plaintiffs are Entitled to Partial Summary Judgment on Their Claim for Tortious Interference with Business Relationships.**

In Count VIII of the Amended Complaint, Plaintiffs each assert a claim against NCIC for tortious interference with business relationships. *See* Doc. 28, ¶s 113-119. The elements necessary to prove a claim for tortious interference under South Dakota law are well-established. A plaintiff must prove: (1) the existence of a business relationship or expectancy with a third party; (2) knowledge by the defendant/interferer of the relationship or expectancy; (3) an intentional and unjustified act of interference by the interferer; (4) evidence that the interference caused the harm sustained; and (5) damage to the party whose relationship or expectancy was disrupted. *See, e.g., Sancom, Inc. v. Qwest Communications Corp.*, 643 F. Supp. 2d 1117, 1129 (D.S.D. 2009); *Setliff v. Akins*, 616 N.W.2d 878, 889 (S.D. 2000).

Plaintiffs are entitled to partial summary judgment on Count VIII because the undisputed evidence establishes elements (1) through (4) of this cause of action.[4] No reasonable juror could find otherwise.

A. Plaintiffs had Existing Business Relationships or Expectancies with Yankton.

South Dakota law does not require the existence of any form of express or written contract between the plaintiff and the individual or entity with which the defendant interferes. As the South Dakota Supreme Court has stated, "none of these elements [for tortious interference] require the existence of an *express* contract. In fact, 'for this tort to occur, the business relationship ... need

---

[4] Plaintiffs leave for trial the issues of the amount of damages they suffered as a result of NCIC's wrongful conduct, as well as their entitlement to an award of punitive damages and the amount of punitive damages the jury should award. *See* Doc. 28, ¶119.

not be cemented by written or verbal contract and, ... it need not be intended that there be a contract.'" *Setliff*, 616 N.W.2d at 889 (quoting *Hayes v. Northern Hills General Hosp.*, 590 N.W.2d 243, 248 (S.D. 1999) (emphasis in original)). "'One is liable for commission of this tort [if the defendant] interferes with business relations of another, *both existing and prospective*, by inducing a third person not to enter into *or continue* a business relation with another or by preventing a third person from *continuing* a business relation with another.'" *Setliff*, 616 N.W.2d at 889 (quoting *Northern Plumbing & Heating, Inc. v. Henderson Bros., Inc.*, 268 N.W.2d 296, 299 (Mich. App. 1978) (emphasis added)). As this Court has summarized:

> *Setliff* ... makes clear that a person may have a claim for tortious interference with business relations where no contract was intended, and may show tortious interference by showing that the defendant induced a third person not to enter into a business relation with another, induced a third person not to continue a business relation with another, or prevented a third person from continuing a business relation with another. ... *Setliff* does not require proof of an actual breach of contract, but merely interference with a business relationship.

*Sancom*, 643 F. Supp. 2d at 1129-1130.

No question exists regarding Plaintiffs' existing and prospective business relationships with Yankton. Reliance Telephone had a long-established business relationship with Yankton since 2010. From 2010 until 2023, Reliance Telephone provided telecommunications services to Yankton's county jail. PSUF 1, 6-8. Reliance Systems had a business relationship with Yankton dating from 2016, and continuing until October 2023, providing text messaging and video call services to Yankton's inmates. PSUF 2, 6-8. Plaintiffs typically have long term relationships with their customers. The average length of Plaintiffs' customer relationships is approximately eighteen (18) years. PSUF 4. As a direct competitor, NCIC also has long term relationships with its customers. PSUF 5. Former Yankton County sheriff James Vlahakis and former jail administrator Mark Payor provided uncontradicted testimony that they were very satisfied with Plaintiffs' provision of services and would have continued to renew Yankton's relationship with them. PSUF

9-10. Even Yankton said "it would have nothing but positive feedback regarding Reliance...." PSUF 11.

Given this undisputed evidence, no reasonable juror could not conclude that Plaintiffs had existing business relationships or expectancies with Yankton. Therefore, Plaintiffs are entitled to summary judgment in their favor on this element of their claim for tortious interference.

B. <u>NCIC Was Aware of Plaintiffs' Business Relationships with Yankton.</u>

No genuine dispute exists regarding NCIC's knowledge of Plaintiffs' business relationships with Yankton. NCIC was aware of the existing business relationship between Yankton and Plaintiffs from the beginning of its efforts in early 2023 to improperly terminate those relationships. Yankton provided NCIC with copies of its then-existing contracts with Plaintiffs early in NCIC's marketing efforts. PSUF 12-14. By April 2023, over three (3) months before Yankton gave notice it intended to improperly end its almost fifteen (15) year relationship with Plaintiffs, NCIC understood, "Yankton *will need to break* their 5-year automatic renewal with Reliance. ..." PSUF 18 (emphasis added). *See also* PSUF 17, 19. After NCIC had successfully induced Yankton to terminate its business relationships with Plaintiffs, NCIC's president candidly admitted, "We will probably be ok *if we don't try to get more to terminate early.*😊😊" PSUF 20 (emphasis added; emojis in original). The undisputed evidence thus establishes this element of Plaintiffs' tortious interference claim.

C. <u>NCIC Intentionally and Unjustifiably Interfered with Plaintiffs' Business Relationships with Yankton.</u>

The evidence establishes that NCIC intentionally and unjustifiably interfered with Plaintiffs' contracts and business relationships with Yankton. NCIC learned of Plaintiffs' business relationships with Yankton early in its efforts to convince Yankton to end its long-term relationships with Plaintiffs. Yankton gave NCIC copies of its then-existing contracts with

Plaintiffs. NCIC knew they would have to be terminated and that there was no provision in them allowing early termination. PSUF 12-17. Once NCIC reviewed the contracts, it knew Yankton would have to break their contracts with Plaintiffs. NCIC knew it was inducing or causing Yankton to prematurely and improperly terminate its business relationships with Plaintiffs, and that NCIC could be sued for doing so. PSUF 16-20. As its president later admitted, "We will probably be ok if we *don't try to get more to terminate early.*😊😊" PSUF 20. NCIC prepared all the draft termination letters and replies that Yankton sent to Plaintiffs. PSUF 23-26, 35, 50-52. NCIC knew that at least some of the reasons it provided to Yankton for terminating the relationships with Plaintiffs were not supported by the contracts or the facts. PSUF 27-37, 44-49.

NCIC's interference with Plaintiffs' business relationships with Yankton was not accidental or isolated. NCIC made similar false, misleading and disparaging statements to Plaintiff's other customers while marketing NCIC's services, including to Davison County and elsewhere. PSUF 57-65. NCIC normally provided draft termination letters to counties it was soliciting for business. Those draft termination letters included the false accusation that Plaintiffs were violating FCC regulations and charging illegally-high rates. PSUF 65. NCIC – a direct competitor – made false statements in sales and marketing communications to Yankton and other actual or prospective customers (like Davison County), for the purpose of influencing those customers to purchase NCIC's goods and services instead of Plaintiffs' goods and services. PSUF 62-66.

To determine whether interference is improper, South Dakota courts (and fact-finders) consider the non-exhaustive factors drawn from the *Restatement (Second) of Torts*, §766B (1979). These factors include the nature of the actor's conduct; the actor's motive; the interests of the other with which the actor interferes; the interests sought to be advanced by the actor; the social interests in protecting freedom of action by the actor and the business interests of the other; the proximity

10

or remoteness of the actor's conduct to the interference; and the relations between the parties. *Qwest Communs. Corp. v. Free Conferencing Corp.*, 837 F.3d 889, 895-896 (8th Cir. 2016). *See Gruhlke v. Sioux Empire Fed. Credit Union*, 756 N.W.2d 399, 408 (S.D. 2008).

NCIC's interference was intentional, was not justified, and was improper. NCIC knew it had to convince Yankton to improperly terminate its relationships with Plaintiffs. NCIC knew that unless it could induce Yankton to end its relationships with Plaintiffs, it would not be able to gain it as a client. NCIC repeatedly made the very damaging and false statement that Plaintiffs were violating the law and charging unlawfully high communications rates without conducting any investigation whether the allegation was true. It included this very damaging, false statement in all of the communications NCIC drafted for Yankton. PSUF 16-49. NCIC told Yankton that Plaintiffs were "lying" when they denied violating the law. PSUF 41. It recognized that what it was doing – convincing Yankton to terminate early – could result in NCIC being sued (as happened). *See* PSUF 19-20.

NCIC's repeated statements – that Plaintiffs were violating the law – were false. Plaintiffs were always in compliance with FCC pricing regulations. PSUF 44-48. NCIC has no evidence proving otherwise. Its expert witness made no attempt to even address the question. NCIC's expert witness does not counter in any way Plaintiffs' evidence that they always complied with FCC pricing regulations.[5] *See* PSUF 49. Plaintiffs' evidence that they were not violating FCC regulations is unrebutted.

Thus, NCIC intentionally and deliberately made false statements regarding its competitors' alleged non-compliance with the law. It intentionally directed those false statements repeatedly to

---

[5] Plaintiffs have filed a *Daubert* motion to exclude entirely NCIC's expert witness. *See* Docs. 194, 195, 197. Even if the Court does not grant Plaintiffs' motion to exclude, NCIC still has no evidence to counter Plaintiffs' proof that NCIC's statements that Plaintiffs were charging illegally-high rates were false, because NCIC's expert never addressed that question. *See* PSUF 49; Doc. 195 at 9-10.

Yankton's decisionmakers to induce Yankton to terminate its business relationships with Plaintiffs. It succeeded. No evidence exists to excuse NCIC for making these false statements. NCIC has not offered any justification. Based on the undisputed evidence, Plaintiffs are entitled to summary judgment on this element of their claims for tortious interference. No reasonable fact-finder could conclude otherwise.

> D. <u>NCIC's Interference Caused Yankton to Terminate Its Business Relationships with Plaintiffs</u>.

Yankton's decision to terminate its business relationships with Plaintiffs was based on NCIC's false and damaging representations and statements regarding the legality or propriety of Plaintiffs' telephone communication rates. PSUF 42. Indeed, given NCIC's constant drumbeat of false assertions over many months – that Plaintiffs were violating the law by overcharging Yankton – no reasonable juror could fail to find that NCIC's interference caused Yankton to end its business relationships with Plaintiffs. *See* PSUF 16-43, 50-53. Plaintiffs therefore are entitled to summary judgment on this element of their claim for tortious interference.

## II. **Plaintiffs are Entitled to Partial Summary Judgment on Their Claim for Violation of the Lanham Act.**

In Count VII of the Amended Complaint, Plaintiffs each assert a claim against NCIC for violation of the Lanham Act, 15 U.S.C. §1125(a)(1)(B), for making false and misleading statements regarding their business operations and services in connection with the marketing and sale of NCIC's goods and services. *See* Doc. 28, ¶s 106-112. Specifically, NCIC repeatedly told Yankton that Plaintiffs were law-breakers charging telecommunication fees in excess of those permitted under applicable FCC regulations. *See id.*, ¶39.

To establish their claim for a violation of §1125(a)(1)(B) of the Lanham Act, Plaintiffs must prove by a preponderance of the evidence that: (1) NCIC made false or misleading statements of fact about the commercial activities of Plaintiffs or their goods and services in commercial

advertisement; (2) the statements actually deceived or had the tendency to deceive; (3) the false or misleading statements were material, meaning they likely influenced Yankton's decision to terminate prematurely its business relationship with Plaintiffs; (4) NCIC made the false statements in interstate commerce; and (5) Plaintiffs suffered damages as a result. *See, e.g., Buetow v. A.L.S Enters., Inc.*, 650 F.3d 1178, 1182 (8th Cir. 2011); *United Indus. Corp. v. Clorox*, 140 F.3d 1175, 1180 (8th Cir. 1998); *Willis Elec. Co. v. Polygroup Macau Ltd.*, 437 F. Supp. 3d 693, 711-712 (D. Minn. 2020); *Rainbow Play Sys., Inc. v. Backyard Adventure, Inc.*, 2009 U.S. Dist. LEXIS 93623, at *17-18 (D.S.D. Sept. 28, 2009).

Plaintiffs are entitled to partial summary judgment on Count VII because the undisputed facts establish elements (1) through (4).[6] No reasonable juror could find otherwise.

A. NCIC Made False Statements About Plaintiffs' Commercial Activities in Commercial Advertisement.

The Lanham Act prohibits false or misleading statements about products and services, and also statements about "commercial activities." 15 U.S.C. §1125(a)(1)(B). *See, e.g., Microstar Logistics LLC v. Cavalier Distrib. Co.*, 2025 U.S. Dist. LEXIS 46968, at *7 (S.D. Ohio Mar. 14, 2025); *Embroidery Library, Inc. v. Sublime Stitching, LLC*, 2010 U.S. Dist. LEXIS 4094, at *7-8 (D. Minn. Jan. 20, 2010); *Insignia Sys. v. News Am. Mktg. In-Store, Inc.*, 2007 U.S. Dist. LEXIS 76161, at *18 (D. Minn. Sept. 28, 2007). The scope of "commercial activities" is broad. Courts have defined "commercial activities" to encompass "'commercial transactions' or all activities surrounding the peculiar 'commerce' of a company...." *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1271-72 (10th Cir. 2000). *See, e.g., Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 801 (6th Cir. 2015) (broadly defining "commercial activities" under the Lanham Act); *Porous Media*

---

[6] Again, Plaintiffs leave for trial determination of the amount of damages each suffered as a result of NCIC's wrongful conduct, as well as the question of whether or not NCIC acted willfully or intentionally. *See* Doc. 28, ¶112.

*Corp. v. Pall Corp.*, 173 F.3d 1109, 1120 (8th Cir. 1999) (same). False statements that a competitor is engaged in illegal activities relate to commercial activities and so are actionable under the Lanham Act. *Insignia Sys.*, 2007 U.S. Dist. LEXIS 76161, at \*17-18. *See, e.g., Microstar Logistics*, 2025 U.S. Dist. LEXIS 46868, at \*9-10 (statements competitor owed large debts and refused to pay them actionable); *Am. Achievement Corp. v. Jostens, Inc.*, 622 F. Supp. 3d 749, 770 (D. Minn. 2022) (statements in contract bids actionable).

"Commercial advertising or promotion" is also broadly defined. "A statement is made in a commercial advertisement if the representations are commercial speech, made by a commercial competitor, for the purpose of influencing consumers to buy that competitor's goods." *My Pillow, Inc. v. LMP Worldwide, Inc.*, 331 F. Supp. 3d 920, 934 (D. Minn. 2018). The "definition of commercial speech applies to more than just the typical type of advertising." *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 667 F. Supp. 2d 384, 456 (D.N.J. 2009) (citing cases holding trade magazine articles, informational pamphlets, non-profit fundraising letters, and former employee's badmouthing of employer as "commercial speech"). The Supreme Court has held that "commercial speech" encompasses "expression related solely to the economic interests of the speaker and its audience." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 422 (1993). Commercial advertising or promotion includes "communications between sales representatives and decisionmakers ...." *Am. Achievement Corp.*, 622 F. Supp. 3d at 770.

"Courts have consistently held that oral statements by a company's sales representative concerning a product constitute 'commercial advertising or promotion' under the Lanham Act." *Zeneca, Inc. v. Eli Lilly & Co.*, 1999 U.S. Dist. LEXIS 10852, at \*88 (S.D.N.Y. July 19, 1999). Even a single promotional presentation to an individual triggers the Lanham Act. *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1386 (5th Cir. 1996). *See, e.g., Mobius Mgmnt. Sys., Inc. v. Fourth*

*Dimension Software, Inc.*, 880 F. Supp. 1005, 1020 (S.D.N.Y. 1994) (single letter to potential customer could constitute "commercial advertising or promotion" under Lanham Act).

Here, NCIC repeatedly made false statements to Yankton asserting that Plaintiffs were charging illegal communication rates. NCIC also made these same false statements to Plaintiffs' other clients, in its attempts to persuade them to terminate their business relationships with Plaintiffs.

No dispute exists that NCIC's made the false statement that Plaintiffs were charging illegal rates. Plaintiffs' evidence proves the falsity of this assertion. *See* PSUF 23-26, 35-36, 38-41, 44-48. NCIC has no evidence to the contrary. NCIC's expert witness did not even attempt to determine the truth or falsity of NCIC's accusations. *See* PSUF 49. Yankton never independently investigated whether its statement was true. Rather, Yankton relied on NCIC for the accuracy of the statement. PSUF 37. Incredibly, NCIC made no attempt to determine whether the false claim that Plaintiffs were charging illegal rates was true before leveling the charge. PSUF 45. Therefore, as a matter of law, this Court should rule that NCIC's statements that Plaintiffs were charging rates in excess of those permitted under FCC regulations were literally false.

No genuine dispute exists that NCIC's false and damaging assertion that Plaintiffs were charging illegally high rates constitutes a claim about Plaintiffs' "commercial activities" under the Lanham Act. Courts previously have recognized that such statements fall within the scope of the Lanham Act. *See, e.g., Insignia Sys.*, 2007 U.S. Dist. LEXIS 76161, at *17-18. Asserting that a direct competitor in the correctional facility telecommunications industry is acting illegally is certainly a statement regarding the commercial activities of that competitor – the charge goes to the heart of how that competitor operates in a law enforcement-related industry. Again, NCIC has no evidence to suggest otherwise.

15

Finally, no genuine dispute exists that NCIC's false statements constitute "commercial advertising or promotion" within the scope of the Lanham Act. The statements were made by a direct commercial competitor of Plaintiffs – NCIC – with the purpose of influencing the potential clients (various correctional facilities) to decide to do business with NCIC and not Plaintiffs. NCIC falsely claimed that Plaintiffs were charging unlawful rates to Yankton and Davison counties in their attempt to convince them to terminate their existing relationships with Plaintiffs and to become NCIC customers. These statements were communicated by NCIC's director of sales and Midwest sales director to the decisionmakers at Yankton and Davison counties. *See* PSUF 17-25, 35-41, 57-66. NCIC knew it needed to convince Davison and Yankton counties to terminate their existing business relationships with Plaintiffs. *See* PSUF 17-20, 61-62. NCIC's efforts paid-off with Yankton. Yankton terminated its relationships with Plaintiffs and entered into a business relationship with NCIC. PSUF 43. NCIC's communication of the literally false claim regarding how Plaintiffs conducted their business (illegally) certainly constituted commercial advertising or promotion, particularly given the broad scope of that element of a violation of the Lanham Act.

NCIC has no evidence to suggest that its false statements were not regarding Plaintiffs' "commercial activities" or that those statements were not made in the context of "commercial advertising or promotion." Plaintiffs are entitled to summary judgment as a matter of law on this element of their Lanham Act claims.

## B. NCIC's False Statements Deceived or Had the Tendency to Deceive Yankton.

False statements, such as NCIC intentionally made regarding Plaintiffs' claimed violations of FCC regulations, are entitled to a presumption that the statement deceived the recipient. *See, e.g., United Indus.*, 140 F.3d at 1180; *Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329, 1333 (8th Cir. 1997); *Microstar Logistics*, 2025 U.S. Dist. LEXIS 46968, at *7-8; *Watson v. Olson*, 2023 U.S. Dist. LEXIS 237897 at *12 (W.D. Mo. Apr. 10, 2023). Because NCIC's statements that

16

Plaintiffs were charging illegally high rates were demonstrably false, Plaintiffs have established this element of their Lanham Act claim and thus their entitlement to summary judgment.

Additionally, even if they are not entitled to the presumption of deception, NCIC's false statements certainly had a tendency to deceive. In the context of providing services for inmate communications to a jail facility, telling a correctional facility that its services provider was violating the law by charging illegally high rates certainly has a tendency to deceive. NCIC spoke with a patina of authority and repeatedly said that Plaintiffs were – and had been – engaging in unlawful conduct. *See* PSUF 23-28, 33, 35-40. NCIC even told Yankton that Plaintiffs were "lying" when Plaintiffs showed they were not charging rates in violation of FCC regulations. PSUF 41. NCIC's repeated false statements and accusation of "lying" had a tendency to, and did, deceive Yankton, and destroyed Plaintiffs' business relationships with Yankton.

C. NCIC's False Statements were Material.

If a competitor's statement is literally false, courts in the Eighth Circuit may presume the materiality element is established. *See, e.g., United Indus.*, 140 F.3d at 1179-1180; *Surdyk's Liquor, Inc. v. MGM Liquor Stores, Inc.*, 83 F. Supp. 2d 1016, 1027 (D. Minn. 2000). As shown above, NCIC's statement that Plaintiffs were charging rates in excess of those allowed by FCC regulations was literally false. *See* PSUF 44-49.

Regardless, no genuine dispute exists that such a false statement – alleging illegal conduct by a competitor and communicated to the competitor's existing clients – would likely influence the decisions of a reasonable correctional facility (as here). *See Skil Corp. v. Rockwell International Corp.*, 375 F. Supp. 777, 779-80 (N.D. Ill. 1974) (first enunciating materiality element). Here, Yankton's decision to terminate its business relationships with Plaintiffs was based on NCIC's representations and statements regarding the legality or propriety of Plaintiffs' telephone communication rates. PSUF 42. Yankton relied on the accuracy of NCIC's statements and did not

conduct any investigation to determine their accuracy. PSUF 33, 37. NCIC made no attempt to verify the truthfulness of its claim that Plaintiffs were charging illegal rates before making the untrue statement. PSUF 45.

Finally, in the context of conducting business with a law-enforcement-related entity (Yankton and Davison counties), asserting that their current communications facility provider is acting unlawfully indisputably is a material statement. NCIC has no evidence to the contrary. Plaintiffs are entitled to summary judgment on this element of their Lanham Act claim.

D. NCIC Made the False Statements in Interstate Commerce.

No genuine dispute exists regarding this element of Plaintiffs' claim under the Lanham Act. NCIC's false and misleading statements were made repeatedly via emails sent from Texas and Minnesota to Yankton and Davison County (among others) in South Dakota. PSUF 67. Sending emails from one state to another satisfies the interstate commerce requirement for purposes of the Lanham Act. *See, e.g., Grubbs*, 807 F.3d at 803 ("the very act of sending an email creates the interstate commerce nexus"); *Doe v. Smith*, 429 F.3d 706, 709-710 (7th Cir. 2005) (internet communications satisfy interstate commerce requirements). *See also Christian Faith Fellowship Church v. Adidas AG*, 841 F.3d 986, 991-995 (Fed. Cir. 2016) (Lanham Act reaches full scope of Congress's commerce power and even minimal interstate activity satisfies the statute). Plaintiffs are therefore entitled to summary judgment on this element of their Lanham Act claim.

**CONCLUSION**

For the foregoing reasons, Plaintiffs Reliance Telephone of Grand Forks Incorporated and Reliance Systems, Inc. respectfully request that the Court grant their motion for partial summary judgment in its entirety.

18

Dated: June 15, 2026.

Patrick L. Sealey, SD Bar # 2465
HEIDMAN LAW FIRM, P.L.L.C.
1128 Historic Fourth Street
P.O. Box 3086
Sioux City, IA 51102
Tel: (712) 255-8838
Fax: (712) 258-6714
Email: Patrick.Sealey@heidmanlaw.com

and

Alan M. Anderson (MN Bar #149500)
(admitted *pro hac vice*)
L. Reagan Florence (MN Bar #0396468)
(admitted *pro hac vice*)
ALAN ANDERSON LAW FIRM LLC
11100 Wayzata Blvd., Suite 545
Minneapolis, MN 55305
Tel: 612-756-7010
Fax: 612-756-7050
Email: aanderson@anderson-lawfirm.com
        LRForence@anderson-lawfirm.com

*Attorneys for Plaintiff Reliance Telephone of Grand Forks Incorporated and Reliance Systems*

19