# EXHIBIT C

*Reliance Telephone, et al. v.*
*Yankton County, et al.*

Scott Baniecke
Vol. 1
August 5, 2025



*Audrey M. Cook, RPR*
*audrey@paramountreporting.com*
*605.321.3539*

Min-U-Script® with Word Index

Page 25

Craig -- many years ago when I first started.

Q   Do you recall how many different versions Mr. Storer or somebody from the company provided you?

A   I do not recall how many versions.  I don't remember.

Q   Do you keep these -- are there -- how many different versions are there, if you recall?

A   I don't think there are versions.  I think that's just one that I have that I've used to provide to other facilities when they requested it or I thought it would be beneficial for them instead of having to re-create the wheel, if you will.

Q   So if the facility asks for a -- something, you provide this draft to them?

A   It's just a draft form, yes.  It's not --

Q   Have --

A   -- anything different than a draft.

Q   Have you provided this form termination to customers without them asking for it first?

A   No, not that I can recall.

Q   So essentially, you only provide the form of termination if they ask for it; is that fair?

A   Form of a termination or notice of nonrenewal, yeah. There's, I think, two different versions of verbiage within those two documents.

Q   When a potential customer or client tells you that they

Page 26

want to terminate an existing contract with a provider, do they provide you with reasons why they want to do it?

A   Yes, they have.

Q   Do you make any effort to determine whether those reasons are valid?

A   No.  That's up to them.

Q   Do you ever ask anyone internally at NCIC about reasons that a potential customer has provided to you and whether they are valid?

A   Will you say that again, please.

Q   Sure.  Have you ever asked anyone in -- anyone within NCIC whether reasons that a potential customer has provided to you for termination -- whether, in their view within NCIC, it was -- those are valid reasons?

A   Not that I can recall.  It may be in conversation or passing I've asked questions about it, but as far as providing them a document, no.

Q   Have you ever told a potential customer that their current provider was charging them fees in violation of FCC regulations?

A   I have told potential customers that their fees are outside the regulated posted FCC costs, yes.

Q   On how many occasions?

A   I don't recall.

Page 27

Q   Is it more than 10?

A   Probably more than 10, yes.

Q   More than 25?

A   If -- if -- I -- I can't answer that.  That's a -- that would be -- there's no record of me ever talking to that many clients about that, but --

Q   Well, what --

A   We have a lot of -- we have a lot of clients that I've talked to, so -- or potential clients I've talked to.

Q   What sort of research or investigation do you do, if any, prior to telling a potential client that the cost they are being charged is outside those permitted by FCC regulation?

A   Well, generally every facility has their inmate communications cost posted on their website or on their handbook of some kind, so it's a public record to look at, to see what they're being charged.

Q   That's in the facility's documentation?

A   Or on their public-facing websites.

Q   Just so I'm clear, the facilities' websites, correct?

A   Yes.  There's also the websites of the current vendors that post those fees for facilities.

Q   Are you familiar with an entity known as Reliance Telephone of Grand Forks Inc., more commonly known as Reliance Telephone?

Page 28

A   Yes, I know who they are.

Q   How long have you been aware of -- and if I refer to them as Reliance Telephone, shortened word, can we agree that I'm referring to Reliance Telephone of Grand Forks Inc.?

A   Works for me.

Q   Okay.  How long have you been aware of Reliance Telephone?

A   Well, since we started -- since I started attending conferences, they've been generally at every -- just about every conference that I've attended.  So...

Q   So that would be in 2018?

A   2018.

Q   What is your understanding of what Reliance Telephone's business is?

A   My understanding is they provide an inmate communication service to jail facilities.

Q   They are a competitor of yours?

A   Yes.

Q   Do you know what type of -- or what nature their inmate tele- -- telephone communication services are that they provide?

A   In general --

Q   Yes.

A   -- I do.  I know they provide a phone service, and I

Page 33

A    The only one that -- well, we changed over -- just recently Edmunds County signed with us. That was a Reliance customer. And, of course, Yankton County.

Q    Was Edmunds County at the end of the term of the contract?

A    Yes.

Q    Yankton County was not at the end of the term of the contract, correct?

A    Correct.

Q    At the time you first -- or strike that.

     Did you approach Yankton County about becoming a Reliance customer?

A    No.

Q    They approached you?

A    Correct.

Q    When did they approach you?

A    I think the first time I met with folks from Yankton County was at a South Dakota Sheriffs Conference in -- I can't remember where that was. I think it was in Aberdeen. It was 2022, I believe. I'm not sure of the exact location.

Q    I'll hand you a document that's been marked previously, sir, in this matter as Exhibit 27. It's a series of emails. Please take a moment to look at Exhibit 27, and tell me when you are finished looking over it.

Page 34

A    (Examines document.)

     Okay.

Q    Have you seen the emails in Exhibit 27 previously, sir?

A    Yes.

Q    And you sent or received them, to the extent they are addressed or copied to you, on or about the dates indicated?

A    Yes.

Q    Okay.

A    There's one seems to be missing, but I don't know.

Q    That's how it was produced.

A    Yeah.

Q    If you'd turn to the last page, please, sir. That is an email from you to a Mr. Todd Brandt, with a copy to Mr. Storer, on March 29, 2023. Do you see that, sir?

A    Uh-huh.

Q    And the subject is "Contact info."

A    Yes.

Q    Do you see that?

A    Uh-huh.

Q    Is that a yes?

A    Yes.

Q    Okay. Do you recall why you were apparently sending an email to Mr. Brandt on March 29th of 2023 with your contact info?

Page 35

A    I believe he gave me a phone call prior to me sending that information. Additionally, I met with his, I believe, sergeant, Tonna Pope (phonetic), I believe is how you pronounce the name correctly, at a jail conference prior to this where we gave them a series of marketing materials for them to look at, and we had a discussion about our services at that time with Tonna Poppe.

Q    All right. With regard to the meeting with Ms. Poppe, do you remember what conference that was or when?

A    South Dakota Sheriffs Conference.

Q    Do you recall when?

A    I believe that was in the fall of '22.

Q    Do you recall what Ms. Poppe said to you at that time?

A    I believe, if my memory served me correctly, she had said that they had some difficulties with their current provider and were looking at other options.

Q    Anything else that you recall her telling you at that time?

A    Not off the top of my head. It was many years ago, so I would be just guessing at that point.

Q    Was Mr. Storer present on that occasion?

A    I don't remember if he was there or not. I think he was there. I believe he was there.

Q    Was anyone else from NCIC present?

Page 36

A    No.

Q    Did Ms. Poppe tell you how long of a term remained in their contract or contracts with Reliance Telephone?

A    I don't recall, at that time, talking --

Q    Just don't recall one way or the other?

A    No.

Q    Were you ever told how much time were left in the contracts with Reliance Telephone?

A    Ever? I mean, I'm aware of there was an early contract out, if you're -- but as far as actual time left within the contract, no.

Q    What do you mean by "early contract out"?

A    They were not out of contract when they -- when we took over the service from Reliance.

Q    With respect to the email that's on the last page of Exhibit 27, it's your recollection that Mr. Brandt called you?

A    Correct.

Q    And what do you recall Mr. Brandt asking from you, if anything?

A    I remember him calling and said that he had received literature from us and was checking if we could spend more time explaining or demoing our product to him.

Q    Okay. Anything else that you recall?

A    At that time, no.

Page 41

A   Not exactly.

Q   How about approximately?

A   At least over an hour.

Q   At -- during this meeting, did anyone from Yankton County tell you that their existing service provider was Reliance Telephone?

A   Yes, they did.

Q   Do you recall who?

A   They all did, all of the staff. Tonna Poppe, the other sergeant that was there, and Todd Brandt discussed Reliance Telephone.

Q   What did they tell you with regard to Reliance Telephone at that time?

A   They said that they were unhappy with the services that they were being provided by Reliance.

Q   Did they provide you with any more -- any further additional specifics?

A   We discussed the inability to have things fixed, how long it took to get resolution to some of what they called complaints or tickets that they had sent in to Reliance, and they discussed that the reliability of the system was poor.

Q   Anything else that you recall them mentioning?

A   We talked about our technologies and showed them our technologies as compared to what they had shown us that

Page 42

they had for facility -- for facility technology there.

Q   How did you show them NCIC's technology?

A   We did a demonstration of our tablet that we have. We provided them screenshots or computer access to looking at how our -- how our system looks.

Q   Did you provide any of that via email to them, like here --

A   We had sent them, previously, marketing information.

Q   Okay. I guess perhaps I made an assumption that I shouldn't have. The marketing information that you sent to them, did you send that to them by email?

A   I provided marketing documentation during the first meeting with Tonna at the conference, and then we also sent marketing information via email to Mr. Brandt, I'm sure. I think I even reference that in here somewhere.

Q   Do you recall when you sent the marketing information to Mr. Brandt?

A   I don't recall, but it was during this time frame. Oh, it was right here: "I'm attaching several marketing slicks," dated March -- well, that's from Craig. March 31st of 2023.

Q   That's the next email.

A   Uh-huh.

Q   Is that correct?

A   Looks like the next email, correct.

Page 43

Q   All right. And do you know what those marketing slicks are?

A   Yes.

Q   Do you -- what are they?

A   It's a series of documents that represent the technologies that we have available. We present them at conferences, at our exhibit table, routinely.

Q   Did you provide Mr. Brandt or anyone from Yankton County with links to these videos or screenshots that you mentioned showing to them while you were there?

A   No, not links to them.

Q   So if I understand correctly, while you were there on April 11th, you had a demonstration device and you showed them stuff on that?

A   Correct.

Q   You didn't leave it with them?

A   No.

Q   At the time that you met with -- in person with Mr. Brandt on April 11th, was that your first in-person meeting with him?

A   I believe so.

Q   During this initial in-person meeting, did they tell you anything about the terms of their contract or contracts with Reliance Telephone?

A   I don't recall the terms coming up, no. Just that they

Page 44

were upset with the services that they were provide -- being provided.

Q   If you'd look at the email on the bottom of the first page, it's from Mr. Storer to Mr. Brandt, with a copy to you, on April 11th. Do you see that, sir?

A   Yes.

Q   And in the email, Mr. Storer, in his last full paragraph, indicates he's "taking a group of folks, (including some Minnehaha County guys) to a steakhouse in Deadwood this evening and we'd be pleased if Sheriff Crissey would like to join us." Do you see that?

A   Yes, I do.

Q   Was that in connection with the sheriffs conference?

A   Yes. I believe that is correct.

Q   Do you recall whether Mr. -- whether Mr. Crissey joined you?

A   I don't recall if he was there or not. We have a -- we had a big group. We generally take a large number of sheriffs out for dinner at conferences.

Q   At the sheriffs conference in Deadwood -- strike that.
    At the sheriffs conferences that you've attended where NCIC was there, do they offer all-expense-paid weekends fishing at a facility in Texas to --

A   No. They don't offer that.

Q   Okay. What do they do?

Page 45

A   We have a drawing to attend a fishing trip, if you will, to a bay house that's owned by Mr. Pope and the company. Everyone can put their name in a hat and be drawn out. Not necessarily sheriffs. It's jail staff or whoever is in attendance, chief deputies.

Q   Do you know the value of this trip?

A   I do not know. I don't pay the bills.

Q   Do you recall that it is an all-expense-paid weekend trip for four individuals, including whoever gets it?

A   I believe it's for four individuals, including the person who receives it.

Q   And that it's all expenses paid?

A   As far as I'm aware, we cover their airfare from the closest airport and then lodging and rental car fees, yeah, and food.

Q   So it's all expenses paid?

A   Well, I guess, if -- if that's what you define "all expenses," I guess.

Q   And at the -- at the time of the conference in April of 2023, Yankton County was an active potential customer for NCIC, correct?

A   Can you repeat that?

Q   Sure. At the time of the sheriffs conference --

A   Which sheriffs conference?

Q   The one in Deadwood of April of 2023.

Page 46

A   Okay.

Q   At that time, Yankton County was an -- was an entity that you were active- -- actively working on to try to get them to switch to NCIC?

A   You know, we just met with them prior to that conference.

Q   So the answer is yes?

A   Well, of course, we had, previously, yes.

Q   All right. And --

    MR. MOSER: Object to the form of the question. I don't think he answered the question that you asked there.

BY MR. ANDERSON:

Q   Well, would you agree with me that at the time -- at that time, in April of 2023, you were actively trying to get Yankton County to become an NCIC customer?

A   We had previously met with them and provided them a demonstration of our products.

Q   That was literally on the day that the conference started, April 11th of 2023, correct?

A   I'm not exactly sure if it was that day or shortly after, but very close to that day.

Q   Well, we saw a reference to you meeting with them on April 11th.

A   Yes.

Page 47

Q   Okay. And that was when you did the demo, correct?

A   Correct.

Q   And that was also the first day of the Deadwood conference, was it not, sir, in 2023?

A   I -- if you say so. I don't know the exact date of -- I can't recall the exact date of the conference starting. But sometimes we don't go until a day into the conference, so it may have actually started on the 10th.

Q   Okay. Well, if you look at the email on the middle of the page that we looked at, from you to Mr. Brandt, dated March 31st, you indicated that Mr. Storer and you were heading out to the South Dakota Sheriffs Conference on April 11th. Do you see that?

A   I do see that.

Q   Does that refresh your recollection that the sheriffs conference started on or about that date in 2023?

A   Yes. The sheriffs conference started on or about that date.

Q   Okay. And so as of that time, Yankton was an entity that you were soliciting to try to become an NCIC customer, correct?

    MR. MOSER: Objection. Asked and answered.

BY MR. ANDERSON:

Q   You can go ahead.

Page 48

A   We were providing them information of our services at that time.

Q   You wanted them to become an NCIC customer, didn't you?

A   We want all of our potential clients to become an NCIC customer.

Q   That would include Yankton in this case, correct?

A   In this case, yes.

Q   And at the time that you -- at that time, as of April 11th, you knew that Yankton's current provider was Reliance Telephone, correct?

A   Yes, we did know that.

Q   Did you know that Reliance Telephone was Yankton's provider prior to that meeting with Mr. Brandt when he told you?

A   I would assume I was aware that Reliance was a customer -- that was their provider, yes, prior to that.

Q   Okay. And what makes you say that you would assume that?

A   Because we've had conversations prior to that April 11th date.

Q   That'd be the March 29th email?

A   That, and meeting with their staff at our exhibit table at conferences prior to that, even.

Q   Well, you've mentioned meeting Ms. Poppe in the fall of

Page 53

MR. ANDERSON: Let me just do one other thing here.

What's the next exhibit number?

THE COURT REPORTER: 97.

MR. ANDERSON: I'm sorry?

THE COURT REPORTER: 97.

(Exhibit 97 is marked for identification.)

MR. ANDERSON: That's mine.

MR. MOSER: Oh, I'm sorry.

MR. ANDERSON: Yours is there. Nice try.

MR. MOSER: Sorry.

BY MR. ANDERSON:

Q   Sir, I'd like you to look at what's been marked Exhibit 97. It has production numbers NCIC-003947 to 48. Please take a moment to look at Exhibit 97, and tell me whether you recall having seen the series of emails on those two pages. And for the record, it's NCIC-003947 to 48 -- I already said that.

A   (Examines document.)
Yes, I've received and reviewed this.

Q   All right. On the first page there is an email from Mr. Storer to you on December 1st of 2023 in which, in the second paragraph, he asks you "Scott, do you have them? There were two separate (concurrent) agreements covering Reliance's services @" -- "at" sign --

Page 54

"Yankton." Do you see that?

A   I do see that.

Q   And then, in response, you said to him, on the same date, "Yes, I should have them. Need to get back to my archives first so will be 45 minutes or so."

A   Uh-huh.

Q   Do you see that?

A   I do see that.

Q   All right. Does that refresh your recollection that you had copies of the contracts?

A   I may have had them at some point in time. I don't remember if I was able to find them, actually.

Q   Okay.

A   But if I did, I would have forwarded them to him, so then I would have had a copy of them from somewhere.

MR. ANDERSON: Okay.
Would you mark that as the next exhibit, please.
(Exhibit 98 is marked for identification.)

BY MR. ANDERSON:

Q   Sir, I'm going to hand you what's been marked as Exhibit 98. It has production numbers NCIC-003945 to 46. Please take a moment to look at the exhibit, and tell me whether you recall having seen them previously.

A   Apparently I did see them previously because I said I sent them.

Page 55

Q   Okay. So you've seen the emails in Exhibit 98?

A   Yes.

Q   Okay. And in the first email on the page -- first page, you -- it's from you to Mr. Storer and Mr. Pope.

A   Uh-huh.

Q   Do you see that?

A   I do see that.

Q   On December 1st of 2023, correct?

A   Correct.

Q   And you then say "Here is the Reliance contract that I have as well as the letters from them and their attorney. I have included our contract for convenience/reference as well." Do you see that?

A   Yes.

Q   And then there's a document attachment, a PDF -- actually, two PDFs. Do you see that?

A   I do.

Q   Well, I take that back. There is four attachments.

A   Correct. Four.

Q   Okay. So does seeing this email refresh your memory that you had received the contracts?

A   Yes, it does.

Q   And do you recall or are you able, from seeing this email that you sent to Mr. Storer and Mr. Pope, when you received those contracts?

Page 56

A   I don't recall when I received them.

Q   Do you recall from whom at Yankton County you received them?

A   Unfortunately, I do not recall. I may have been provided a copy, now that I read this, from Mr. Brandt during one of our meetings.

Q   All right. Do you recall when that was?

A   Well, the only meeting I had with him in person would have been in April of 2023.

Q   That April 11th --

A   Yeah.

Q   -- meeting? That was your only in-person meeting with Mr. Brandt?

A   I believe so.

Q   Based on the fact that you had copies of the contracts and that being your only in-person meeting, is your best -- is it your best recollection, as you testify here today, that Mr. Brandt handed you or provided you with copies of the contracts at that time?

A   He either provided them at that time or he apparently sent them to me, because obviously I had them.

Q   Do you recall whether he sent them to you as attachments to an email?

A   That, I don't recall.

Q   Just don't recall one way or the other --

Page 57

A   No.

Q   -- sir?

A   Apparently I had them, but I don't remember how I got them.

Q   Okay.

MR. ANDERSON: We can take a break now.

THE VIDEOGRAPHER: The time is 1502. This is the end of Media Unit Number 1. We're off the record.

(Recess taken from 3:02 p.m. to 3:20 p.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 1520. This begins Media Unit Number 2.

Go ahead, Counselor.

BY MR. ANDERSON:

Q   Mr. Baniecke, before we took the break, we looked at a couple of exhibits that showed that you had the Reliance contracts and you provided them to -- excuse me -- Mr. Pope in December -- on December 1st of 2023.

A   Correct.

Q   Do you recall providing them to Mr. Storer at or about the time that you recall receiving them from Mr. Brandt, either in person or via email, back in April -- or excuse -- yeah --

A   I don't recall, but generally I would have provided them to both Bill and Craig.

Q   Okay. Well, with respect to Mr. Pope, in the email on

Page 58

the -- in the middle of page -- of the page on Exhibit 97 or 98, he says that "I don't have a copy of the contract." Do you see that? Mr. Pope?

A   Yes.

Q   Okay. So would you -- do you have a recollection of providing copies of the contracts to Mr. Pope prior to your email back, attaching them, on December 1st?

A   No, I would -- that would have been the only time I provided them to him.

Q   All right.

A   On December 1st, via email.

Q   With regard to Mr. Storer, do you recall whether he received them directly from Mr. Brandt or whether you provided them with Mr. Brandt, or don't you recall?

A   I don't know if Mr. Storer received them in any other fashion, but he is included in the email to Craig on that date. So Craig and Bill would have gotten them.

Q   Okay. In Mr. Storer's email, he -- also on December 1st, he says "I went all the way back through my Yankton folder, thought I had the Agreements handy but apparently don't. I know we had access to them at one point." Do you see that, sir?

A   Yes.

Q   Does that refresh your recollection at all as to whether you provided those contracts to Mr. Storer

Page 59

prior to December 1st of 2023?

A   As far as I'm aware, the only time I provided them was on December 1st of 2023 to Bill and Craig --

Q   All right.

A   -- via email.

Q   Okay. Do you have any recollection, from the meeting that you had with -- the one meeting that you had with Mr. Brandt, that he provided, at that time, copies of the contracts by hand to you and Mr. Storer?

A   I don't recall, honestly, if he gave them to me in person that day or if he sent them via email, but apparently we got them.

Q   All right. Would it be fair to say that whether in person or by email, you certainly had contract -- copies of the contracts? Correct?

A   Correct.

Q   And would it also be your belief that Mr. Storer had copies of the contracts?

A   My belief would be yes, he had copies of the contracts.

Q   So it'd be fair to say that at least by April 11th of 2023, you and Mr. Storer were aware of the contracts with Yankton and Reliance Telephone and Reliance Systems, based on what you've seen here today so far.

A   I don't know if I could say exactly if April I received them, but obviously prior to December 1st of 2023 I

Page 60

received them.

Q   I'm going to hand you a document marked previously in this matter as Exhibit 28. It is a copy of two contracts between Yankton County and Reliance Telephone and Reliance Systems. Please take a moment to look at Exhibit 28, and tell me whether you recognize those as copies of the contracts between Reliance Telephone and Systems and Yankton County that you have seen -- or had seen previously.

A   (Examines document.)

I don't recall if this is the exact document that I received. I can't see that from the PDF number on here, if this is the exact one or not. And very well could be.

Q   Okay. If you'd look at the Bates -- if you down in the lower right-hand corner, there are things we lawyers call Bates numbers.

A   Uh-huh.

Q   And go to the one that's numbered 2324, please, sir.

A   Yes.

Q   This is a contract between Reliance Systems and Yankton County. Do you see that, sir?

A   Yes.

Q   And looking at this particular contract, do you recall having seen it previously during the time that you were

Page 61

trying to get Yankton County as a customer for NCIC?

A  Again, I don't know if this is the exact contract that I have seen via the PDFs or not, as it's being handed to you -- handed to me by you, but it appears to be that contract.

Q  Is it --

A  I don't have them to compare side by side.

Q  Okay.  Do you -- looking at that page, 2324 of Exhibit 28, do you recall that the term of this contract between Yankton and Reliance Systems ended five years from December 2nd of 2022 [sic]?

MR. MOSER: Objection.  Can you repeat that question again?

MR. ANDERSON: I can restate it because it was a bad question.

BY MR. ANDERSON:

Q  Looking at this contract, do you see in sub- -- in paragraph B it has an effective start date of the 2nd day of December 2020?  Do you see that, sir?

A  Yes.

Q  And if you look a couple of lines above there, it says that the term is five years.  Do you see that?

A  Yes.

Q  Do you recall learning in or about April of 2023 that the term of this contract ended five years from

Page 62

December 2nd, 2020?

A  I do not recall.  That term came into question when we were demoing our product to them.

Q  Do you recall at some point in time the term of the contract did come into question?

A  No.

Q  Do you recall discussing any of the terms of this contract with anyone at Yankton County?

A  We discussed their level of service, but I don't recall discussing the terms of the contract with them as far as dates of the contract.

Q  Okay.  When you say "level of service," do you mean their -- or what do you mean, sir?

A  The services or lack of services in this case, that they were being provided by Reliance Ser- -- by Reliance Systems.

Q  Do you recall what the lack of services allegedly were?

A  They were complaining that they did not get any help from Reliance Systems or Reliance to fix their phones or to answer their questions or to help them with their -- what they called their tickets that they had submitted.  That was the gist of the conversations that I had with them, not on dates of contract.

Q  Do you recall discussing any of the terms in this contract with anyone at NCIC?

Page 63

A  I don't recall specifically, no.

Q  How about generally?

A  Generally speaking, if we received this contract, we would have looked at it and saw the terms of the contract, yes.

Q  And would that include the length of time remaining on the contract?

A  I'm sure it would have.

Q  Do you recall becoming aware that the contracts between Yankton County and Reliance Telephone and Reliance Systems did not end until December 2nd of 2025?

A  It states specifically right here that the contract was from five years dated from December of 2020.  So...

Q  My question is, do you recall becoming aware of that?

A  I don't recall becoming aware of it, no.

Q  Do you recall any discussions with Mr. Storer concerning the terms or the provisions in this contract?

A  I know we discussed the provisions of nonsupport.  I don't recall having a discussion with Craig about the actual dates of the contract.

Q  Do you recall having a discussion with Mr. Storer about anything other than the assertion of not -- by Yankton County that they weren't getting the support they wanted?

Page 64

A  Yes.  We also talked about the level of technology that we provide versus what Yankton County had from Reliance.

Q  Anything else?

A  No.

Q  All right.  What do you recall discussing concerning the level of technology that NCIC provided versus the level of technology Yankton County was receiving?

A  The level of technology that we provide includes many other systems, if you will, that Yank- -- that Reliance does not have or had not provided to Yankton County, some of which are mail scanning services; the educational services of our tablets; the what we call learn-to-earn system of our tablets, where inmates can take courses for free on a -- nonchargeable courses. They don't -- they have to actually do something productive on the devices, which they then earn time, where they can spend that time on movies, games, and what we call, in the industry, premium content.  They don't have to buy it.  There's no cost to them, there's no cost to the facility, and there's no cost to the family or friends.

Q  Anything else?

A  I said mail scanning.  We do document viewing on our devices.  Our law library, we discussed that, being

Page 69

Q   Okay.  Do you recall any discussions with anyone from Yankton concerning the terms of this particular contract between Reliance Telephone and Yankton?

A   I did not talk to anyone from Yankton about their terms of their contract.

Q   Okay.  Any conversations that you recall with Mr. Storer about the terms, other than what you've already testified to?

A   Yes.  We -- as stated previously, Craig and I talked about the terms of the contract.

Q   And that was with regard to the services, correct?

A   Correct.

Q   You did not talk -- when you say "terms," did you not talk about the length of time left --

A   I don't recall talking about the length of time.

Q   I'll hand you a document that's marked previously as Exhibit 30, sir.  It has production number NCIC-000300.  It's a -- well, strike that.
    Do you recall having seen this document previously?

A   Yes, it looks familiar.

Q   Do you recall --

A   I don't know if it was exactly this document but...

Q   Do you recall whether you provided this document to Mr. Brandt at Yankton County?

Page 70

A   I believe I provided a Termination of Service document to him, yes.  Draft.

Q   Is Exhibit 30 that draft?

A   I don't know.  I don't have the one I provided in front of me to compare.

Q   Did you provide it to him by email?

A   Yes.

Q   Did you -- were you able to locate that email in your search for emails to produce in this matter?

A   I -- if I did, I would have included it.

Q   Sure.  It's your recollection that you provided the -- provided it to Mr. Brandt by email?

A   Yes.

Q   Is this a -- what I'll call -- how much -- to what extent -- it appears that this is a form because it says "Attention <Insert Account Rep Name>" in a couple places here.  Do you see that?

A   Yes.

Q   So can you tell me whether this is the actual form termination letter that you have on -- that you have in your possession or whether you modified this document?

A   It looks like the draft form that I would have provided.  I don't believe I included Todd Brandt as the jail administrator because that -- we usually don't provide that naming on.  We just provide a draft, and

Page 71

they insert the appropriate remaining information --

Q   Okay.

A   -- usually on their own letterhead, if they want to do service to their provider.

Q   I will tell you that this document was produced from NCIC's files --

A   Yeah.

Q   -- based on the Bates number.

A   Okay.

Q   Does that refresh your memory about whether you provided --

A   I may have provided it, or Craig may have provided it, or -- I don't believe Bill provided it.  It was probably provided by Craig or I.

Q   The form termination letter that you have on your computer that you talked about before --

A   Uh-huh.

Q   -- did you provide or produce a copy of that in this case?

A   I assumed I did with all the documents that I sent.

Q   You don't recall?

A   I don't recall if this exact form was sent as a document that I provided or if Craig provided it.

Q   And just so we're clear, I'm talking not about Exhibit 30.  I'm talking about the form that you said

Page 72

you have on your computer.

A   Yes.  My computer form does not include names of individuals.  They're left blank.

Q   Okay.  It's your recollection that you provided the form to Mr. Brandt by email.

A   It's my recollection.

Q   Since you didn't -- you only met with him in person once, on April 11th, correct?

A   Correct.

Q   All right.  In this form letter it states, in the last sentence of the first paragraph, "Accordingly, I am providing formal notice of our intent to terminate the agreement ninety (90) days from today's date."  Do you see that, sir?

A   Yes.

Q   Do you know whether the contracts you had seen from Reliance Telephone and Reliance Systems provided a 90-day notice of intent to terminate?

A   From the documents that you've provided me today, I did not see that listed.

Q   From the documents that I provided you today, did you notice any provision that would permit termination prior to the expiration of the term of those contracts?

A   I didn't read the entire document you provided me, but generally speaking, there usually is a clause, when

Page 73

both people -- both parties agree on a contract, that there's an opt-out period of some kind, but I'd have to research the entire contract. I don't know if this is the entire contract from Reliance or not.

Q   Okay. Well, why don't you take a minute to go back to Exhibit 28.

A   Is this the entire contract from Reliance?

Q   It is actually several contracts from Reliance, so I'm going to direct you to the entire contract -- one of the two entire contracts that was in effect, which is at 2324 in the lower right-hand corner.

A   What is the difference between 2322 and 2324?

Q   2322 is an agreement from August 1st of 2016. 2324 is an agreement from -- it's dated August -- it was entered into August 18th of 2020, with an effective date of December 2nd of 2020. Does that answer your question, sir?

A   Yes and no. I don't know if this is specifically the entire contract that Reliance uses for their clients. I don't know that.

Q   Well, I will represent to you that the page 2324 is the entire contract between Reliance Systems and Yankton County. It's one of the two that are in issue in this case.

A   Okay.

Page 74

Q   My question is, could you just take a couple minutes to look through that page, and tell me whether you see any provision that permits termination prior to -- or termination prior to the expiration of the contract on December 2nd of 2025.

A   (Examines document.)
    Yes, it does state in this contract that -- "unless a notice is given by either party at least 30 days prior to the renewal date." So there would be a provision there, at least 30 days prior to the renewal date, to provide notice.

Q   Okay. And that's in a section -- or paragraph that says "This agreement shall be automatically renewed with the same terms and conditions for consecutive five (5) year periods, unless a notice is given by either party at least thirty (30) days prior to the renewal date." Did I read it correctly sir?

A   That's how I read it.

Q   So what you were referring to is 30 days' notice not to renew it for an additional five years.

A   You had asked me if there was any other provisions within the contract.

Q   I'm sorry. Do you see any provisions in this contract that permit termination prior to the end of the five-year term?

Page 75

A   Not in this document, no.

Q   Going back to Exhibit 30 that we were looking at, sir, this form notice, it has a date on it of April 15, 2023. Do you see that, sir?

A   Uh-huh.

Q   Is that a --

A   Yes.

Q   -- yes? Okay.
    Do you know -- did you have any discussions with Mr. Storer concerning providing this form Termination of Service notice to Yankton County on or about that date?

A   Yes.

Q   What do you recall of those conversations?

A   I asked him -- we discussed if he had a termination letter or if we should send a Termination of Service letter to -- to Yankton County, because they had requested one.

Q   So you asked Mr. Storer?

A   Yes.

Q   And when did -- or who from Yankton County requested a termination notice letter?

A   I don't -- don't recall them specifically requesting a termination letter from us. We provided that to them because they had asked for our assistance in getting

Page 76

out of their contract because of the lack of service and, yeah, the things that we discussed so far.

Q   Did they make this request to you or Mr. Storer or both?

A   I can't speak for Mr. Storer, but they requested our assistance in getting out of their contract for those reasons to me, I know that.

Q   And who is the "they"?

A   Todd Brandt and his staff at Yankton County.

Q   So it was Mr. -- was this a single conference or meeting with Mr. Brandt and others and yourself?

A   Going back to the April of 2023 meeting, there was multiple people within the conference at that time.

Q   Okay. So that was on your one meeting with Mr. Brandt and others at Yankton County?

A   Correct.

Q   And it's your testimony that all of them asked for assistance in getting out of their contracts with Reliance, correct?

A   They -- they had discussed the failures of Reliance with us and asked for our assistance in getting that corrected.

Q   And getting out of their contracts with Reliance, correct?

A   I don't recall the terms "getting out of their

Page 77

contract." I recall them talking about the lack of service that they were being provided by their current provider.

Q  Well, you testified several times before I said it that they wanted the -- they wanted assistance in getting out of their contracts. Do you recall that testimony, sir?

A  Yes, they did.

Q  Okay. And I think you said that you asked Mr. Storer if he had a form.

A  I'm sure we discussed which form that we should help them or provide them as a draft.

Q  Now, I thought you testified that you only had the one form for term- -- for early termination of the contract.

A  No, there's two. One is a Termination of Service and one is Notice of Nonrenewal.

Q  All right. So you understood that this was not a nonrenewal situation, this was a termination of the contract situation --

MR. MOSER: Objection.

BY MR. ANDERSON:

Q  -- is that correct?

MR. MOSER: Understood when?

Page 78

BY MR. ANDERSON:

Q  Understood in April of 2023.

A  Yes.

Q  And at the time that you provided this form to Mr. Brandt, do you recall any discussions with Mr. Storer concerning whether it was possible for them to terminate the contracts with Reliance Systems prior to the end of the term?

A  I know we've had that conversation, but I don't know when it occurred exactly.

Q  When you say "we," who do you mean?

A  Craig Storer and I had that conversation.

Q  Okay. With regard to this conversation which you don't recall exactly when it happened, what do you recall of what you said and what Mr. Storer said?

A  That the folks at Yankton County were not happy with the service that they were getting from their vendor and they wanted a new vendor and for the items that we've discussed previously.

Q  Did you have a -- do you recall any discussion with Mr. Storer concerning the fact that it was the middle of the term of the contract?

A  No.

Q  Did you ever have such a discussion with Mr. Storer?

A  It wasn't the point of us trying to help them with

Page 79

their services, so it wasn't a point we discussed.

Q  Ever?

A  Well, we've discussed it recently. I mean, we're discussing it now.

Q  Okay. Have you recently discussed it with Mr. Storer?

A  No.

Q  Have you discussed it ever -- the fact that it was the middle of the term with Mr. Pope?

A  Yes.

Q  When did you discuss that with Mr. Pope?

A  When I sent him the documents December 1 of 2023.

Q  What did --

A  I didn't -- let me rephrase that. I don't know if I spoke directly to Mr. Pope during that conversation. I believe I spoke to Mr. Storer during that time frame.

Q  Okay. During that time frame, did you speak with Mr. Storer concerning the fact that the -- that Yankton County was trying to get out of their contracts with Reliance prior to the end of the term?

A  I'm sure that conversation occurred, yes.

Q  Do you recall anything of this conversation?

A  No, not specifically.

Q  How about generally?

A  I'm sure generally we spoke about all the things we talked about today so far.

Page 80

Q  I'm talking about in particular with regard to the fact that Reliance was trying to terminate their contracts -- excuse me -- that Yankton was trying to terminate their contracts with Reliance before the end of the term of those contracts.

A  I don't recall any of that conversation as far as dates of the contract. Based on the service of the contract, yes, service end of it.

Q  Have you look at what's been marked previously as Exhibit 29. The first page of Exhibit 29 is two emails, one from Mr. Storer to Mr. Brandt on which you are copied on April 12th, and then another one, from you to Mr. Brandt, with a copy to Mr. Storer, dated April 20th. Please take a moment to look at Exhibit 29, and tell me whether you recall seeing previously these two emails as well as the attachment.

A  Yes.

Q  In the first email in time in Exhibit 29, Mr. Storer sends a proposal to Mr. Brandt, on April 12th of 2023. Do you see that, sir?

A  Yes.

Q  That would be the day after you first met with anyone in person from Yankton, correct?

A  Yes -- no. I met with people from Yankton County as far back as 2022.

Page 85

Q It would be fair to say that as of April 20th, you were aware that Yankton County had existing contracts with Reliance Telephone and Reliance Systems, yes?

A Yes.

Q Did Mr. Brandt ask you for additional help in navigating their current vendor contract?

A No.

Q Did Mr. Brandt ask you for assistance with "some more or different contract termination language"?

A No.

Q Did you have any discussions with Mr. Storer concerning either of those topics after sending this email on April 20th?

A Not that I recall.

MR. ANDERSON: 99.

(Exhibit 99 is marked for identification.)

BY MR. ANDERSON:

Q I'd like you to look, sir, what's been marked as Exhibit 99. Has production numbers as NCIC-000446 to 47. Please take a moment to look at Exhibit 99 and tell me whether you recall having seen the emails that comprise it previously.

A (Examines document.)

Yes.

Q If you turn to the second page of the exhibit, you'll

Page 86

see your email, which we just looked at, of April 20th to Mr. Brandt that's the follow-up. Do you see that, sir?

A Yes.

Q And then if we go to the first page, you'll see Mr. Brandt responded on April 20th.

A Yes.

Q Okay. And in his email to you, he says "I have met with my legal counsel regarding the current contract we have with Reliance. The county attorney has advised me on how to proceed and I am currently working as directed. I anticipate hearing back soon and will be in touch hopefully sooner than later." Do you see that, sir?

A Yes.

Q Do you recall, did you have any discussions with Mr. Brandt, at or about this time, concerning his meeting with his legal counsel and his advice on how to proceed?

A No.

Q Did you discuss this email with anyone internally at NCIC?

A No.

Q You then responded on the same date. That's the top email on the exhibit, correct?

Page 87

A Correct.

Q And you thank him for the update, and then you say "If we can be of any assistance don't hesitate to reach out to either Craig or myself directly." Do you see that, sir?

A Yes.

Q Do you recall whether Mr. Brandt reached out to you directly?

A I do not recall.

Q Don't recall one way or the other?

A Nope.

Q I'll have you look next at what's been marked previously as Exhibit 34. Please take a moment to look at Exhibit 34, and tell me whether you recall having seen it previously.

A (Examines document.)

Yes.

Q The first page of Exhibit 34 is an email from you to Mr. Brandt, copied to Mr. Storer, on April 28th of 2023. Do you see that, sir?

A Uh-huh. Yes.

Q In the email, you say to Mr. Brandt, first line, "Thanks for the call." Do you see that?

A Yes.

Q Do you recall what Mr. Brandt told you during that

Page 88

con- -- that call from him?

A I do not recall.

Q In the next line, you say "Here is the other termination example letter that we discussed." Do you see that?

A I do.

Q And then the attachment, which is the second page of Exhibit 34, is that the other termination example letter that you discussed with Mr. Brandt?

A Yes, it appears to be the same thing we discussed.

Q All right. Do you recall your discussion with Mr. Brandt concerning the other termination example letter that's attached?

A Yes.

Q What do you recall?

A I recall stating that we had a different type of draft that he could use if it would help him and if he wanted to take a look at it. This is one that we apparently had for a different company at some point in time. It looks like 2022.

Q Is this a example termination letter that was from your laptop, or did you obtain this from Mr. Storer or someone else?

A I obtained it from Mr. Storer.

Q Do you recall discussing this example with Mr. Storer?

Page 89

A   Vaguely.

Q   What do you recall vaguely?

A   I remember saying -- asking if there was a different type of termination document that we had done at any other facilities.

Q   Did he provide you with any other examples, other than the one that's the second page of exhibit --

A   Not that I can --

Q   -- 34?

A   -- recall.

Q   Would it be fair to say that none of the areas of dissatisfaction listed here necessarily pertained to Reliance Telephone and Reliance Systems and their services to Yankton County?

A   I can't speak for Yankton County.

Q   Well, did you modify this example termination letter to fit Yankton County, or was this simply a copy of some previous letter, appears to be from 2022?

A   It was a copy of a previous letter.  It was not modified for Yankton County.

Q   If you go back to the first page of Exhibit 34, your second to last paragraph says "We are more than happy to get together with you to discuss points of concern for your letter and how they relate to your current vendor situation."  Do you see that, sir?

Page 90

A   I do.

Q   Do you recall whether you got together with Mr. Brandt, either in person or via telephone, to discuss points of concern for their letter?

A   I honestly don't recall if we did or not.

Q   Do you recall whether Mr. Storer talked with you about getting together with Mr. Brandt to discuss points of concern?

A   I don't recall.  He possibly could have.

Q   You just don't recall one way or the other, sir?

A   No.

Q   I hand you next what's been marked previously as Exhibit 36, sir.  Please take a moment to look at Exhibit 36, and tell me whether you recall having seen it previously.

A   (Examines document.)
      This is inclusive of the documents you already previously gave me.

Q   Correct.  They are some of the later emails or some of the earlier emails in time we've already looked at.  My question is whether you recall having seen the emails in this exhibit previously, and that would include the ones on the first page, which I will tell you are the new ones.

A   Yeah.  They were directed -- some of these were

Page 91

directed from Craig to me.  Yes, I would have seen them.

Q   Okay.  At the bottom of the first page, which is where the new ones we haven't looked at are, the first email is from Mr. Brandt to you on April 20th.  Do you see that?

A   Yes.

Q   And he thanks you for the follow-up email, which is the one that we looked at previously where you say you're following up.  Do you see that on the -- if you look at the previous -- just -- yeah.

A   Okay.

Q   Okay.  And Mr. Brandt says "I had the Sheriff speak with our attorney regarding our contractual commitment to Reliance.  I will let you know as soon as I have an answer."  Do you see that, sir?

A   Yes.

Q   Do you know whether -- or did Mr. Brandt ever get back to you regarding what, if anything, his attorney said regarding our -- their contractual commitment to Reliance?

A   Did he get back to me?

Q   Yes, sir.

A   Specifically?

Q   Yes, sir.

Page 92

A   No, I don't recall him getting back --

Q   All right.

A   -- to me.

Q   In the next e- -- the next email is from you to Mr. Storer on April 25th of 2023.  Do you see that?

A   Yes.

Q   And you are forwarding to him the email from Mr. Brandt on April 20th, correct?

A   Correct.

Q   And in your email to Mr. Storer, you say "This is Yankton County," right?

A   Yes.

Q   And then you say "We have the same situation here as we do in Davison.  Yankton will need to break their 5-year automatic renewal with Reliance as well."
      Or no.  Sorry.  Then he goes on, in the next paragraph, to say "Hopefully their attorney won't advise them to stay with Reliance for the 5-year renewal?" question mark, closed quote.  Did I read that correctly?

A   Yes.

Q   All right.  First off, when you say -- said "We have the same situation here as we do in Davison," what is Davison?

A   I believe we're talking about the automatic renewal

Page 93

built into their contract as stated in what you provided me, that their contract renews every five years automatically.

Q When you say "they," you're referring to Reliance?

A Yes.

Q Okay. But what is Davison?

A I believe that's a different county that I was working on somewhere.

Q Do you recall where Davison County is?

A No.

Q But it'd be either North Dakota, South Dakota, or Minnesota?

A Possibly, yes. But we don't have a contract with Davison County --

Q Okay.

A -- anywhere, that I have.

Q Do you recall efforts to try to obtain Davison County as a customer --

A Yes.

Q -- or client?

A Davison County, South Dakota.

Q Okay. It is South Dakota. And was Davison County an existing Reliance client?

A Yes. Well, I think they still are a Reliance -- they're not a client of ours.

Page 94

Q Okay. Certainly in April of 2023 they were a Reliance client. Yes?

A As far as I'm aware, yes.

Q And you were aware that they had a five-year term in their contract with Reliance, just like Yankton?

A On auto-renewal term --

Q Yes.

A -- is what we're referring to.

Q Yes. And the term then was five years, with a renewal for an additional five years.

A I don't know that.

Q Well, do you recall that from looking at the contracts that we saw earlier this afternoon?

A In the Davison con- -- I mean, excuse me, in the Yankton contract it states right there there's auto-renewal, five years.

Q Okay. The fact that you said that "We have the same situation here as we do in Davison," referring to Yankton County, does that lead you to believe that Davison had a five-year term with an automatic renewal?

A Yes.

Q All right. You then said "Yankton will need to break their 5-year automatic renewal with Reliance as well." Do you see that, sir?

A Yes.

Page 95

Q So you knew that Yankton would have to break their five-year --

A Auto-renew contract.

Q Yes. They'd have to break their auto-renewal contract with Reliance. Yes?

MR. MOSER: Objection. That calls for a legal conclusion in terms of breaking a contract.

MR. ANDERSON: His word.

BY MR. ANDERSON:

Q You knew that Yankton will need to break their five-year automatic renewal with Reliance at the time that you sent this email to Mr. Storer on April 25th of 2023, correct?

A Meaning that they were -- their contract has not yet completed, yeah.

Q Uh-huh. You said -- you told Mr. Storer --

A Uh-huh.

Q -- "Yankton will need to break their 5-year automatic renewal with Reliance."

A Yeah. They have to have had to break that because they have a -- they had an auto-renew pol- -- auto-renew clause for another five years from -- I believe from September 16th, as it's stated right here.

Q Just so we're clear, you're --

A I mean 2016.

Page 96

Q You're looking at the 2016 contract. If you go to the -- couple pages in --

A It's the same contract --

Q No, it's different. Sorry. It's hard.

A Yeah, the auto-renew policy is stated in both contracts.

Q And for the contract that was in effect in 2023, it was five years from December 2nd of 2020, correct?

A That's what is stated in the contract --

Q All right.

A -- correct.

Q And you knew Yankton was going to have to break that contract, correct?

A I knew that the contract was not expiring at that time.

Q Well, you stated -- you told Mr. Storer "Yankton will need to break their 5-year automatic renewal with Reliance as well." Those are your words, correct, sir?

A Yes, they are.

Q Okay. You then stated "Hopefully their attorney won't advise them to stay with Reliance for the 5-year renewal?" question mark. Do you see that, sir?

A Yes.

Q Were you concerned that Yankton's attorney would advise them that they had to stay with Reliance until the end of their five-year term?

Page 97

A   I was hopefully going to gain a new client. Nothing -- nothing about their contract.

Q   Okay. Well, weren't you -- aren't you saying, when you say "hopefully their attorney won't advise them to stay with Reliance for the 5-year renewal," your concern was that their attorney would advise them that they couldn't terminate the contract prior to the end of the five-year term? Isn't that true?

A   Well, I believe this is in reference to what they had said: They had placed this -- were waiting on their attorney to get back with them. So "hopefully," I was -- the meaning of "hopefully" was their attorney would have -- would advise them to go forward with getting out of their current contract.

Q   If you go up to the next email chronologically, it's from Mr. Storer to you on -- also on April 25th. Do you see that, sir?

A   Yes.

Q   And in it, Mr. Storer asks you "Do we know exactly where Yankton is in the Reliance agreement, relative to the renewal? Coming up on it? Just renewed? I don't think we've seen their Agreement yet, right?" Do you see that?

A   I see that.

Q   And then you responded on the same day, quote -- the

Page 98

next email up, on April 25th, "Yes. I have a copy at home and it just recently automatically renewed as well." Do you see that?

A   Yes.

Q   So you were aware as -- certainly as of April 25th, that they were in the midst of their five-year term or at some point within the five-year term and not coming up on renewal; is that correct?

A   Yes.

Q   In the next email on Exhibit 36, which is the first one, from Mr. Storer to you, on April 25th, please take a moment to read it to yourself, and then I'll have some questions for you.

A   (Examines document.)

    Okay.

Q   All right. In Mr. Storer's email back to you, he says, in his second paragraph, "I can think of at least 4 things right off the top of my head that they could lean on," it says, "top terminate early with Reliance." I think it's supposed to be "to." Anyway, do you see that paragraph, sir?

A   Yes.

Q   Did Mr. Storer share with you the four things that he thought of right off the top of his head?

A   I think they were part of the -- this termination from

Page 99

a different county that we've already looked at.

Q   Well, that letter -- or email where you sent it to him, that's the three items on Exhibit 34?

A   Yes. The --

Q   I thought --

A   -- same items.

Q   I thought you said that those items were not necessarily applicable to Yankton County and Reliance.

A   I said they may be applicable to their -- to them -- to their -- to Yankton County. They both followed suit with what their complaints were against their provider.

Q   All right. Did Mr. Brandt or anyone from Yankton County ever express to you one of their areas of dissatisfaction was tardiness of commission checks?

A   No.

Q   Did they ever discuss with you that they had been -- that Reliance "has been promising advancements and improvements for our technology offerings and education/entertainment options for our inmate population for quite some time (several years)"? Do you see that?

A   I do see that.

Q   Do you recall Mr. Brandt or anyone from Yankton expressing that to you?

A   Not in these terms, but he did express that the

Page 100

technology they had was far insuperior [sic] to what we had.

Q   It goes on in that provision to say that there had been a discussion of a prospect of a visit to the facility, and "As of the writing of this notice, that visit has not eventuated"?

A   This is, again, just a draft for them to look at.

Q   Okay. But I'm trying -- I thought you had testified previously that this draft was not modified to fit Yankton County, and now I get -- now I understand that you're saying that it was.

A   This draft represents a lot of different companies that we deal with with this same type of lack of service, lack of tardiness, and lack of technology that we see across the whole spectrum of people we deal with.

Q   Okay. So -- but again, this example termination letter that you sent to Mr. Brandt on April 28, you had not modified it to fit specifically Yankton County?

A   I did not.

Q   Okay. Now going back to Exhibit 36, the email from Mr. Storer to you where he mentions four things right off the top of his head, do you see that on Exhibit 36?

A   Yeah.

Q   Did he ever express to you what those four things were?

A   I'm sure we talked about it. I don't recall if they

Page 113

asked Reliance Telephone, as of July of 2023, for a mail scanning program, do you, sir?

A   I do not know if they asked, no.

Q   Okay.  Going down to paragraph 3, it says "Calling Rates and Fees."  Tell me -- read that to yourself and then tell me when you're done.

A   (Examines document.)
Okay.

Q   Okay.  Do you recall any discussions that you had with Mr. Brandt or -- at Yankton County regarding the calling rates and fees being charged by Reliance?

A   Yes, we did discuss their fees, calling rates specifically.  I think that's why I included what was on the Reliance website into this document right here that states that their fees were what they were.

Q   Okay.  And when you say "this document right here" --

A   Exhibit 41, attachment from the Reliance public website.

Q   Okay.  Do you recall any discussions with Mr. Brandt concerning the rates?

A   Yes, we discussed the rates with him.

Q   And you -- did you -- did you, in your conversation with him, accuse Reliance of charging rates in excess of current FCC allowances?

A   No.  I merely pointed out the fact that -- what was on

Page 114

their website.

Q   Well, in the draft letter from -- that Mr. Storer prepared that was sent to Mr. Brandt, the last line of paragraph 3 says "As Reliance is aware, any calls in prepaid format currently being charged at a rate higher than $0.21/Minute is in violation of current FCC allowances."  Do you see that?

A   I do see that.

Q   Did you make any determination as to whether Reliance, in fact, was charging rates higher -- or in violation of current FCC allowances?

A   I did not.

Q   Do you know who made the decision to include that assertion?

A   This was penned by Mr. Storer.  So --

Q   Okay.

A   -- I would assume he made that assertion.

Q   Would you agree that accusing a competitor of charging rates in violation of current FCC allowances impugns their reputation?

A   I think it merely states the fact that they are charging what they're charging on the public site -- the website.

Q   Would you --

A   I don't think it impugns anyone.

Page 115

Q   You don't think that's bad for their reputation -- to accuse someone of violating FCC regulations is bad for their reputation?

A   It merely states they're charging something outside the FCC regulations.

Q   You don't think that's a bad thing?

A   It's stating the facts.

Q   Okay.  But you did nothing to investigate whether that was, in fact, true?

A   Just -- I just provided that document.

Q   Do you know or did you make any effort to determine whether, in fact, the 25 cents per minute that you were referring to from the website was inclusive of the USF and TSR fees -- or TRS fees that you are allowed to tran- -- to pass on to your inmates?

A   I'm -- I'm not versed in those terms.  So...

Q   So you made no effort to determine --

A   I made no effort, no.

Q   Do you know whether Mr. Storer made any effort --

A   I cannot speak for Mr. Storer.

Q   He didn't tell you whether he had done anything.

A   No, he did not.

Q   Okay.  Do you think it's a bad thing to accuse a entity of charging fees in excess of current FCC allowances?

A   I think it's a bad thing to overcharge what's allowed

Page 116

by law.

Q   Okay.  So you would agree that it's not good to be -- to charge someone -- overcharging than what's allowed by law?

A   I would concur that breaking the law is not good, yes.

Q   And would you agree that in this letter that Mr. Storer wrote, he in effect is -- is accusing Reliance of breaking the law?

A   He's breaking the current regulations imposed by the FCC.

Q   Okay.  And that's breaking the law?

MR. MOSER: Objection.  Calls for a legal conclusion.  He doesn't know what's breaking the law or not breaking the law.

MR. ANDERSON: He used the phrase.

BY MR. ANDERSON:

Q   As you used the phrase "breaking the law," would you agree that this is accusing them of breaking the law?

A   I would -- I would say that they are not following the FCC regulations.

Q   Well, did you consider this to be accusing them of breaking the law?  You spent your career in law enforcement, sir.

MR. MOSER: Objection.  Misstates the facts in the record.  He didn't spend his career in law enforcement.

Page 117

You've already asked him the question, and it calls for a legal conclusion.

BY MR. ANDERSON:

Q   Well, you used the phrase "breaking the law," didn't you, sir?

A   Yes.

Q   All right.  Using your understanding of what "breaking the law" is -- not a legal conclusion, but you personally -- would you agree that in this letter that Mr. Storer wrote for Yankton County, he is accusing Reliance of breaking the law?

A   No.  I -- they're in violation of following the rules of the FCC.

Q   Okay.  But you don't know whether, in fact, that was true.

A   I'm not versed in the fees based -- no, I'm not.

Q   Okay.  So you didn't know?

A   I did not know.

Q   Okay.

Do you recall having any discussions with Mr. Storer, prior to him drafting this letter, whether it was possible for Yankton County to terminate their contract prior to the end of the five-year period or term?

A   Can you repeat that one more time.

Page 118

MR. ANDERSON: Could you read it back, please.

(The record was read by the reporter as follows:

"Q   Do you recall having any discussions with Mr. Storer, prior to him drafting this letter, whether it was possible for Yankton County to terminate their contract prior to the end of the five-year period or term?")

THE WITNESS: Yes.

BY MR. ANDERSON:

Q   What do you recall in that regard?

A   The discussion was the fact that Yankton County was a -- very disappointed in the services that they were getting, and they wanted our technology, but they were under contract, so we were discussing ways that they may be able to go with NCIC versus staying with Reliance.

Q   How would they might be able to go with NCIC as opposed to staying with Reliance?

A   They would terminate their contract with Reliance and go with any other vendor at that point in time.  They were that dissatisfied.

Q   It'd be fair to say that you were hoping or you -- strike that.

It would be fair to say that you wanted Yankton County to terminate their contracts with Reliance and

Page 119

go with NCIC?

A   Yes, we would have wanted them to go with NCIC.

Q   And, in fact, they did endeavor to terminate their contracts with Reliance and go with NCIC.  Yes?

A   As far as I understand, yes.

Q   I'd like you to look at what's been marked previously as Exhibit 39.  This is another form of -- it looks like a draft contract.  This one has Yankton County production numbers.

My question is whether you recall ever having seen this draft previously.

A   It shows -- appears to be very similar to the one you just showed me in Exhibit 44.

Q   I understand it's similar to Exhibit 44, but Exhibit 39 is a draft.  My question is whether you recall having seen Exhibit 39 in draft form.

A   This appears to possibly be the attached letter that is referenced, maybe, in July 10th, that Craig penned for Yankton County.

Q   Okay.  Well, let's not get --

A   I don't --

Q   Yeah.  I realize it's confusing because you've got a plethora of --

A   Yeah.

Q   -- of drafts, and then none of them were produced

Page 120

attached to the emails.  So --

A   Correct.

Q   -- Exhibit 38 is the draft with Mr. Storer's comment on it.

A   Okay.

Q   Right?  You would agree with that?

A   Yes.

Q   Okay.  And I believe you testified that that was the draft that Mr. Storer provided you to provide with the attached letter, which is Exhibit 41.

A   Okay.

Q   Okay?

A   That would make sense.

Q   All right.  So my question is -- and I realize I've already showed you Exhibit 38, which is the letter that was actually sent.

A   38?

Q   I'm sorry.  Not 38.

A   39?

Q   No.

A   44.

Q   44.  Can't tell...without a program.

Exhibit 44 is the actual letter sent.

A   Okay.

Q   All right.  I'm trying to determine whether you recall