# EXHIBIT E

*Reliance Telephone, et al. v.*
*Yankton County, et al.*

Craig Storer
August 6, 2025



*Audrey M. Cook, RPR*
*audrey@paramountreporting.com*
*605.321.3539*

**Min-U-Script® with Word Index**

Page 21

A   I would say so.  And we may not have dealt with all three of those individuals at that time, but we certainly have dealt with them all since pretty consistently.

Q   Okay.  Before you got Reliance [sic] County to terminate their contract with Yank -- with Reliance, was it -- who did you meet with:  Ms. Pope, Mr. Luke, Ms. Rabe -- or Rabe, sorry -- or all of them?

A   Can you repeat that question --

Q   Sure.

A   -- please.

Q   Sure.

Before you -- before you had Yankton County terminate their contract with Reliance, did you meet with Ms. Pope, Mr. Luke, and Mr. [sic] Rabe?

A   I never had Yankton County terminate their contract with Reliance.  That's my response to that question.

Q   Okay.  Didn't you want them to terminate their contract?

A   Not necessarily.

Q   Not -- were you -- you were aware that they would have to break their contract.

A   Would I like to have Yankton County as a customer, like any other jail facility, absolutely.

Q   Okay.  You were aware that you needed to have them

Page 22

break their contract, didn't you, sir?

A   I was not aware of that at all.

Q   You weren't.  Okay.

A   Was I aware that they wanted out of their contract?  Yes, I was.

Q   That's not my question.  My question, sir, is you were aware that you needed to have Yankton County break their contract.

A   No, I was not --

Q   You said --

A   No, I -- I wouldn't agree with that statement.

Q   Okay.

I'm going to hand you what's been marked previously as Exhibit 36, sir.

A   Sure.

Q   Please take a moment to look at Exhibit 36 and tell me whether you recall having seen the emails that comprise Exhibit 36 previously.

A   So I'll go ahead and take this opportunity to let you --

Q   No.

A   -- know, sir --

Q   Sir, you answer my questions.

A   Okay.

Q   Your counsel will have an opportunity for you to speak.

Page 23

A   I'm about to answer your question.

Q   All right.  My question is do you recall having seen those emails previously.

A   I haven't had a chance to review it yet.

Q   Please look it over.  Thank you.

A   (Examines document.)

MR. MOSER:  And you can take your time and just let him know when you're --

THE WITNESS:  Sure.

MR. MOSER:  -- you've looked at it.

THE WITNESS:  (Examines document.)

All righty.

BY MR. ANDERSON:

Q   Have you had a chance to look at Exhibit 36, sir?

A   Yes, in a cursory fashion.

Q   All right.  Do you recall having sent or received the emails that comprise Exhibit 36?

A   I don't recall sending or receiving emails that I sent last week.

Q   Okay.

A   But that doesn't mean I didn't send it.  Obviously I did.

Q   All right.  Do you have any reason to believe that emails either addressed to you at your NCIC email address or sent by you at your NCIC email address were

Page 24

not, in fact, sent or received by you?

A   Not at all.

Q   All right.  I'd like to direct your attention to the email from Mr. Baniecke to you dated April 25, 2023, which is on the lower half of the first page of Exhibit 36.  Do you see that, sir?

A   I do.

Q   And in the email from Mr. Baniecke, he says, in part "Yankton will need to break their five-year automatic renewal with Reliance as well."  Do you see that, sir?

A   I do.

Q   And you received that email on or about April 25th of 2023, correct, sir?

A   Evidently, because I responded to it.

Q   Yes.  And he mentions -- Mr. Baniecke mentions "We have the same situation here as we do in Davison."  Do you see that?

A   I do.

Q   Is Davison Davison County?

A   I assume so.  There are several of them around the country, but that would be the one in South Dakota.

Q   All right.  And to your recollection, was Davison County also a Reliance Telephone customer?

A   They still are.

Q   And were they at the time on April 25th of 2023?

Page 25

A    As far as I recollect.

MR. MOSER: Make sure to let him finish the question.

THE WITNESS: Yes, sir.

BY MR. ANDERSON:

Q    Yes.  It's important to slow down.  Thank you, sir.

If we go up in the email thread, you asked Mr. Baniecke on the same day, April 24th [sic], "Do we know exactly where Yankton is in -- is in the Reliance agreement relative to the renewal?  Coming up on it?  Just renewed?  I don't think we've seen their agreement yet, right?"  Do you see that, sir?

A    Yes, I do.

Q    And in response, Mr. Baniecke said to you "Yes, I have a copy at home and it just recently automatically renewed as well."

A    Uh-huh.

Q    Do you see that, sir?

A    I do.

Q    Did you receive a copy of the Reliance contract or contracts from Mr. Baniecke?

A    To my best recollection, yes.

Q    Do you recall when you received those copies of those contracts from Mr. Baniecke in relation to the email from Mr. Baniecke on April 25th where he told you that

Page 26

he had a copy?

A    No.  I review about 15 contracts a week.  I would have no idea.

Q    All right.  Do you recall specifically reviewing the Reliance Telephone contracts?

A    At a high level.

Q    When you say "at a high level," what do you mean, sir?

A    I review Reliance inmate communications contracts fairly commonly for different agencies around the country.

Q    Okay.  When you say "agencies," you're talking about counties?

A    Uh-huh.  When I use the term "agency," I refer to sheriff's offices and jails, the collective law enforcement entity in the county.

Q    Thank you.

I'm going to hand you next what's been marked previously as Exhibit 28, sir.

A    Thank you.

Q    And if you could -- excuse me -- look not at the first page, but at the third, fourth, and fifth pages, sir.  These, I will tell you, are copies of contracts made as of August 18th of 2020 between Reliance Systems and Reliance Telephone and Yankton County, and my question to you, sir, is if you could please look at those three

Page 27

pages and tell me whether you -- whether these -- whether you recognize these as copies of the Reliance contracts that you received and looked at.

A    Yes.

Q    Okay.  And by the way, there's two entities involved in this case, Reliance Telephone and Reliance Systems.

A    Right.

Q    If I say Reliance Telephone, do you understand that I'm referring to what is formally Reliance Telephone of Grand Forks Inc.?

A    Yes, sir.

Q    All right.  And if I say Reliance Systems, I'm referring to Reliance Systems, Inc.?

A    Yes.

Q    All right.  And if I generically say Reliance, can we agree that that's referring to both entities?

A    Of course.

Q    Thank you.  And are you familiar with Reliance Systems as a separate entity?

A    Extremely.

Q    And how are you extremely familiar with Reliance Systems?

A    Because they're a competitor of mine and I'm an expert on all of my competitors as it relates to sales and business development efforts.  I'm familiar with their

Page 28

business practices at a high level, not the internal business practices but as it relates to how they deal with their facilities.  I am familiar with the nature of their service delivery.  I'm familiar at a high level with their technology and how it differs from ours.  I'm familiar with their billing practices at a high level.  I'm familiar with how they handle the collection of fees from the friends and families of inmates.  I'm familiar with their potential and their ability to generate revenue from facilities for the different services that they offer.  I'm familiar with how they advertise their services at conferences and in trade shows and things of that nature.

I'm extremely familiar with Reliance, as I am with probably 13 other companies in our industry.  That's my job, to be familiar with my competitors -- one of my jobs.

Q    Okay.  What is your understanding of what Reliance Systems' business is, sir?

A    They provide a range of communications and investigative offerings for law enforcement agencies and the incarcerated people at those agencies and their friends and families.

Q    Can you tell me what sort of telecommunications services Reliance Systems provides specifically, sir?

Page 37

Q   What is your general understanding, sir?

A   Reliance -- and I haven't gone and checked the Reliance web -- the public-facing website lately, but Reliance charges -- or has charged at certain points in the past between 21 cents and up to 40 -- I think it may have even been up to 50 per- -- 50 cents per minute, but certainly up to 40 cents per minute on domestic and in-state phone calls.

I can't speak to what the international rates are that Reliance charges because they're -- they're kind of ancillary in our industry, but I know for a fact that prepaid -- the online calling cards, which are a prepaid format of phone calls, were at one point charged north of 25 cents per minute, which was, at that time, in excess of the FCC allowances for that particular call type and billing type.

Q   What is the basis for your assertion that that -- that the charge stated of 25 cents was in excess of FCC allowances?

A   My general understanding and industry understanding of regulatory allowances and considerations in our industry from the close attention that we pay to our regulatory environment.

Q   Do you pay close attention to your regulatory environment?

Page 38

A   I consider myself a -- that I do pay pretty close attention to it.  We have to.

Q   Are you familiar with something called a USF charge?

A   At a high level.  Universal services fund fee.

Q   And do you know what that percentage is, approximately?

A   No, I don't.  It change -- it actually varies, if I'm not mistaken, on a quarterly basis.

Q   Are you aware of the fact that the USF charge can be passed on to the inmate, or the end user, if you will?

A   I'm aware that certain vendors do that.

Q   And NCIC does that, correct?

A   I couldn't say one way or another.  I haven't checked on it recently.

Q   Do you know whether Reliance Telephone does that?

A   Not off the top of my head.

Q   Do you know whether the 25 cents charge includes the USF fee?

A   No, I don't.

Q   Did you make any effort, ever, to determine whether the 25 cents a minute includes the USF fee?

A   No, not that I can recall.

Q   Because it would be permissible to include the USF fee, correct?

MR. MOSER: Objection to the extent it calls for a legal conclusion.

Page 39

THE WITNESS: I don't have --

BY MR. ANDERSON:

Q   Based on -- based on your -- based on your understanding of the FCC regulations that you've testified to, sir.

A   My understanding is that when a per-minute rate is advertised on -- generally speaking, on the public-facing websites of companies in our industry that that per-minute rate is the rate charged by the provider and is not inclusive of any required regulatory taxes.

Q   What is that understanding based on, sir?

A   My general understanding of how things go in our industry and how vendors operate in our industry from 15-plus years of being in it.

Q   Have you ever asked anyone from Reliance Telephone whether their rate includes the USF fee?

A   No.

Q   Are you familiar with something called the TR- -- I think it's TRS -- TRS [sic] fee?

A   Not really.  At a high level.

Q   Are you familiar with the fact that telecommunications companies can pass on the TRS fee to end users, inmates?

A   Yes, I am.

Page 40

Q   And NCIC does that, correct?

A   I couldn't comment one way or another on that. That's --

Q   You -- you don't know.

A   I don't know.

Q   Do you know whether Reliance Telephone's rates include the TRS fee?

A   I know that if they did, when they're advertised on the public-facing website, they wouldn't be a round figure.

Q   Why do you say, "wouldn't be a round figure"?

A   Wouldn't be.  Because I highly doubt that if there was -- they're including certain applicable taxes, that those figures would be rounded off to, say, 25 cents or 40 cents per minute on the public-facing website.

Q   Well, isn't it possible, sir, that 25 cents a minute includes the USF and TRS fees and to the extent it's an odd number, Reliance Telephone is simply rounding it off to the benefit of the end user?

A   I haven't considered that specific idea.

Q   Okay.

A   Seems unlikely.

Q   That's your speculation.

A   Uh-huh.

Q   Even though you --

A   Sure.

Page 41

Q    Even though you --

A    Based on experience.

Q    Okay.  But you don't know, even for that matter, whether the rates quoted by NCIC, when you add on the USF and TRS fees, are more like 28 or 29 cents a minute, do you, sir?

A    When we advertise per-minute rates on public-facing websites or list them in contracts, we do not add on the applicable taxes that we have to remit to various governmental and quasi governmental entities around the country because they vary on a quarterly basis, they change during the course of the contract, and they vary based on all sorts of things in our service, including origination and termination of phone calls, the billing option used for that particular phone call.  There's various reasons that we don't include those in the rates that we advertise.
    We mention them and how they're handled in our contracts, but if we were to mention a per-minute rate on any sort of public-facing document or website, it would not include any -- any specification of taxes.

Q    Okay.  But you don't know what Reliance Telephone rates include -- whether they built in the taxes so that the actual rate paid by the inmate is 25 cents regardless of -- so that that includes the USF and TRS fee.  You

Page 42

don't know that, do you?

A    No, I don't.

Q    Okay.
    So going back to Exhibit 28, sir, with the contracts and the three pages that I asked you to look at.  You said you recognize these as the contracts that you saw with -- between Reliance Systems/Reliance Telephone and Yankton County, correct?

A    Yes, sir.

Q    And you said that you reviewed these at a high level when you received them; is that correct?

A    I probably reviewed them in detail when I received them.  I have a high-level recollection of reviewing them.

Q    All right.  What do you recall of your high-level recollection, sir?

A    Probably some general characteristics about the term of the contract, the revenue share outlined in the contract, key dates in the contract, the usual things that I would pay attention to when I'm reviewing contracts for our competitors, potential clauses in the contracts relative to options that the agency might have for termination, renewal options, the originating date of the contract, the -- to the extent that the contract covers all of the services that are deployed

Page 43

at the facility, things of that nature.

Q    Okay.  What, in this general description, do you recall with regard to the term of the Reliance contract, sir?

A    I don't recall off the top of my head.  I'd have to review it again.

Q    But at least at the time that you received it, you would have taken note of the term.  Is that a fair statement?

A    I'm sure I would have.

Q    All right.  And do you recall, as you sit here today, the revenue share?

A    No, I don't.

Q    But again, at the time you received it, you would have taken note of that?

A    Yes, sir.

Q    And key dates.  Do you recall any key dates as you sit here, sir?

A    No, not off the top of my head.

Q    But at the time that you received and reviewed them, you would be aware of the key dates, correct?

A    Absolutely, I would have.

Q    And then you also said that you would pay attention to potential clauses relative to the option for the agency to terminate.

A    Yes.

Page 44

Q    Do you recall anything, as you sit here today, with respect to the Reliance contracts?

A    No, not specific to this contract.

Q    But at the time you received it, you would have reviewed that and taken note of that, correct?

A    I would -- that would have been one of the things I was looking for.  Whether or not anything eventuated from my review at that time, I can't say one way or another.

Q    Okay.  Why is that one of the things you would be looking for?

A    That's one of the things that I look for whenever I review contracts for any facility with any competitor around the country.

Q    Okay.  And you don't recall what you learned in that regard with respect to the Reliance contracts at this time; is that correct, sir?

A    That's correct.

Q    But you would have taken note of their ability or inability to terminate back at the time.

A    Yes, as I --

Q    All right.

A    As I usually do.

Q    All right.  You also mentioned origination date.  Do you recall the origination date of these contracts without -- as you sit here today?

Page 45

A   No, not off the top of my head.

Q   Okay.  But back at the time, you would have reviewed it in detail and taken note of that, correct?

A   Yes, sir.

Q   And then you also mentioned the contract, I think you said, commission schedule?

A   Revenue share --

Q   Revenue share.

A   -- I think I said.

Q   All right.

A   Commissions revenue share.

Q   And do you recall, as you sit here today, the revenue share?

A   No, sir, not off --

Q   But back --

A   -- the top --

Q   I'm sorry.  But back at the time you would have.

A   Yes, sir.

Q   All right.  Do you recall discussing back at the time, in 2023, any of the terms of these contracts, first, with Mr. Baniecke?

A   At a high level, yes.

Q   Okay.  Anything more specific than just you discussed it at a high level?

A   No, sir.

Page 46

Q   Do you recall discussing the terms of these contracts with Mr. Brandt at Yankton County?

A   Yes, at a high level.

Q   Anything more specific than that, sir?

A   Not really.

Q   Do you recall whether you pointed out anything about the term or ability to terminate or key dates or anything like that?

A   No, sir, not really.

Q   All right.  How about with Mr. Crissey, Sheriff Crissey?  Did you discuss any of the terms of these contracts with him?

A   No, sir.

Q   All right.  Did you discuss any of the terms of these contracts with Mr. Pope at that time?

A   I'm sure I did.

Q   Do you recall how soon it was after you received these contracts that you had that discussion with Mr. Pope?

A   No, sir.

Q   Okay.  Do you recall any of the details of those discussions, sir?

A   No.

Q   Okay.  I'm going to hand you what's been marked previously in this matter as Exhibit 57, sir.

A   Thank you.

Page 47

Q   Please take a moment to look at it and tell me whether you recall having seen it or any of the pages in it previously.

A   (Examines document.)

   MR. MOSER: You said 57, Alan?

   MR. ANDERSON: Yes, sir.

   THE WITNESS: Okay.

BY MR. ANDERSON:

Q   All right.

A   The only portion of this -- all of these documents that I'm familiar with is some of the marketing material that I've seen at -- on tables at conference and things of that nature.

Q   Okay.  That's the second page of the exhibit --

A   Yes, sir.

Q   -- sir?  All right.

   Could you turn to the last page, see if that's headed -- I think it's Attachment A?

A   Yes, sir.

Q   Okay.  And it's the phone rates, correct?

A   Yes, sir.

Q   Do you see that the phone rate listed indicates that it's 21 cents plus the USF fee, inclusive?

A   I see some general commentary about taxes.

Q   Okay.  What does it say about taxes?

Page 48

A   There's footnotes here evidently that says includes a four cent -- four cents for the federal universal service -- FUSF required by law on all interstate calls.

Q   Okay.  And that's a footnote to the rate of 25 cents?

A   Yes, sir.

Q   So that would indicate that the charge was 21 cents plus the USF, correct?

A   Presumably.

Q   Okay.  Thank you.

   Were you aware of that fact back in 2023?

A   I can't recall.

Q   Okay.  Going back to Exhibit 36, sir.

A   Is that this one?

Q   No.  It has a big sticker on it, says --

A   Oh, 36.  Okay.

Q   Yes, sir.

A   That makes sense.

Q   Yep.  All right.

   I'd like you to direct your attention to the top email.

A   Okay.

Q   It's from you to Mr. Baniecke on April 25th.  Do you see that, sir?

A   Yes, sir.

Page 49

Q   In the email you -- to Mr. Baniecke, you say, in the second sentence, "Let's hope Tom's appetite to move remains as strong as it was when we were in his office, and our burgeoning relationship with the sheriff should really help with that too."  Do you see that, sir?

A   Yes, sir.

Q   Okay.  First off, "Tom" refers to Mr. Brandt?

A   I assume so.

Q   Okay.  Any other -- anybody else that you think it could refer to?

A   No.

Q   All right.

A   Not that I can think of.

Q   Why were you hoping that Mr. Brandt's appetite to move remained strong?

A   I have -- I have hopes that the appetites of about 5,000 correctional facilities would be strong to move to NCIC services.

Q   Anything more than that, sir?

A   No.

Q   All right.  You then talk about, quote, our burgeoning relationship with the sheriff.  Do you see that, sir?

A   I do.

Q   What are you referring to there?

A   We have fantastic relationships with our customers and

Page 50

law enforcement professionals around the country and facility personnel, sheriffs, chief deputies, deputy sheriffs, patrol people, investigators.  We take relationships very seriously at NCIC.  That's one of the reasons we're successful.  That looks like general commentary to that effect.

Q   Okay.  Did your burgeoning -- the words "burgeoning relationship with the sheriff" refer to the fact that just a week or 10 days previously Sheriff Crissey happened to be awarded an all-expense-paid fishing vacation or holiday for himself and three other individuals to Texas?

A   My reference in this email to a burgeoning relationship with Sheriff Crissey would have absolutely nothing to do with the fact that he won randomly a trip to Texas.

Q   Okay.  It was just coincidental that Sheriff Crissey was the winner first time that he had been to a sheriffs conference and only days after you first met with him and offered him a -- gave him a proposal; is that correct?

A   A lot of the people who come down to our place in Texas that are randomly awarded that door prize, as we refer to them, it's their first time at that particular conference.  That's not something specific to Sheriff Crissey.

Page 51

Q   So my question is, it was just simply a coincidence that it happened to be Sheriff Crissey that received the weekend literally a couple of days after you first sent him a proposal?

A   Completely coincidental.

Q   All right.  In the next paragraph, sir, you say "I can think of at least four things off the top of my head that they could lean on --" the word is "top."  Did you mean to say "to"?

A   Probably.

Q   All right.

A   I never learned how to type properly.

Q   -- "to terminate early with Reliance."  Do you see that, sir?

A   Yes, sir.

Q   So you understand that they were going -- that Yankton County was going to have to terminate early with Reliance, correct?

A   For a facility that he's currently under contract to come to NCIC from another provider, that would generally involve termination or a cessation of their existing agreement, yes.

Q   Okay.  Does NCIC -- do you try as much as you can to get facilities to terminate early, if necessary, to go with NCIC?

Page 52

A   No.  There have been cases where we've provided necessary guidance to agencies that don't have it internally if they're under a miserable arrangement with their incumbent vendor, but we don't encourage them to do that.

Q   Okay.  And so with respect to Yankton, did you provide guidance?

A   Yes, at a high level.

Q   Okay.  And what were the four things that you were thinking of off the top of your head that Yankton could lean on to terminate early with Reliance?

A   So this email evidently was sent on the 25th of April 2023, and as I mentioned, I don't remember what happened last week, but I'll take a swing at it.  I think I mentioned a couple of them earlier.

Issues with video visitation, the quality and reliability of the video visitation platform; discontent with the responsiveness and attentiveness, generally, that Reliance was providing to the sheriff's office and the jail as far as dispatching technicians to fix broken equipment; the limited utility of the chirpers, the handheld devices that Reliance was providing to Yankton County.  Those are the three things that I can think of off the top of my head several years later.

Page 53

Q   Okay.  Can't think of the fourth?

A   No, sir.

Q   All right.  By the way, going back to the individuals, just to sort of close the loop here, where you had mentioned Ms. Poppe, Mr. Luke, and Ms. Rabe --

A   Uh-huh.

Q   -- would you character- -- prior to entering into the contract with them, would you characterize any one of them as being more vocal in terms of complaints about Reliance than the others?

A   No.  And I think I mentioned earlier I can't confirm that we dealt with all three of those pre-contract, but no, I would not differentiate the level of discontent.

Q   Okay.  And just to be clear, you don't recall which of them you dealt with pre-contract, correct?

A   I'm fairly -- I'm fairly certainly it was Tonna Poppe that we dealt with at a very high level when we were in those initial discussions with Todd Brandt.  Sergeant Poppe.

Q   Okay.  Going back to your discussions with Mr. Pope concerning this matter, you said that you discussed with him -- your words were, I believe, merits of the case.

A   Yes, sir.

Q   Do you recall that?

Page 54

What did you say discuss with Mr. Pope concerning the merits of the case?

A   The merits of the situation.  Probably generally the amount of discontent that the agency had with their current provider.  Probably similar to conversations I have with him about agencies and our interactions with them around the country:  Lack of service delivery, the ability -- the potential ability for us to be a service provider for Yankton County at some point in the future.  Things that would fall in line generally with generally accepted sales and business development efforts in our industry.

Q   Anything specific regarding the merits of this case?

A   Probably -- the main thing that comes to mind would be the general discontent and dissatisfaction that Yankton County Sheriff's Office and jail had with their vendor at that time.

Q   Anything other than that, sir?

A   Not that I can recall.

Q   Okay.  You also mentioned difference in -- with service provided, and you've talked about a lot of that; so I don't want to ask you to repeat stuff.  Is there anything other than what you've already mentioned?

A   Not that I can recall.

Q   All right.  And you also identified nature of the

Page 55

relationship with Yankton County.  Again, anything other than what you've already testified to?

A   Not that I can recall.

Q   Okay.
    Other than your conversations with Mr. Pope concerning this litigation, excluding conversations with your counsel, have you had any conversations with anyone else regarding this dispute?  Again, excluding conversations with your counsel, sir.

A   Not that I can recall.

Q   Could you briefly describe for us your educational background, sir.

A   Sure.  I got a -- I completed high school in Kyabram, my hometown.  I went to Murdoch University in Perth Western Australia between 2004 and 2008.  I got a bachelor's -- my bachelor's degree is in international business.  When I resided in Shreveport, Louisiana, I went --

Q   I'm sorry.  Let me slow down a bit.  I apologize.
    So you went to Murdoch University in Perth?

A   In Perth, in Western Australia.

Q   And you received a bachelor of arts in international business?

A   Yes, sir.

Q   Have you received any further formal or informal

Page 56

educational training after your bachelor's degree?

A   Yes.  I got an MBA in Shreveport, Louisiana, at Centenary College.

Q   How do you spell Centenary?

A   Common spelling, C-e-n-t-e-n-a-r-y.

Q   Oh.  When did you receive your MBA from Cent- -- as we would pronounce it, Centenary University?

A   Well, they don't pronounce it that way, but --

Q   All right.

A   If memory serves me correctly, I think I graduated from there in 2015.  Don't quote me on that.

Q   Did you --

A   Somewhere around there.

Q   Did you have a particular area of expertise in your MBA, sir?

A   No, sir.  It's just an -- it was just a general MBA that they offer.

Q   Was this online or in person?

A   It was in person, in the evenings, after work.

Q   You're presently employed by NCIC, correct?

A   Yes.

Q   And just so we're clear on the record, NCIC is Network Communications International Corporation -- or Corp?

A   Yes, sir.

Q   Okay.  What is your office address?

Case 4:24-cv-04098-ECS    Document 201-5    Filed 06/15/26    Page 10 of 32 PageID #:
6602
Reliance Telephone, et al. v.
Yankton County, et al.

Craig Storer
August 6, 2025

Page 65

(Recess taken from 10:08 a.m. to 10:19 a.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 10:19 this begins Media Unit 2.

Go ahead, Counselor.

MR. ANDERSON: Thank you.

BY MR. ANDERSON:

Q   Mr. Storer, you testified previously with respect to your understanding of the businesses of Reliance Telephone and Reliance Systems.

A   Yes, sir.

Q   They're competitors of NCIC, correct?

A   Correct.

Q   And is there any specific or particular geographic area that you consider them to be your competitor in?

A   Primarily in the Midwest. South Dakota, North Dakota, Minnesota, would be the primary ones.

Q   In comparison with Reliance, do you know who had -- which entity has more clients in South Dakota, NCIC or Reliance?

A   Currently, Reliance.

Q   Was that true in 2023?

A   Yes.

Q   And in North Dakota, currently, who has more clients, Reliance or NCIC?

A   I would guess Reliance.

Page 66

Q   Would that be true in 2023?

A   Yes.

Q   And in Minnesota. Same question.

A   That's a good question. I can't speak to that one way or another.

Q   Okay.

A   I wouldn't know.

Q   Okay. Both currently or in 2023?

A   Right.

Q   In 2023, prior to Yankton County, am I correct in understanding that NCIC had only one county as a client?

A   What time? Sorry.

Q   2023.

A   Yes. In that state, yes.

Q   And was that Minnehaha County?

A   It was -- is.

Q   And they had been a customer of somebody other than Reliance, correct?

A   Yes.

Q   When we were looking at Exhibit 36, sir, there was a reference, you recall, to Davison County?

A   Okay.

Q   And I believe -- correct me if I'm wrong -- I may have asked this, and I apologize if I did -- they were a

Page 67

Q   Reliance customer?

A   I believe so.

Q   And they did not switch; is that correct?

A   Not to date.

Q   You're hoping that you'll get them?

A   I wouldn't say -- comment on that one way or the other.

Q   Okay. And they had a long-term contract with Reliance at that time, correct?

A   Davison County?

Q   Yes, sir.

A   Yes, sir. I believe so.

Q   Do you recall whether it was five -- do you -- did you obtain copies of their contracts?

A   I can't recall.

Q   One way or the other?

A   No, sir.

Q   Do you recall whether you started trying to get Davison County as a customer before or after you first started with Yankton?

A   I couldn't recall.

Q   Would you have emails in your system about communications with Davison?

A   I'm sure.

Q   Is it your understanding or view that in the industry contracts between vendors and counties are typically

Page 68

Q   multiyear?

A   Yes.

Q   Is there a average number of years, based on your understanding in the industry, sir?

A   Every vendor is different, but it's pretty common in the industry to see a three-year initial term followed by a couple of one-year renewal option -- or extension options, but it varies. There is not a standard.

Q   Okay. And the Reliance contracts with Yankton were five years. Do you recall that, sir?

A   I don't recall off the top of my -- sounds -- sounds about right.

Q   Okay. Based on your experience in the industry, is there a general number of years for the relationship with a -- between a vendor and a county in excess of five years?

A   Depends how good the relationship is.

Q   Do you have any understanding as to the length of time that Reliance typically has relationships with its customers, on average?

A   I think Reliance has a lot of long-standing relationships with facilities that have smaller jails in the Midwest.

Q   Okay. Does NCIC have longer-term relationships with its customers or clients?

Page 69

A    Yes, we do.

Q    Any understanding as to an average number of years for your customers?

A    We are growing very rapidly all through the country and abroad.  In the states where we have been operating and functioning longer, like in a lot of the southern states, like Texas and Alabama and Oklahoma and those areas, we've got plenty of contracts that are in excess of 10, 15 years.

Q    When you say "plenty of contracts," you mean the relationship.

A    Yes, sir.

Q    Yeah.  You don't -- the contracts aren't 10- or 15-year terms.

A    No, sir.

Q    Okay.

A    No, but they're all -- sorry.  The overall, as far as renewed contracts and extended contracts and things like that.

Q    Do you recall when you first -- you personally first had contact with Yankton County?

A    No, sir.

Q    I'll hand you what's been marked previously as Exhibit 27, sir.

A    Thank you.

Page 70

Q    Please take a moment to look at the emails that comprise Exhibit 27 and then tell me whether you recognize or recall having seen the emails that include you as an author or recipient.

A    Yes, I do, at a high level.

Q    All right.  If you look at the very first email in time, which is the last page of the exhibit, sir -- very last page.

A    Yep.  Getting there.

Q    This is an email from Mr. Baniecke to Mr. Brandt, with a copy to you, dated March 29th of 2023.  Do you see that, sir?

A    Yes.

Q    Do you have any recollection of any conversations with Mr. Baniecke at or about March 29th concerning providing contact info to Mr. Brandt at Yankton County?

A    I don't have a direct recollection of that, but I'm sure it happened.

Q    Okay.  Do you have any recollection of having any contact with Yankton County -- of you having any contact with Yankton County prior to that time?

A    Yes, I have a high-level and general recollection of that happening.

Q    No, I'm sorry.  Prior to March 29th, do you have a recollection of having any contact with Yankton County?

Page 71

A    I -- I couldn't say one way or the other.

Q    You just don't recall?

A    I don't recall.

Q    All right.  Then if we go a couple of pages farther along, there is an email from Mr. Baniecke to Mr. Brandt with a copy to you on March 31st.  Do you see that, sir?

A    Yes.  At 12:40 p.m.?

Q    Yes, sir.

A    Yes, I see it.

Q    And in the email, summarizing, Mr. Baniecke asks about meeting at Yankton County on the morning of April 11th.  Do you see that, sir?

A    Yes.

Q    Do you have a recollection of meeting with Mr. Brandt on that morning?

A    I remember meeting with Mr. Brandt at the sheriff's office and detention facility.  I don't recall what day or time it was.

Q    Do you recall any of the discussions with Mr. Brandt at that time?

A    Yes, I do.

Q    And what do you recall of those discussions, sir?

A    General dissatisfaction with the service delivery being provided by their incumbent vendor at that time,

Page 72

reflecting some of the things that I've already mentioned in this deposition.  Various areas of operational dissatisfaction.  I believe I remember a general comment to the effect that the agreement was entered into before the new administration, Sheriff Crissey's administration, general conversation around those lines.

Q    With regard to the operational and general dissatisfaction, those are all things that you've already testified to, correct?

A    Today, yes.

Q    Yeah.  Anything other than what you already testified to that you can --

A    No.

Q    -- think --

A    No.

Q    All right.

A    Not that I can recall.

Q    Okay.  With regard to the general comment that the agreement was entered into before the current -- then current administration, do you recall anything more specific in that regard?

A    No, not really.

Q    Okay.  With respect to working to try to get Yankton County to become an NCIC customer, between you and

Case 4:24-cv-04098-ECS   Document 201-5   Filed 06/15/26   Page 12 of 32 PageID #:
6604
Reliance Telephone, et al. v.
Yankton County, et al.

Craig Storer
August 6, 2025

Page 73

Mr. Brandt, who was primarily, if you will, in charge or involved in that process -- strike that.

Between you and Mr. Baniecke --

A   Mr. Baniecke is our Midwest director of sales, and I support him.  I offer a supporting role for his efforts in the Midwest.

Q   So was Mr. Baniecke the one that was primarily leading the charge, or was it you or a combination of the two of you together?

A   Probably a matter of opinion, but I would say, from my opinion, he is the primary account executive, representative, salesperson here in this area, in the Dakotas.

Q   Okay.

Hand you next, sir, what's been marked as Exhibit 29.

A   Thank you.

Q   This is two emails and then an attached proposal.  Please take a moment to look at Exhibit 29 and tell me whether you recognize it.

A   (Examines document.)

Yes, I recognize it.

Q   The email on the lower half of the first page is from you to Mr. Brandt on April 12th of 2023?

A   Appears to be.

Page 74

Q   Okay.  And that would be a day after you met with Mr. Brandt in his office, correct?

A   Yes.

Q   And you provide him with a -- as you put it, a formal proposal for inmate communications.  Do you see that, sir?

A   Yes, I do.

Q   And is the attachment to Exhibit 29 that formal proposal that you provided?

A   I presume so.

Q   Did you prepare the proposal?

A   Yes, with help from Mr. Baniecke.

Q   If you go to -- strike that.

This was a proposal for a multiyear contract; is that correct?

A   They usually are, yes.

Q   Okay.  And if you go to what is page number 28, which has option -- excuse me -- 27 and 28, has Option 1 and Option 2?

A   Right.

Q   These were the two proposed calling rates and compensation options that you provided?

A   Yes.

Q   How did you arrive at the rates and compensation or commission structure offered in those?  Do you have a

Page 75

form or a grid that you try to stay within or something like that?

A   I have to be careful with -- I don't want to divulge too much of our IP and our operational processes and how we determine rates and revenue share and the mix of services that we provide; but at a high level, we would have looked at things like the size of the facility, the ADP, the average population, who the commissary company is at the facility, where it is geographically in relation to our nearest field technicians, a range of different characteristics of the facility that over the years has allowed us to develop the expertise needed to come up with a competitive offer for the facility and the agency.

Q   And what was it with respect to Yankton County that led you to the specific two options that you made here?  And just so you know, your counsel can designate your answer or portions thereof as attorneys' eyes only, so there's no issue about you divulging stuff that you might otherwise be concerned about, if he does it correctly.

A   I understand.

Q   All right.  Go ahead.

A   I guess the way I would answer that is kind of what I just mentioned a moment ago.  Whenever -- or

Page 76

oftentimes, when we do a proposal, we want to pitch a couple of options or offers for the agency's review and consideration to give them the flexibility to potentially choose what works best for their facility and their constituents.

I don't -- being several years ago, I don't remember exactly which of the considerations that I just mentioned we applied at that time, but it was probably all of -- part or all of those ones that I just -- certainly the population of the facility and the capacity of the facility.

Q   Do you recall how you came to have knowledge of the population of the facility between April 11th when you met with Mr. Brandt and providing this proposal on April 12th?

A   No, not directly.  Probably through verbal communications with him.  I -- I know how to go and get population estimates for any facility in the country through different means and mechanisms.

Q   How do you do that, sir?

A   Various ways.  Oftentimes the public-facing website of the sheriff's office or jail has the rated capacity for each facility.  It has reference to the average daily population.  A lot of times each facility will have an inmate roster, a public-facing inmate roster, so that

Page 81

facility on a sliding scale between zero cents a minute and 21 cents a minute and our experience in servicing other comparably sized facilities.

Q   The 18-cents-per-minute charge here, is that a unique rate to Yankton County that you were proposing?

A   No.

Q   Is it a -- typically a standard rate for NCIC?

A   No.  I wouldn't say it's standard either.

Q   Okay.  Is there a standard rate for NCIC, to your knowledge?

A   No.  Just within the confines of regulatory allowances.

Q   Okay.  And just so I'm clear, these rates that are quoted here, that is excluding USF and TSR fees, correct?

A   Yes, correct, and it's considerably less than the allowed rate for 21 cents per minute for domestic phone calls.

Q   Sure.  But then on -- the amount actually paid by the inmate is -- would be, for example, for prepaid collect calls in the United States, 18 cents plus the USF fee, plus the TSR fee, and then before sales taxes as well?

A   Depending on each phone call.  My understanding is not every -- not each one of those taxes is applicable to every single call type and billing type.

Q   Do you have an understanding as to which types those

Page 82

are applicable to?

A   My high-level understanding of the application of taxes -- and Bill Pope can speak to it better than I can because he's been around longer -- certain taxes are only applicable to out-of-state phone calls and not in-state phone calls.  I can't say right now which of the two that might be.  Different taxing jurisdictions have different requirements for how inmate phone companies have to handle the taxing of phone calls and video chats and text messages.

Q   As I look at these two proposals on Bates-numbered pages 294 and 295, they appear to be the same except that on Option 1, the categ- -- the line item that says "Technology Grant" is $10,000, which then results -- or has higher commission rates, of 60 percent for phone calls and 25 percent for video visitation and inmate messaging; and then if I look at the second page, the technology grant is $20,000 and the commission rates are 45 percent and 20 percent.  Do you see that, sir?

A   Yes, sir.

Q   My first question is, is a -- what you describe as a technology grant something that, in your experience, NCIC typically offers?

A   Not typically, but we -- we certainly do on a case-by-case basis, much like the rest of the industry.

Page 83

Q   Why did you offer a -- what you describe as a technology grant of either 10- or $20,000 to Yankton?

A   For the operational benefit of the facility and for the Yankton County Sheriff's Office to utilize as they see fit for the enhancement and the safety of their jail facility and the benefit of their inmates.

Q   Would you describe that as an extra bonus, if you will, for signing on with NCIC?

A   Not at all.  I describe it as an optional financial incentive to be utilized at the discretion of the Yankton County Sheriff's Office.

Q   It's a financial incentive to sign on with NCIC, correct?

A   Correct.

Q   And they can use what you title here as a "technology grant" however they wish, correct?

A   Correct.

Q   Do you have authority to offer technology grants at any amount or within a certain range?

A   My boss has given me the authority to offer financial arrangements to potential and existing customers within the confines of feasible business practices and revenue expectations.

Q   Okay.  What are those within that, business expectations?

Page 84

A   Well, they depend on a whole range of factors, including the size of the facility, potential duration of the contract, the operational needs and objectives of each facility, whether they are looking for financial injections to their inmate welfare fund, safety equipment for their deputies or their correctional officers, improvements in their facilities.

Q   So can you offer a technology grant in any amount without getting prior approval?

A   Me and Bill Pope have an arrangement and an understanding from our time working together.  He doesn't need to see everything that I'm doing because he trusts my knowledge and my judgment on these things.

Q   Okay.  What's the largest technology grant you've ever offered to a potential customer?

A   I would have no idea off the top of my head.

Q   Do you recall whether $20,000 was at the high end of what you have offered previously?

A   No, it's -- no, it's at the low end.

Q   Okay.  Did anyone from Yankton County tell you, prior to you sending this proposal to them on April 12th, that they wanted a financial incentive?

A   I can't recall.

Q   You just don't recall one way or the other?

Case 4:24-cv-04098-ECS   Document 201-5   Filed 06/15/26   Page 14 of 32 PageID #:
6606
Reliance Telephone, et al. v.
Yankton County, et al.
Craig Storer
August 6, 2025

Page 85

A   No.

Q   Okay. If you look at the email at the top of Exhibit 29, sir. First page.

A   29.

Q   Yep.

A   Big yellow sticker.

Q   Yeah. You need to keep -- the pages are coming apart, so that's why there's the clip, to try to keep them all clipped together.

A   Hmm.

Q   All right. That's an email from Mr. Baniecke to Mr. Brandt, with -- and you're copied, on April 20th. Do you see that, sir?

A   Yes.

Q   In the email Mr. Baniecke tells Mr. Brandt, in part, "Additionally, we can assist with some more or different contract termination language as well if you so desired." Do you see that, sir?

A   I do.

Q   Does NCIC provide contract termination language to potential customers for their consideration?

A   We provide a range of helpful and useful template documents of all types and all types of utility for agencies who are seeking guidance to potentially better their arrangements with their service providers in

Page 86

their facilities.

Q   Okay. When you say "better their arrangements with vendors," that's go with NCIC?

A   Potentially.

Q   Okay. Well, do you provide your range of template documents to counties for their consideration and use if they're going to go with someone other than NCIC?

A   It certainly has happened.

Q   Do you do that intentionally or was that where you were competing with someone and it turned out they used your template language to go with someone else?

A   That's happened quite a few times.

Q   But is that something you do intentionally, or they just did it?

A   How do you mean in- -- is it something I did -- I didn't intentionally want them to choose another vendor because of the nature of my job, but I intentionally provide agencies with a range of useful template documents that they may otherwise not have the internal expertise or knowledge to develop by themselves.

Q   And your intention in providing them with those templates is that they would use it to go with NCIC.

A   My intention in providing those documents is to help themselves guide their own way through their procurement process to choose whatever service provider

Page 87

best suits the operational objectives of that agency.

Q   You hope that's NCIC, don't you?

A   Of course I do.

Q   Okay. How many different templates or documents does NCIC have for -- to assist potential customers with terminating their existing contracts with vendors?

A   A handful. Less than ten, probably. There is really only a limited number of documents that are useful in our industry for procurements and competitive bids and so forth.

Q   I'm going to hand you what's been marked previously as Exhibit 30, sir. Please take a moment to look at Exhibit 30 and tell me whether you recognize it.

A   Yes, I do.

Q   Is this a form of template that you recognize as originating from NCIC --

A   It looks --

Q   -- with certain information filled in specific to this matter?

A   It looks similar to a template document that we have, on occasion, provided to correctional agencies, yes.

Q   Does seeing Exhibit 30 -- do you know whether you provided this template or form of template to Yankton County or Mr. Baniecke?

A   I can't recall whether that happened or not.

Page 88

Q   Okay. You don't recall whether it was you or him or --

A   I -- I don't.

Q   All right. Thank you.
    Do you recall that Mr. Brandt was concerned whether -- about whether they could legally terminate their contract with Reliance?

A   I don't recall whether he had any concern about that.

Q   Do you recall any conversations with Mr. Baniecke concerning Brandt's concerns?

A   No, I don't recall anything specific to that.

Q   Do you recall generally that that was one of his concerns?

A   No, I don't recall that.

Q   Going back to Exhibit 36, sir, which we looked at earlier today. Exhibit 36.

A   Yep.

Q   On the bottom of the first page, as part of a thread, there is an email from Mr. Brandt to Mr. Baniecke in which Mr. Brandt says, in part, "I had the sheriff speak with our attorney regarding our contractual commitment to Reliance." Do you see that, sir?

A   Yes, I do.

Q   As part of this email thread that ultimately you're the author of on the first -- first email on that page, do you recall having seen that at the time, from

Page 97

general sales and business development activities around the country.

Q   So that's something you just do generally with respect to potential customers?

A   I do it all the time.

Q   Okay.

MR. ANDERSON: Would you mark this as the next exhibit, please.

(Exhibit 101 is marked for identification.)

BY MR. ANDERSON:

Q   Sir, I'd like you to look at what's been marked as Exhibit Number 101.

A   Thank you.

Q   It has production numbers NCIC 011285 to 297. Please take a moment to look at Exhibit 101 and tell me whether you recall having seen or received the emails and documents that are part of it.

A   40 cents per minute.

Yes, they look familiar.

Q   Okay. My first question, sir, is, do you know why these were produced by NCIC with a "Draft" legend across them?

A   No, I've got no idea.

Q   Do you know whether this is how they exist in NCIC's files, with this "Draft" legend across them?

Page 98

A   No, I wouldn't be able to speak to that.

Q   Okay. If you go three pages in, to Bates-numbered page 11287.

A   11287. Uh-huh.

Q   Is that a yes?

A   Yes, sir.

Q   Okay. There is an email from Mr. Brandt on July 12th in which he states "I got the green light to proceed with sending the letter to Reliance. You had mentioned that you wanted to have another call before I send it." Do you see that, sir?

A   I do, yes.

Q   Okay. Do you recall having seen or received this email from Mr. Brandt indicating that he had gotten the green light to proceed with sending the letter to Reliance?

A   I don't recall emails that I received last week.

Q   Okay. So do you have any reason to believe that you did not receive -- or see -- receive this email on or about July 12th of 2023?

A   No. I'm sure I did.

Q   Okay. And in it Mr. Brandt requests a call or says that "You -- you wanted -- You wanted to have another call." Do you see that? And that's referring to Mr. Baniecke, I believe?

A   I'm sorry. Which page are you on now?

Page 99

Q   I'm still on the page third -- third page.

A   Yes.

Q   Do you recall whether you participated in a call with Mr. Brandt at or shortly after this date -- and Mr. Baniecke?

A   I would have no idea.

Q   Okay. Do you keep any sort of notes of phone conversations that you have, sir, in your business?

A   Not if I want to spend three hours of day keeping track of myself.

Q   All right. Do you keep any sort of a diary entry?

A   No.

Q   Okay. If you go to the last -- the pages that begin with NCIC 11295.

A   Okay. Do you mean the number in the bottom right corner?

Q   Yes, sir.

A   Okay.

Q   Yes. And these appear to be, I think, screenshots -- at least the next two pages are images from a Reliance Telephone website. Do you recognize --

A   Yes, sir.

Q   -- them as such?

A   They look familiar.

Q   Do you recall whether you obtained those web pages?

Page 100

A   I have in the past, yes.

Q   Okay. Do you recall doing so in or about June or July of 2023?

A   No, not specifically.

Q   Okay. On NCIC 11295, it says -- under "Prepaid Collect Call Account Information and Fees," there is a line that says "Collect State-to-State Calls." Do you see that?

A   Collect -- oh, yes. Yes, 21 cents per minute. Yes.

Q   21 cents per minute plus applicable taxes, plus federal universal service fund." Do you see that, sir?

A   I see it, yes.

Q   Okay. To your understanding, that's within the amounts permitted by the FCC, correct?

A   That particular reference is, yes.

Q   Okay. And then in the next line above, it says "Collect in-state calls, 25 cents to 40 cents per minute plus applicable taxes. Rate may vary depending on facility." Do you see that, sir?

A   Yes, I see it.

Q   And correct me if I'm wrong, but in-state calls are not regulated by the FCC, correct?

MR. MOSER: Objection to the extent it calls for a legal conclusion.

You can answer if you know.

Page 101

THE WITNESS: That's -- that's a contentious issue in our industry.

BY MR. ANDERSON:

Q   Okay.  What do you mean by it's a contentious issue in your industry?

A   There is petitions for reconsideration in front of the FCC at the moment, appeals from different vendors as to whether or not the Federal Communications Commission has jurisdiction to interfere with contracts between local enforcement agencies and their vendors.

Q   Do you recall whether, as of June or July of 2023, it was permiss- -- the in-state calls were not regulated or under the jurisdiction of the FCC, based on your understanding?

A   At which time?  Sorry.

Q   June or July of 2023.

A   For in-state calls?

Q   Yes, sir.

A   It was -- it's my opinion that at that time the FCC should not be regulating calls that originate and terminate within the same state.

Q   Okay.

A   That's my opinion.

Q   Okay.  But do you have a recollection of what understanding based on your knowledge of FCC that you

Page 102

have garnered through your years in the industry?

A   No.

Q   Okay.  The next page, sir.

A   11296?

Q   Yes, sir.  Do you recognize this as a image from the Reliance Telephone website?

A   Yes, it is.

Q   And do you recall being aware of this page of the website in or about June or July of 2023?

A   Yes, at a high level.

Q   Okay.  And under "Phone Card" for -- if you go down to the bottom, it says "Phone Card State-to-State Calls, 21 cents per minute plus federal universal service."  Do you see that?

A   Directly underneath the reference to 40 cents a minute?

Q   Directly underneath that.

A   Yes.

Q   And the 21 cents per minute plus federal universal service, that's within the FCC regulations, based on your recollection and understanding, correct?

A   That particular reference is, yes.

Q   All right.  And then above that, it says "Phone Card In-State Calls, 40 cents per minute."

A   I see that.

Q   Do you see that, sir?

Page 103

A   Yes.

Q   And is it your understanding that as of -- at least as of June, July of 2023 those rates were not regulated by the FCC?

A   It is my understanding, comprehensive understanding, that at the time you just mentioned, in-state phone calls of a prepaid nature, such as phone card calls where the friend or family member has paid for the call and funded the card before the time that the call was placed, making a prepaid call, that 40 cents a minute is absolutely outside of the allowances of the FCC.

Q   Are you aware -- is that across the board for everybody, or is that just your understanding?

A   That's my understanding of industry allowances.

Q   Okay.  Are you aware whether Reliance Telephone had made -- had submitted various studies to the FCC and had received approval to charge 40 cents per minute for in-state calls, pre -- phone card in-state calls?

A   I have no idea about that.

Q   Okay.  Did you make any effort to investigate that fact?

A   No.

Q   Okay.  Under "Prepaid Collect Calls," looks like part is cut off, but it says "Collect Local Calls, 25 cents per minute plus applicable taxes."  Do you see that,

Page 104

sir?

A   Yes.

Q   Is it your understanding that that is within the FCC regulations?

A   At that time, yes, collect calls were allowed to be charged up to 25 cents a minute.

Q   Okay.  And then it looks like collect in-state calls, there's a line missing.

A   I can't --

Q   There's nothing --

A   I can't comment on that.

Q   Yep.  Okay.
    Then if you look at the next page, this is the document headed "Inmate Phone Rates 2020."  Do you see that, sir?

A   Yes.

Q   Okay.  And we looked previously at Exhibit -- I think it was 57 or 58 in your stack.

A   Okay.
    I can't see a 57 or a 58.

Q   Oh, here.  I'm sorry.  I took it back.

A   No worries.

Q   There you go.  No worries.

A   Okay.

Q   All right.  And that's the -- a document from Yankton

Page 105

County to N- -- to -- excuse me -- from Reliance Telephone to Yankton County that includes, if you go to the last page, the inmate phone rates 2020.

A   Proposed at that time --

Q   Yes.

A   -- evidently.

Q   Yes.

A   Yes, sir.

Q   And you would agree that that last page is the same as NCIC 00 -- excuse me -- 011297 in Exhibit 101.

A   This page in front of me?

Q   Yes.

A   Appears to be, at a glance.

Q   Okay.  Well, take a minute to look at the two and compare them and tell me whether you see any differences.

A   (Examines documents.)

They appear to be the same.

Q   Okay.  On the inmate phone rates, the last page -- so the last page of Exhibit 101, are there any rates there that you see that you believe are contrary to what was permitted by the FCC at the time?

A   On these -- on either of these pages that I'm looking at?

Q   Just pick one since you said they appear the same.  You

Page 106

can look at 11297, the page that came from NCIC's files.

A   This document suggests that these rates were posed and potentially applicable as of 2020.  There was a significant FCC proceeding in 2021 that preceded the 2024 FCC proceeding --

Q   Okay.

A   -- and I can't immediately recollect what the allowances were regulatorily in 2020.

Q   Okay.  So you don't -- as you sit here today, you have no way of recollecting whether the rates on this page, which NCIC had, since it was produced from their files -- whether all those rates are within the FCC regulations; is that correct?

A   This was several years before the screenshots were taken from the website if it -- it looks to be.

Q   I understand that, but my question is with regard to the rates specifically on the last page of Exhibit 101.  My question is, as you sit here today, you do not know whether any of those rates are or are not within the FCC rates as of 2020; is that correct?

A   My short answer is yes.

Q   Yes, they were?

A   My short -- my short answer is yes, I don't know --

Q   All right.

Page 107

A   -- off the top of my head, but I would question some of them, and I'll have to go back and check.

Q   Well, did you make any effort to go back and check as to whether these rates were within FCC regulations in or about June or July of 2023?

A   Any assertion that I made about the regulatory allowances for calling rates and video visitation rates would have been made based on the materials that I was looking at in 2023, not in 2020.

Q   Okay.  What materials were you looking at in 2023?

A   From recollection, the public-facing Reliance website specific to Yankton County.

Q   Anything other than that, sir?

A   Not that I can recall.

Q   And with regard to the public-facing website, do you know whether the two preceding pages in Exhibit 101, Bates-numbered 11295 and 11296 -- whether those were the public-facing Reliance Telephone website pages for Yankton County?

A   They -- excuse me.  They appear to be.

Q   Okay.  Did you -- so that's what you were looking at at that time?

A   Presumably.

Q   Okay.  Do you recall looking at anything else?

A   Not off the top of my head.

Page 108

Q   Do you recall doing any other research into the -- the legitimacy or the appropriateness of the rates being charged by Reliance Telephone, other than relying on what you saw on the public-facing website pages for Yankton County?

A   Not off the top of my head.

Q   Thank you.

Ask you to look at what's been marked previously as Exhibit 41, sir.

A   Thank you.

Q   Please take a moment to look at Exhibit 41 and tell me whether you recall having seen this -- these emails and the attachments previously, sir.

A   Okay.  They look familiar.

Q   All right.  If you look on the first page, there's an email from Mr. Baniecke to Mr. Brandt with a copy to you on July 10th.  Do you see that?

A   Yes, I do.

Q   And in the email Mr. Baniecke references a call "last week."  Do you see that?

A   I do, yes.

Q   Do you recall whether you participated in the call with Mr. Brandt that Mr. Baniecke is referencing?

A   Absolutely no clue.

Q   Okay.  It then goes on to say "Craig put the attached

Page 109

letter together for you." Do you see that, sir?

A   Yes, I do.

Q   Okay. And then he says "I included a snippet from the Reliance website regarding your calling pricing as referenced in the attached letter." Do you see that?

A   Yes.

Q   And then the snippet, I believe, is on the next -- second page of Exhibit 41. Do you see that, sir?

A   Yes.

Q   And do you recall whether you had any discussions with Mr. Baniecke concerning the rates or the calling pricing referenced in the snippet?

A   It appears that I did.

Q   And what do you recall of those conversations, sir?

A   They were probably in parallel to the conversations I had with Mr. Baniecke for pricing and rate considerations for facilities that we're pursuing in different parts of the Midwest.

Q   Anything that you recall specific with regard to the rates being charged by Reliance Telephone?

A   Outside of the excessive nature of them and how we could potentially provide a more favorable arrangement for Yankton County and its constituents, no.

Q   When you say "excessive nature," what do you mean?

A   40 cents a minute for prepaid phone calls, depending on

Page 110

your personal opinion and industry norms, is excessive.

Q   Okay. Why do you say that in your personal opinion and industry norms you find that excessive?

A   Because the FCC and regulators have seen fit to get involved in our industry because of things like this.

Q   At the time were -- was the FCC regulating the 40 -- the in-state calls?

A   At the time in 2020- --

Q   3?

A   -- -3, I believe the FCC stated that they had the authority and the jurisdiction to, yes.

Q   Okay. But they had not actually done so, correct?

A   The FCC has never policed anything that they've gone and done.

Q   Okay. But at least when they -- they said they had jurisdiction but they hadn't imposed any rates for in-state calls, correct?

A   They had for a lot of vendors in the industry.

Q   Do you know whether they imposed rates for Reliance Telephone in the industry at that time?

A   My understanding is yes, that they did, like every other vendor.

Q   What is your understanding based on that they had done so for Reliance Telephone specifically?

A   I can't recall if it was the 2021 FCC order, but one of

Page 111

the FCC orders prior to the 2024 FCC IPCS order was that -- one of the long-standing issues that the FCC had was that vendors in our industry were able to work around regulations governing out-of-state versus in-state phone calling because they -- some vendors claimed to the FCC that they couldn't tell whether or not a call was, in fact, an in-state or an out-of-state phone call unless they geographically located the recipient of the phone call at the time that each phone call was placed. Someone that lives in South Dakota could be in Timbuktu and receive a phone call, and there's always been contention in the industry as to whether or not that qualifies as an out-of-state or an in-state phone call.

Now, the FCC preempted local jurisdiction at one point because they came out with -- I forget what they named it, but they essentially said that if you're a vendor in our industry and you can't determine the exact geographic location of an individual at the time that they're receiving a phone call, then you can't determine whether or not that's an out-of-state phone call, and thus you will be beholden to the requirements of the FCC. And I'm quite certain that happened before 2023.

Q   Okay. Do you know whether -- or do you know that

Page 112

Reliance Telephone submitted studies to the FCC, which were approved, to determine the amount of calls that are in state versus out of state?

A   I'm aware that FCC, compared to other players in the industry's interaction with the FCC and contributions to meaningful change with the FCC, has been minimal.

MR. ANDERSON: For the record, I'll object and move to strike as nonresponsive.

BY MR. ANDERSON:

Q   Could you please answer my question, sir.

MR. ANDERSON: Would you, Court Reporter, please reread my question.

(The record was read by the reporter as follows:

"Q   Do you know that Reliance Telephone submitted studies to the FCC, which were approved, to determine the amount of calls that are in state versus out of state?")

THE WITNESS: No, I do not know that.

BY MR. ANDERSON:

Q   With regard to the rates shown there of state-to-state calls of 21 cents per minute plus federal universal service, that's within the FCC regulations, based on your understanding, correct, sir?

A   21 cents for calls across state lines, yes.

Q   Okay. And the collect local calls, 25 cents per minute

Page 113

plus applicable taxes, that's within your understanding of what was permitted by the FCC at the time, correct?

A   Yes, correct.

MR. ANDERSON: Mark this as the next exhibit, please.

(Exhibit 102 is marked for identification.)

BY MR. ANDERSON:

Q   I'm going to hand you what's been marked as Exhibit 102, sir.

A   Thank you.

Q   It has production numbers NCIC 003963 to 65. Please take a moment to look at Exhibit 102 and tell me whether you recognize the emails and the attachment.

A   Yes, they look familiar.

Q   Okay. Exhibit 41, which you were just looking at, references an attached letter that it says Craig put together.

A   Uh-huh.

Q   Okay. Is the attachment to Exhibit 102 the letter that you put together for Yankton County to use?

A   Potentially.

Q   Well, take a moment to look at the attachment and tell me whether you believe that is it.

A   I couldn't say one way or another. It's been that long ago.

Page 114

Q   All right. Take a moment to look at Exhibit -- the attachment to 102 and tell me whether it appears to be a letter that you put together.

A   Yes, it looks like I may have been involved with it.

Q   All right. In fact, there is a comment on the draft letter that's indicated as being from Craig Storer 1. Do you see that, sir?

A   Yes.

Q   And you say in the comment "Todd - I think you mentioned it was a 12-step program... please adjust as needed." Do you see that?

A   Yes, I do.

Q   Would that indicate to you that that was a comment that you added to this draft?

A   Yes, it does.

Q   In the draft letter, there are three areas of dissatisfaction listed. Do you see that, sir?

A   Yes.

Q   Okay. The first one, "Utility of Handheld Devices," do you see that, sir?

A   I do, yes.

Q   Is that information that you were taking based on what Mr. Brandt had communicated to you?

A   Potentially. I can't recall.

Q   You just don't recall one way or the other?

Page 115

A   Uh-uh.

Q   All right. Is that a no?

A   No.

Q   Okay. And then Item 2 is "Nondelivery of Technology and Programming." Do you see that, sir?

A   I see it, yes.

Q   And is that based on information provided to you -- provided to you by Mr. Brandt?

A   I can't recall.

Q   Just don't recall one way or the other?

A   No, sir.

Q   Do you have any other -- do you have any idea where that information may have come from if not from someone at Yankton County?

A   No idea.

Q   Okay. The third item, "Calling Rates and Fees," do you see that, sir?

A   Yes.

Q   Do you know what the genesis or source was for that area of dissatisfaction?

A   No, not off the top of my head.

Q   Do you recall Mr. Brandt ever expressing to you during any of your conversations with him prior to July 7th of 2023, concerns about the calling rates being charged by Reliance?

Page 116

A   Yes, I do.

Q   What do you recall in that regard?

A   Just general commentary about the expensive nature of the communication services being provided and how it was creating complaints from inmates and their families to the folks who worked at the sheriff's office and the jail.

Q   Did he ever express to you that he thought the Reliance rates were in excess of those permitted by the FCC?

A   I don't believe Mr. Brandt had the regulatory knowledge to make any comments to that effect.

Q   So the answer is no?

A   No.

Q   Okay. So in the last sentence of section 3, there's a sentence that says "As Reliance is aware, any calls in prepaid format currently being charged at a rate higher than 21 cents per minute is a violation of FCC -- of current FCC allowances." Do you see that, sir?

A   I see it, yes.

Q   That would be a sentence or a point that you inserted, correct?

A   I couldn't say one way or another whether I inserted that comment.

Q   Well, you said that Mr. Brandt would have no way of knowing.

Page 117

A  That doesn't mean he didn't go and research it.

Q  Well, as you sit here today, are you aware of whether he researched it?

A  I've got no idea.  Potentially, in his role as a jail administrator.

Q  So you just don't know.

A  I don't know.

Q  Okay.  If we look back at Exhibit 41, sir.

A  Yes.

Q  The rates listed on the second page of Exhibit 41 for phone card state-to-state calls, I believe you testified, was within the FCC regulations, to your knowledge.  Correct?

A  Phone card state-to-state calls --

Q  Yes.

A  -- 21 cents per minute.  Yeah.

Q  Plus --

A  Yes, sir.

Q  And collect local calls, 25 cents per minute plus applicable taxes, that was within the FCC rates, to your recollection and understanding, correct?

A  Yes, sir.

Q  And with regard to phone called -- call [sic] in-state calls, the 40 cents per-minute, I believe you testified you don't know whether that was permissible in this

Page 118

regard.  Correct?

A  My understanding is that it's not permissible and outside of FCC allowances.

Q  Okay.  But did you make any effort to determine whether Reliance Telephone, based on its studies submitted to the FCC, was permitted to charge 40 cents per minute for in-state calls?

A  No.

Q  You just don't know?

A  I don't recall.

Q  Okay.  And correct me if I'm wrong, but I believe you testified that the FCC -- or at least it's an area of disagreement whether the FCC has jurisdiction to regulate in-state calls.  Is that correct?

A  Amongst some players in the industry, yes.

Q  Does that include NCIC?

A  We've always adhered to FCC parameters and allowances.

Q  But that's not my question.  My question is whether that is an area of disagreement at NC- -- NCIC that --

A  No.

Q  So NCIC agrees that the FCC has jurisdiction to regulate purely in-state calls.

A  We have adhered to FCC's position on in-state call billing, yes.

Q  Well, that's not my question.

Page 119

A  Okay.

Q  My question --

MR. MOSER: Objection.  He doesn't speak for NCIC.

MR. ANDERSON: I understand.

BY MR. ANDERSON:

Q  Is it your understanding, from being employed at NCIC, that NCIC does not dispute that the FCC has jurisdiction to regulate purely in-state calls?

A  I can't comment --

MR. MOSER: Object to the form.

THE WITNESS: -- to that --

MR. MOSER: Answer if you can.

THE WITNESS: -- one way or another.

MR. ANDERSON: Let's take a break.

THE VIDEOGRAPHER: The time is 11:28.  This is the end of Media Unit Number 2.  We're off the record.

(Lunch recess taken from 11:28 a.m. to 12:34 p.m.)

THE VIDEOGRAPHER: We are back on the record.  The time is 1234.  This begins Media Unit Number 3.

Go ahead, Counselor.

BY MR. ANDERSON:

Q  Good afternoon, Mr. Storer.

A  Howdy.

Q  You understand you're still under oath?

A  Yes, absolutely.

Page 120

Q  Could you go back to Exhibit 102, briefly, sir?

A  Yes.

Q  And --

A  Okay.

Q  -- specifically the draft letter that is the second and third pages of the exhibit.

A  Second -- okay.

Q  We were looking at section 3, Calling Rates and Fees.

A  Uh-huh.

Q  Do you recall that --

A  Yes.

Q  -- prior to the break?  And directing your attention to the last sentence of that section which says "As Reliance is aware, any calls in prepaid format currently being charged at a rate higher than 21 cents per minute is a violation of current FCC allowances."  Do you see that, sir?

A  I do.

Q  Would you agree that accusing a telecommunications service provider of charging rates in violation of current FCC allowances is a serious allegation?

A  No.

Q  Why do you say -- would you -- would it bother you if NCIC was accused of charging rates in violation of current FCC allowances?

Page 121

A  Not one little bit.

Q  So if a internet and advertising campaign started by -- is run that accuses NCIC of charging rates in violation of current FCC allowances, that wouldn't bother you at all.

A  Wouldn't concern me in the slightest.

Q  Wouldn't think it'd be -- adversely reflect on NCIC?

A  No.

Q  Do you think that this allegation, as against Reliance, adversely reflects on Reliance?

A  Who made the allegation?

Q  Well, Mr. Brandt is preparing to.

A  I don't have an opinion on that one way or the other.

Q  And -- okay.  I'd like you to look at what's been marked previously as Exhibit 42.  I got it right here.

A  Okay.  Thank you.

Q  Please take a moment to look at Exhibit 42 and tell me whether you recall having seen the emails in this exhibit previously.

A  They look familiar.

Q  Okay.  On the second page, at the bottom there's an email from Mr. Brandt.  It's addressed to Mr. Baniecke, but I believe you end up receiving it as part of the thread, in which Mr. Brandt says "I got the green light to proceed with sending the letter to Reliance."  Do

Page 122

you see that?

A  Yes.

Q  Do you know who Mr. Brandt received the green light from?

A  No idea.  I don't speak on behalf of Mr. Brandt.

Q  Do you recall any discussions with Mr. Baniecke concerning Mr. Brandt apparently receiving the green light to proceed?

A  Nothing outside of this email thread.

Q  Okay.  In the response from Mr. Baniecke to Mr. Brandt on July 12th, he references, in the second sentence, "We need to firm up some dates from our installation team."  Do you see that, sir?

A  Sorry.  I'm trying to keep up here.

Q  Sure.  Second page, at the bottom.

A  Yes, I see that.

Q  Okay.  And then there is -- if you continue up on the thread to the first page, it indicates that you sent a Zoom link.

A  Correct.

Q  Okay.  And that was a Zoom link with Mr. Brandt and the NCIC installation team; is that correct?

A  I don't think I've ever been on a Zoom session with NCIC's installation team.

Q  Okay.  Do you recall what the Zoom link with Mr. Brandt

Page 123

was with regard to?

A  Evidently potential business development efforts.

Q  Well, not to speculate, but do you remember?

A  No.

Q  Okay.  Do you recall that as of about June 13th you believed that the relationship with N -- with Yankton County and Yankton County going -- switching vendors to NCIC was going to proceed?

A  Based on some of the commentary like what I see in this thread here about, quote, constant issues with the video visitation system, then yes.

Q  Okay.  Are you referring to -- what are you referring to there?

A  An email from Mr. Todd Brandt --

Q  Which --

A  -- on July 10th, 2023.

Q  And is that in Exhibit 42?

A  Yes, it is, the most recent one you handed me.

Q  So the answer to my question, as of that point in time, you believed -- or you were confident that the -- that Yankton was going to switch to NCIC.

A  I've never been confident about that until it happened, but I was hopeful, probably.

Q  Well, you were taking steps under the assumption or belief that they were going to convert to NCIC,

Page 124

correct?

A  Not the assumption or the belief.  The hope.

Q  Okay.

MR. ANDERSON: Would you mark that as the next exhibit, please.

(Exhibit 103 is marked for identification.)

MR. MOSER: Is this 103?

MR. ANDERSON: I believe so.

BY MR. ANDERSON:

Q  I'd like to hand you, sir, what's been marked Exhibit 103.

A  All righty.

Q  It has production number NCIC 003137.  Please take a moment to look at the exhibit and tell me whether you recall having seen it previously.

A  Yes.

Q  And these are emails from you to Mr. Brandt, correct, and from --

A  Evidently.

Q  And in the first email timewise on July 13th, you attached examples of -- said "an example of something that can be posted in/near the inmate living areas to publicize about the change to mail scanning when NCIC comes in."  Do you see that, sir?

A  Yes.

Page 133

see Yankton changing course."  Do you see that?

A   Yes, sir.

Q   First off, what did you mean by "I don't see Yankton changing course"?

A   Evidently that was relative to Yankton's desire to pursue an upgrade to their system in their jail with a move to NCIC.

Q   That was terminating their contract with -- or contracts with Reliance and going with NCIC, sir?

A   That potentially would be a part of it.

Q   Okay.  Do you recall discussing the status of the -- of Yankton changing to NCIC with Mr. Pope on or about -- or in about August -- mid-August of 2023?

A   Not outside of this email thread.

Q   Okay.
    Hand you what's been marked previously as Exhibit 46, sir.

A   Thank you.

Q   Please take a moment to look at Exhibit 46 and let me know whether you recall having seen these emails or the email threads previously.

A   Yes, they look familiar.

Q   I had asked you previously if you recalled drafting a response letter to Reliance's e- -- or communication back to Reliance Telephone dated July 30th.  Do you

Page 134

recall that?

A   Yes, sir.

Q   And I believe you indicated -- correct me if I'm wrong -- that you didn't recall whether you did so?

A   I can't recall.

Q   All right.  If you go to page 3, there is an email from Mr. Brandt to Mr. Baniecke and yourself dated August 2nd.  Do you see that, sir?

A   Yes, I do.

Q   And he says "I received the attached letter this morning."  Do you see that?

A   Yes.

Q   Given the date, would that indicate to you that it was the letter from Reliance Telephone dated July 30th that we looked at previously?

A   Potentially.

Q   Do you have any reason to believe that it's not?

A   No.

Q   Okay.  And then in response, you wrote to Mr. Brandt on August 2nd saying, in part, "Bill and I are reviewing." Do you see that?

A   Yes.

Q   And do you recall reviewing the response letter from Reliance Telephone with Mr. Pope?

A   No, not at all.

Page 135

Q   Do you recall discussing it with him?

A   No.

Q   And when you say you don't recall, you just don't recall one way or the other?

A   Right.

Q   Okay.  In your response email to Mr. Brandt, you say "We are prepared to push forward as planned, for reasons we can discuss later."  Do you see that?

A   Yes.

Q   Did you discuss the reasons with Mr. Brandt?

A   I'd have no idea.

Q   Just don't recall?

A   Don't recall.

Q   All right.  And then in the next email from Mr. Pope to you and Mr. Brandt and Mr. Baniecke, he makes a couple of comments.  Do you see that, sir?

A   Yes, towards the bottom of the second page --

Q   Yes, sir.

A   -- and onto the next one?  Yes.

Q   Yep.  And do you recall discussing that at all with Mr. Pope?

A   Not outside of this email thread.

Q   Okay.  So you don't recall anything beyond what's stated in the email?

A   No.

Page 136

Q   All right.  And then in the next email addressed to Mr. Pope, Mr. Brandt, and Mr. Baniecke, you say "Attached --" in part, "Attached is the response I'm proposing which I sent to you and Scott yesterday."

A   Yes.

Q   Okay.  And is that -- if you go to the last two pages of the exhibit, is that the draft response that you prepared?

A   I would have no idea.

Q   Well, it's from NCIC's files, based on the production number.

A   Okay.

Q   And it says "Dear Dave," and it's just typed out.  You don't -- you don't recognize that as a draft response that you wrote?

A   It looks like a familiar document.  I couldn't tell whether I drafted it or not.

Q   Okay.  So we'd have to look at the meta- -- what's known as the metadata?

A   Sure.

Q   Okay.  And if the metadata shows that you drafted it, you wouldn't have any reason to disagree or dispute that, would you?

A   No.

Q   In the draft attachment on the second page, there are

Page 137

two sections that are highlighted.  Do you see that?

A   Yes, sir.

Q   And the first one on the second page says "Todd, you might wish to add your own comments here regarding the portion of their response concerning continual failing of visitation and how that's been handled by Reliance."  Do you see that?

A   Yes.

Q   Do you recognize that as a comment that you made?

A   It may be.

Q   You just don't recall one way --

A   I don't --

Q   -- or the other?

A   I don't recall.

Q   And then in the next paragraph, there is also a highlighted parenthetical.  Do you see that, sir?

A   Yes.

Q   And it says "Todd, enter the date you put in your original letter... I think it may have been November 1st?"  Do you see that?

A   Yes, sir.

Q   Do you recognize that as a comment that you made in this draft letter?

A   It potentially could be.

Q   You just don't recall?

Page 138

A   I don't recall.

Q   If we go back to the second page.  At the top there's an email from Mr. Pope to you.  Do you see that?

A   Yes.

Q   And he references an attached FCC order.  Do you see that?

A   Yes, sir.

Q   Do you recall having any dis- -- first off, do you recall reviewing the attached FCC order?

A   I'm sure I reviewed it at some point.

Q   You just don't recall?

A   I recall reviewing it, not specific to Yankton County or this situation.

Q   Okay.  Do you recall any discussions with Mr. Pope concerning the FCC order?

A   We've had hundreds of discussions about FCC orders over the years.

Q   Okay.  And then there's a second FCC order that he references.  Do you see that?

A   Yes.

Q   And same questions.  Do you recall reviewing that second FCC order?

A   With Mr. Pope, yes, numerous times.

Q   Okay.  But specifically in response to this email?

A   No.

Page 139

Q   What do you recall of reviewing it with Mr. -- or discussing it with Mr. Pope numerous times?

A   Probably generalities about NCIC's ongoing efforts to observe and comply and adhere to FCC parameters and how that's going to affect our general business operations, how it will affect our ability to deliver services and applications to our facilities, things of that nature.

Q   Would it be fair to say that based on your conversations with Mr. Pope, that NCIC would prefer to minimize the extent of FCC regulation?

A   I think any independently owned organization worth their salt would probably want to minimize regulatory interference with their operations.

Q   So the answer to my question is yes?

A   Yes.

Q   All right.  And would it be fair to say that NCIC desires to maximize the revenue that it can earn from providing inmate communications services?

A   Not necessarily.

Q   So do you think NCIC wishes to minimize the revenue it can earn?

A   Not necessarily.

Q   What does it wish to do with regard to the revenue that it earns?

A   Provide service and technology in a way that we can

Page 140

operate economically and feasibility without gouging inmates and their families and hopefully earn a -- or return a fair revenue share to the agencies that we work with for their operational benefit.

Q   Do you care about making any money or -- for NCIC?

A   We have to, to survive and operate.

Q   To your understanding, does NCIC wish to maximize the revenue that it earns?

A   In some cases I'm sure that's the objective.

Q   In some -- what cases would it not be the objective, to your knowledge?

A   When we service a facility where there is a strategic reason we may want to potentially take some kind of a short-term loss in order for a longer-term expansion in a particular territory or something of that nature.

Q   Okay.  With respect to Yankton County in South Dakota, were you willing to -- were you trying to take a short-term loss --

A   No, I doubt it.

Q   Okay.  If we continue on on the exhibit, sir, there's an email from you to Mr. Brandt on August 7th, again referencing "please see the attached."  Do you see that?

A   Yes, sir.

Q   All right.  And again, do you have any reason to

Page 141

believe that that is not referring to the last two pages of Exhibit 46?

A   It could very well be.

Q   Do you have any reason to believe that it's not?

A   No.

Q   Okay.  And then in response, Mr. Brandt says to you "I'll be in touch later."  Do you see that?

A   Yes.

Q   Do you recall whether Mr. Brandt got back to you?

A   No idea.

Q   Don't recall one way or the other?

A   Don't recall.

Q   All right.  And then if we go up to the top email on the page, there is an email from you to Mr. Baniecke. Do you see that?

A   Yes.

Q   And in the email, in part, you state to Mr. Baniecke "Just wanting to give Todd all the ammo he needs."

A   Yes.

Q   Do you see that?

A   Yes.

Q   And what does that refer to?

A   I couldn't recall.

Q   Okay.  Does it refer to giving Mr. Todd [sic] all of the ammunition you thought he needed to be able to

Page 142

terminate the contracts with Reliance Telephone and Reliance Systems?

A   Potentially.

Q   Is there anything else that it could refer to, other than that, potentially?

A   Putting the necessary steps in place to upgrade and enhance the inmate communications environment at the Yankton County Jail.

Q   And that would be replacing Reliance Telephone with NCIC, in your opinion, correct?

A   That would necessarily need to be a part of that, yes.

Q   All right.

    MR. ANDERSON: Mark this as the next exhibit, please.

    (Exhibit 105 is marked for identification.)

BY MR. ANDERSON:

Q   I'd like to hand you what's been marked as Exhibit 105, sir.

A   Thank you.

Q   Has production numbers NCIC 002810 to 11.  Please take a moment to look at the emails in Exhibit 105 and tell me whether you recall having seen them previously.

A   Looks familiar.

Q   Directing your attention to the second page, there are several emails either addressed to you or copied.

Page 143

A   Yes.

Q   And in the email at the top, Mr. Brandt sent an email to Mr. Baniecke, with a copy to you, with regard to an email from Mr. Hangsleben at Reliance Telephone.  Do you see that?

A   Yes.

Q   Okay.  And in it Mr. Brandt references texting.  Do you see that?

A   In -- yes.  In his email, yes.

Q   Okay.  And then if you go to the first page, sir, there is an email from you to Mr. Brandt on August 31st.  Do you see that?

A   Yes.

Q   And in that you say, in part, "Right... not sure what the point of sending the texting revenue was... aside from being a hail Mary, I guess.  We already spoke about the fact that Reliance's texting merely cannibalizes the phone revenue since the text message rates are low (by industry standards) while the calling rates are (illegally) high."  Do you see that, sir?

A   Yes, I do.

Q   First off, do you recall your conversation with Mr. Brandt in which you spoke about the fact that Reliance's texting merely cannibalizes the phone revenue?

Page 144

A   At a -- sorry.

Q   Just don't recall one way or the other?

A   I -- I wasn't sure if you were finished.

    At a high level, yes, I do.

Q   What do you recall of that high-level discussion with Mr. Brandt?

A   Just what you described about the shifting of the revenue between the different services, like we spoke about earlier.

Q   Okay.  And the -- do you recall telling him that by -- or having a conversation with him that by cannibalizing the phone revenue, that reduces the revenue to Yankton County?

A   I don't remember that specific point.

Q   Okay.  In -- in your email here, you describe Reliance Telephone's calling rates as, quote, illegally high closed quote.  Do you see that, sir?

A   Yes.

Q   Do you agree that that is a serious accusation?

A   It could be construed as a serious accusation.

Q   In which situations would it not be construed as a serious accusation?

A   In cases where no one takes it seriously.

Q   Do you believe that Mr. Brandt took it seriously?

A   I've got no idea.  I don't speak on behalf of

Page 145

Mr. Brandt.

Q   You had told him on previous occasions during your communications with him that Reliance Telephone's calling rates were illegally high, or words to that effect, had you not?

A   I don't recall saying that specifically.

Q   Well, in this email you told him that they were illegally high, or you accuse that -- made that accusation, correct?

A   It looks like it was mentioned in this email.

Q   Okay.  And to make such a -- what you said could be construed as a serious allegation, you would want to ensure that it was accurate, would you not?

A   I wouldn't have made that statement if that wasn't my personal belief.

Q   Okay.  And that personal belief was based on your review of the public-facing web pages of Reliance Telephone with respect to Yankton County that we looked at earlier, correct?

A   That, and my understanding of the regulatory environment at that time.

Q   Okay.  And as we looked at from those publicly facing pages, the only thing that -- only aspect that you had any questions over was the intrastate charges, correct?

A   I -- yes.  I believe so.  From memory.

Page 146

Q   Okay.  And on those, you indicated that it was a question of whether or not the FCC had, in fact, regulated or had the authority to regulate those rates, correct?

A   Yes.

Q   Okay.  Did you have any conversations with Mr. Brandt concerning you telling him or accusing Reliance Telephone of charging illegally high rates for phone rates?

A   Not outside of that email.

Q   Okay.  In your email to Mr. Brandt, you did not distinguish between intrastate rates and interstate rates, correct?

A   I didn't know I was supposed to.

Q   That's not my question.  You did not distinguish between them.

A   Evidently not.

Q   Okay.  You were just -- in your email you asserted that Reliance Telephone's calling rates, in general, were, quote, illegally high, closed quote, correct?

A   I'm looking for where it says "in general."  I don't see "in general."

Q   Well, do you see any distinguishing between interstate and intrastate rates?

A   No.

Page 147

Q   All right.  Then in the next email -- it is from you to Mr. Pope -- you said "LOL."  Do you see that?

A   Yes.

Q   Laughing out loud, correct?

A   Lots of laughs, laughing out loud.  I'm not sure what I was saying.  Something --

Q   All right.

A   Something to that effect.

Q   All right.  So why did you say -- forward it to Mr. Pope and say "LOL"?

A   No idea.

Q   All right.  If you go up to the next email from Mr. Pope to you, it -- there's Mr. Pope's statement that "It appears he's backing down from his contract-default stance.  LOL.  Diverting them to texting because of the 'illegally' high rates.  Good catch."  Do you see that?

A   Yeah, and then I called him a peanut evidently.

Q   That's the "exactamente mi caca-" --

A   Cacahuete.

Q   Cacahuete?

A   Yes.

Q   Exactly --

A   My peanut.  Yeah.

Q   My peanut.  Why do you call him "my peanut"?

Page 148

A   We just call each other -- I don't know.  We just banter, internal banter.

Q   All right.

A   Inconsequential internal banter.

Q   All right.  Do you know why Mr. Pope ended his email to you with the words "good catch"?

A   He's said that to me about a million times during my time with NCIC.  I've got no idea.

Q   No idea with respect particularly to Yankton?

A   No.

Q   Okay.  I'd like you to look next at what's been marked previously as Exhibit 53, sir.

A   Thank you.

Q   Please take a moment to look at Exhibit 53 and tell me whether you recall having seen or received the emails and attachment that comprise Exhibit 53.

A   They look familiar.

Q   Okay.  The first email in the exhibit is actually from me to Mr. Brandt on September 5th.  Do you see that, sir?

A   Yes, sir.

Q   And then attached is a letter, actually from me to Mr. Brandt, on September 5th.  Do you see that?

A   Yes, sir.

Q   And in the middle email on the first page, Mr. Brandt

Page 149

forwards the attachment to Mr. Baniecke. Do you see that?

A   Yes.

Q   And then apparently Mr. Baniecke sent it to you.

A   Evidently, yes.

Q   Okay. Because the top email is from -- from you to Mr. Baniecke saying "Leave it to [sic] me. They're flat-out lying about violating FCC rate caps." Do you see that, sir?

A   Yes.

Q   What is it in the letter of September 5th which you believe is, quote, flat-out lying about violating FCC rate caps?

A   It's going to take me at least three and a half minutes to read that entire letter to formulate a response. Do you want me to do that?

Q   Yes, please.

A   (Examines document.)

All righty.

Q   All right. What is it in the letter that you asserted to Mr. Baniecke was, quote, flat-out lying about violating FCC rate caps?

A   Let's see. There is general commentary in here that Reliance operates within the confines of FCC allowances, which, in my professional opinion, is that

Page 150

it doesn't, or at least did not at that time. There is a suggestion in here that the FCC directed or suggested to Reliance at some point that they could -- or that Reliance charges rates -- where is it? Let me get back there.

Q   Please refer to specifically --

A   About two thirds of the way down page 2, ending in 000136.

Q   Can you point to the paragraph?

A   The one that says "You made this threat despite Mr. Hangsleben making clear in his letter dated July 31st --"

Q   Okay.

A   -- Reliance -- let's see. No, let me see. Sorry. I'm trying to catch up with myself here.

Q   That's okay. Take your time, sir.

A   Somewhere in here about Reliance charging the rates that the FCC suggested they charge, which I would about guarantee did not happen.

Let's see. "The fees charged by Reliance Telephone -- (Telephone) are exactly what the FCC advises us to use."

So the FCC advised Reliance to charge 40 cents a minute for online calling card calls?

Q   Why do you believe that -- is that what you believe is

Page 151

a lie?

A   I would about guarantee it would be.

Q   Okay. Would it surprise you if I -- if it's not a lie?

A   Yes, it would.

Q   All right. Did you make --

A   Or at least, to a degree, inaccurate.

Q   Did you make any effort to determine whether the F- -- whether Reliance Telephone had submitted studies of their interstate versus intrastate calls to the FCC to -- and the FCC responded that they would then -- could charge 40 cents per minute for interstate calls?

A   The FC- --

MR. MOSER: Objection. Object to the form of the question.

BY MR. ANDERSON:

Q   You may an- --

MR. MOSER: You can answer --

BY MR. ANDERSON:

Q   You may ans- -- you may answer it.

MR. MOSER: -- if you understood the question.

THE WITNESS: My personal and professional opinion is that I highly doubt that the FCC directly or indirectly suggested to Reliance Telephone or Reliance Inc. or whoever that they could charge 40 cents a minute for online calling card calls. They're a

Page 152

prepaid format of phone calls, just like a -- what we call a debit phone call in the industry, or a prepaid collect phone call. They're a phone call being conducted in a prepaid fashion versus a postpaid fashion.

BY MR. ANDERSON:

Q   Do you know whether Yank -- whether Reliance Telephone submitted studies of their interstate versus intrastate calls to the FCC?

A   No.

Q   Did you make any effort to determine that?

A   No.

Q   Prior to accusing -- or stating to Mr. Baniecke that Reliance is, quote, flat-out lying about violating FCC rate caps, did you make any further effort to determine whether or not they were, in fact, violating FCC rate caps, other than what we've already talked about today?

A   No.

Q   Is there anything else that you contended was flat-out lying in the September 5 letter, other than the sentence you just referred us to?

A   No, because the September 5 letter didn't go into the specifics of individual rates for specific services.

Q   I'm sorry. Did you say no at the beginning of that?

A   No. Yeah. Yes, that's right, I did say that.

Page 157

Dakotas.

Q   And when you said -- you indicated here that you told Sheriff Crissey, Mr. Baniecke, and Matt Crannell "the play is to just blitzkrieg the cutover and go from there," what were you referring to or what did that mean?

A   It appears to be a reference to just moving forward with the installation.

Q   And what is -- what was the blitzkrieg reference to?

A   That's a German reference. Have you heard it? Are you familiar with it?

Q   Ich spreche Deutsch.

A   You speak German?

Q   Yeah.

A   I don't.

Q   Okay.

A   But I --

Q   Lightning war.

A   That's right.

Q   All right. So what was the reference to "just blitzkrieg the cutover." To go very quickly?

A   My understanding would be just to go forward with the transition in the upgrade to services.

Q   And to do so with lightning speed.

A   That could be one interpretation.

Page 158

Q   Well, is there any other interpretation that you're familiar with for the word "blitzkrieg"?

A   Yes, there are. Comprehensive, from different directions. I mean, I'd have to go back and read the definition, but...

Q   If I told you the definition was lightning war, would that help you?

A   Is that the comprehensive definition?

Q   That is the comprehensive definition in German.

A   If I googled it right now, that would be the only --

Q   I would tell you that in German that's what it means.

A   Okay.

Q   But my question is, you have a different understanding when -- when you used the term "blitzkrieg" here, were you using it to mean anything other than lightning or very quick?

A   I don't know that I would think lightning, but I would think comprehensive, from all angles, from all -- approaching it from all necessary angles to ensure success.

Q   And to do so quickly?

A   Sure.

Q   Okay. Oh, back at 107. The email at the top from yourself to Mr. Pope. Do you see that?

A   107. Yes.

Page 159

Q   Okay. Where it says, yeah, it was a lame hail Mary...

A   Yes, I see that.

Q   Why were you referring to the spreadsheet sent by Reliance Telephone to Yankton as a, quote, lame hail Mary?

A   I'll tell you exactly why.

Q   Please do so.

A   Because it was a diversion -- in my own personal and professional estimation, it was a diversion from the serious operational deficiencies that were being caused at the Yankton County Sheriff's Office relative to the Reliance services and hardware and technologies that were then deployed. It was a diversion from the things that were operationally hindering the objectives of the sheriff's office and the detention facility which have been made clear in various emails and comments from the Yankton County people.

Q   So in your opinion, it was a diversion by Reliance Telephone. Is that what I understand you to be saying, sir?

A   That's one of the reasons, yes.

Q   What other reasons did you describe it --

A   Diversion, deflection.

Q   -- did you describe it as a lame hail Mary?

A   I'm sorry.

Page 160

Q   What are the other reasons that you -- for you describing it as a, quote, lame hail Mary?

A   Just mainly for what I just referenced. I believe it was a pure deflection from what the primary issues were that Yankton County was out in the market actively looking for a new vendor.

Q   Okay.

MR. ANDERSON: Would you mark that as the next exhibit, please.

(Exhibit 108 is marked for identification.)

THE WITNESS: Thank you.

BY MR. ANDERSON:

Q   I'd like you to look at what's been marked as Exhibit 108. It has production numbers NCIC 002996 to 97. Please take a moment to look at this exhibit and tell me whether you recall having sent or received the emails that comprise it.

A   Yes, it looks familiar.

Q   These emails appear to be communications between yourself and Mr. Crissey concerning terms of the final subscription agreement.

A   Okay.

Q   Would you agree?

A   It appears to be, yes.

Q   Okay. And do you recall having any discussions with

Page 161

Mr. Crissey concerning the terms of the agreement other than as set forth in these emails?

A   At a high level, yes.

Q   What is your recollection at a high level, sir?

A   I recall, now that I've seen these, that they were looking for some assistance in reaching -- achieving their operational objectives.  It looks like we assisted them with finding some technology for their facility that had nothing to do with NCIC through a technology grant that evidently went back into the operations and the welfare of the agency.  I remember visiting with Sheriff Crissey about that.

Q   Anything else?

A   No.

Q   Okay.

MR. ANDERSON: Mark that as the next exhibit, please.

(Exhibit 109 is marked for identification.)

BY MR. ANDERSON:

Q   I'll hand you what's been marked as Exhibit 109.

A   Thank you.

Q   Has production numbers NCIC 001398 to 1400.  Please take a moment to look at the exhibit and tell me whether you recall having sent or received the emails that comprise it.

Page 162

A   It looks familiar.

Q   All right.  If you go to the first email in the thread, it's an email actually from myself to Mr. Brandt, dated October 19th.  Do you see that, sir?

A   Yes.

Q   Okay.  I'm now going to have marked, because there's no attachment, the next exhibit, which will be 110.

MR. ANDERSON: And I apologize, Counsel.  For some reason I only have one copy.

MR. MOSER: We can share.

MR. ANDERSON: Thank you.

(Exhibit 110 is marked for identification.)

MR. ANDERSON: Ope.  Here it is.

BY MR. ANDERSON:

Q   All right.  Exhibit 110 has production numbers YC 004687 to 4690, and if you look at Exhibit 110, which is the October 19th email addressed to Mr. Brandt from myself, you'll see that it is the same as the first email on Exhibit 109.  Do you see that?

A   Yes, sir.

Q   And I'd like to refer you to the attachment on Exhibit 110, which is an October 19 letter.

A   Okay.

Q   All right.  So with that in mind, do you recall having seen the October 19th letter previously?

Page 163

A   I can't recall.

Q   Do you have any reason to believe that you did not receive it given that there is an email in Exhibit 109 where it appears to be forwarded to you by Sheriff Crissey on October 19th at 2:51 p.m. CDT?

A   It appears to have been provided to me.

Q   Okay.  And then there's an email from you to Mr. Pope and Mr. Baniecke on October 19.  It starts on the bottom of the first page of Exhibit 109 and goes over to the top of the second page of Exhibit 109.  Do you see that?

A   Yes, sir.

Q   And in that email you are forwarding to them the October 19th letter from Reliance Telephone's counsel, correct?

A   I'm sorry.  One more time.

Q   Sure.  Your email on the 19th, you are forwarding to Mr. Pope and Mr. Baniecke the letter dated October 19th from Reliance Telephone's counsel, correct?

A   Yes, sir, that appears to be the case.

Q   And then in the text of your email forwarding it, you state "No concerns whatsoever, on my side."

A   Right.

Q   Why did you have no concerns whatsoever?

A   Because I didn't.

Page 164

Q   Why not?

A   Because at that time I had a complete and thorough understanding and comprehension of the fact that Yankton County, of its own volition, and Yankton County Sheriff's Office was in the market and actively out researching potential upgrades and enhancements to their inmate communications and educational tablet offering, and I was also one thousand percent confident that in the event that we ended up as a service provider for Yankton County Sheriff's Office and their community, that they would be completely happy and satisfied with the services that NCIC provides.

Q   Any other reason that you had no concerns whatsoever, as stated in your email forwarding the letter to Mr. Pope and Mr. Baniecke?

A   No.  Those are the primary reasons.

Q   All right.  If you look at the first page of Exhibit 109, Mr. Pope writes to you and Mr. Baniecke "Do Todd or Sheriff Crissey have a preferred commercial attorney there in Yankton?"  Do you see that?

A   Yes.

Q   Do you know why Mr. Pope was making that inquiry to you?

A   No idea.

Q   Did you make any effort to determine whether Mr. Brandt

Page 173

A   I've seen Mr. Pope assist a really large number of correctional and law enforcement agencies with regulatory affairs of all types, state, local, federal regulatory affairs.  It's one of the reasons that he leads a successful company and has a bunch of happy customers.

Q   Okay.  Did you have any discussions with Mr. Pope concerning a -- drafting a response?

A   No, I don't recall.

Q   All right.  If you'll look on the first page, there is a email from Mr. Pope to Sheriff Crissey in the middle.  Do you see that?

A   Yes, sir.

Q   In the email Mr. Pope again asks Mr. Crissey for "the name of one of your favorite local attorneys who handles business/contract law?"  Do you see that?

A   Yes.

Q   Did you have any discussions with Mr. Pope regarding having Sheriff Crissey provide the name of a favorite local attorney?

A   Not outside of this thread.

Q   Okay.  In the email, Mr. Pope says "I think we'll go ahead and put him on retainer.  I think that will show them we're serious."  Do you see that?

A   Yes.

Page 174

Q   Do you know why NCIC was willing to put a local attorney -- a favorite local attorney who handles business/contract law on retainer?

A   Probably to assist the Yankton County Sheriff's Office in securing a more favorable arrangement for their facility and their community.

Q   Do you know whether NCIC, in fact, put a local attorney on retainer for the benefit of Yankton County?

A   Apparently, because it looked like there was potentially going to be some sort of litigation relative to the issue.

Q   So you know whether -- do you know whether they did that, whether it --

A   I can't recall.

Q   Okay.  Do you have any -- do you recall any conversations with Mr. Pope regarding placing a local attorney on retainer for the benefit of Yankton County?

A   No, sir.

Q   In the next sentence Mr. Pope says "If this abuse were to make it to the FCC, it could put Reliance out of business and ruin his chances of selling his company, which he was naive enough to tell Scott a few weeks ago."  Do you see that?

A   Yes, I do.

Q   Were you hoping that the FCC would put Reliance out of

Page 175

business?

A   No, I've never had any hardcore aspirations in that direction.

Q   Never?

A   That's not to say that it couldn't happen.

Q   Okay.  Have you ever expressed your hope that they would be -- that the FCC would put them out of business?

A   Not that I recall.

Q   Have you ever expressed the hope that, as a result of this dispute, Yankton Telephone and Yankton Systems -- or excuse me -- Reliance Telephone and Reliance Systems would be put out of business?

A   Not that I recall.

Q   If I show you emails in which you have expressed those views, would that refresh your recollection?

A   Potentially.

Q   All right.  Well, we'll get to those.
    Did you have any discussion with Mr. Pope regarding his suggested response which he addressed to Mr. Alderson?

A   No.

Q   In your reaction email at the top of the page to Mr. Pope, you just said "Damn," all in caps and then four exclamation points and two --

Page 176

A   Emojis.

Q   -- emojis with hearts for eyes.  What was the meaning of that?

A   I can't recall.  Could have been any -- me expressing any sort of reaction.  Maybe I was impressed with the willingness of Bill, as a company and industry leader, to assist Yankton County with their efforts to improve their inmate communications environment.  It could have been a comment about the well-structured email that he proposed.  I can't recall exactly what it would have been.

Q   Okay.
    MR. ANDERSON: Mark that as the next exhibit, please.
    (Exhibit 112 is marked for identification.)

BY MR. ANDERSON:

Q   I'll hand you what's been marked as Exhibit 112, sir.  Has production numbers NCIC 003145 to 46.  Please take a moment to look at the emails which comprise this exhibit and tell me whether you recall having seen them previously.

A   Yes, I recall it.

Q   At the top of the page there's an email from you to Mr. Pope with a copy to Mr. Baniecke dated October 26.  Do you see that, sir?

Page 177

A   Yes.

Q   And in it you say "If that language you drafted today makes it to Dave, that will definitely be the end of it... that was awesome."

A   Uh-huh.

Q   Do you see that, sir?

A   Yes.

Q   And that's referring to the draft response that's in the middle of the first page of Exhibit 111?

A   Presumably, yes.

Q   Okay.  Why did you believe that that response, if it makes it to Dave, will, quote, definitely be the end of it?

A   I can't recall what my thinking was at that point.

Q   Okay.  I'll hand you a document marked previously as Exhibit 68, sir.

A   Thank you.

Q   Please take a moment to look at Exhibit 68 and tell me whether you recall having sent or received the emails that comprise it.

A   It looks familiar.

Q   If you look at the email at the top of page [sic] 68, it's from yourself to Mr. Pope, with a copy to Mr. Crissey and Mr. Baniecke, on October 26th.  Do you see that, sir?

Page 178

A   Yes.

Q   And in it you say "Thanks a lot for this, Bill... this should be more than enough to send Reliance on their way."  Do you see that?

A   Yes.

Q   Why did you say that?

A   I can't recall what my thinking was at that point relative to that comment.

Q   Okay.  And then in the next sentence you say "Sheriff Crissey, I'm available tomorrow to assist with polishing this up and getting it ready to send on to Reliance."  Do you see that, sir?

A   Yes.

Q   And do you recall whether you had any communications with Mr. Crissey for polishing up Mr. Pope's draft response?

A   Not outside of this email no.

Q   So you don't recall anything one way or the other?

A   That's correct.

Q   Okay.

    (Exhibit 113 is marked for identification.)

BY MR. ANDERSON:

Q   Hand you what's been marked as Exhibit 113, sir.

A   Thank you.

Q   Has production numbers NCIC 002497 through 2503.

Page 179

Please take a moment to look at this exhibit and tell me whether you recall having sent or received the emails that comprise it.

A   It looks familiar.

Q   The email at the top of the page is from Sheriff Crissey to yourself and Mr. Pope on October 27th.  Do you see that?

A   Yes.

Q   And in the email he says "Thank you all for the prompt response.  I'm still in communication with our SA and will keep you posted."  Do you see that?

A   Yes, sir.

Q   Do you recall whether Mr. Crissey ever got back to you with any further communication with respect to the draft response that Mr. Pope had prepared?

A   I don't recall.

Q   Just don't recall one way or the other?

A   That's right.

Q   Okay.

    (Exhibit 114 is marked for identification.)

BY MR. ANDERSON:

Q   I'd like you to look, sir, at what's been marked as Exhibit 114.

A   Thank you.

Q   Has production numbers NCIC 002515 to 2521.  Please

Page 180

take a moment to look at the exhibit and tell me whether you recall having sent or received the emails on or about the dates indicated.

A   I see it.  It looks familiar.

Q   All right.  And at the bottom of the first page, continuing on to the top of the second, is the email from Mr. Pope to yourself and Sheriff Crissey with his draft proposed response that we've talked about, correct?

A   Yes.

Q   All right.  And then on November 8th Mr. Pope asks you whether -- it says "No updates from Crissey re Reliance?"  Do you see that?

A   Yes.

Q   Okay.  And your response says "I don't think I responded to this one.  Attached is the most recent.  I think we're good."  Do you see that?

A   Yes.

Q   Do you know what you were attaching where you said "attached is the most recent"?

A   It looks like I was responding to an email of some sort and attached an email -- attached an email to an email.

Q   But do you recall or can you tell what that email was that you attached?

A   Wouldn't have no idea.

Page 181

Q   All right.  And then Mr. Pope, in response, says "Okay.
I saw that one."  Then he says "We will probably be
okay if we don't try to get more to terminate early,"
and then two, looks like, crying-face emojis.  Do you
see that?

A   Yes.

Q   And you received that email from Mr. Pope on or about
November 10th?

A   Evidently.

Q   And then, in response, on November 10th, you responded
to Mr. Pope with a copy to Mr. Baniecke saying
"I agree!"

A   Yes.

Q   And that was indicating your agreement with Mr. Pope's
email sent on November 10th at 10:17 p.m., correct?

A   I could have been agreeing to the fact that he saw that
one.  I don't recall what I was agreeing with at that
point.

Q   Okay.  Well, do you think you were -- you're
agreeing -- you're agreeing that he saw that one or
you're agreeing with "We will probably be okay if we
don't try to get more to terminate early"?

A   I couldn't tell you either way.

Q   You just don't recall?

A   Right.

Page 182

Q   Okay.  Ask you to look at what's been marked previously
as Exhibit 70, sir.  Please take a moment to look at
Exhibit 70 and tell me whether you recall having seen
it previously.

A   It looks familiar.

Q   Do you recall receiving a telephone call from Sheriff
Crissey informing you that Yankton County had been sued
by Reliance Telephone and Reliance Systems?

A   No.  I don't recall phone calls I received last week.

Q   So the answer is no?

A   Correct.

Q   All right.  Do you recall having any conversations with
Sheriff Crissey concerning the fact that Yankton County
had been sued by Reliance Telephone and Reliance
Systems?

A   No, I don't.

Q   In the middle email -- or in the upper half of
Exhibit 70, Mr. Pope says "I don't have a copy of the
contract," and then he goes on to say "Sheriff Crissey
just called and is bummed he got sued, but I assured
him that I am on top of this and told him to give his
insurance company my cell number."  Do you see that?

A   Yes, sir.

Q   Do you recall having any conversations with Mr. Pope
concerning his conversation with Sheriff Crissey?

Page 183

A   Not outside of this thread.

Q   Do you recall any conversations with Mr. Pope
concerning him asking Sheriff Crissey to give
Mr. Pope -- Mr. Crissey's insurance company's cell --
insurance company Mr. Pope's cell number?

A   No, not outside of this thread.

Q   All right.  And then in the top email you wrote to
Mr. Pope and said "I have the contract docs, and I'll
send later when I'm out of jail."  Do you see that?

A   Yes.

Q   When you say "out of jail," what were you referring to?

A   I'm hoping I referred to the fact that I was performing
my professional duties inside a jail, like I usually
am.

Q   As opposed to actually being incarcerated?

A   Right.  Those days are behind me, thankfully.

Q   Okay.  That's good.
And when you say "I have the contract docs," are
you referring to the contracts between Yankton County
and Reliance Systems and Reliance Telephone that we
looked at previously?

A   I couldn't recall.

Q   Just don't recall one way or the other?

A   Right.

Q   I'm going to hand you what's been marked previously as

Page 184

Exhibit 97, sir.

A   Thank you.

Q   Please take a look at Exhibit 97 and tell me whether
you recall having sent or received the emails.

A   Yes, they look familiar.

Q   Okay.  There's an email from you to Mr. Pope and
Mr. Baniecke on December 1st where you state, in part,
"Thought I had the agreements handy but apparently
don't.  I know we had access to them at one point."  Do
you see that, sir?

A   Yes.

Q   And that was an accurate statement at the time you made
it, correct?

A   Yes.

Q   Okay.  And then you asked Mr. Baniecke if he has them.
Do you see that?

A   Yes.

Q   And then in his response he says -- he attaches the
Reliance contract that he has as well as the letters
from them and their attorney.  Do you see that, sir?

A   Yes.

Q   Do you recall any conversations with Mr. Pope
concerning the Reliance contracts with Yankton County
after they were provided to Mr. Pope?

A   No, I don't.

Page 189

that he was referring to the then pending litigation between Reliance Telephone and Reliance Systems and Yankton County pending in the United States District Court for the District of North Dakota?

A   Yes, sir.

Q   And then in your response on the bottom of the first page of Exhibit 116, you wrote to Mr. Pope and Mr. Baniecke and a Karin Sandahl.  Do you see that?

A   Yes.

Q   First off, who is Karin --

A   She --

Q   -- Sandahl?

A   She was an agent that was involved with NCIC for some -- and still is to a degree.  I don't deal with her very much.  She's based in Des Moines, and she has some wholesale arrangements with NCIC with correctional facilities.  She was initially involved with NCIC's efforts with Yankton County.  I can't speak to the current nature of whatever arrangement Bill or NCIC has with Karin.  I don't deal with her personally.

Q   Do you know what her involvement was with respect to the relation- -- or with respect to NCIC and Yankton's termination of its contracts with Reliance?

A   Scott Baniecke joined NCIC originally because of an introduction from Karin, and I believe Scott's efforts

Page 190

were somehow tied into Karin's wholesale financial deal with NCIC, but operationally, fairly irrelevant.  She may have had some small financial interest in any facilities that Scott Baniecke was involved in.  I can't speak to the specifics.

Q   You just don't know, sir?

A   Right.

Q   Okay.  And your understanding is that TS Phones, or whatever company is her email URL, is based in Des Moines?

A   Yes, it is.  Telespan.  Yes, it is.

Q   Okay.  Telespan is the name?

A   Telespan.

Q   Thank you.  Anyway, in your email back to Mr. Pope you say "Sorry to hear that.  Let me know if there's anything I can do to help."  Do you see that?

A   Yes.

Q   And then in his response to you on February 9th, Mr. Pope asks you "Can you go run over Dave?"  Do you see that, sir?

A   Yes.

Q   And you received that email from Mr. Pope, correct?

A   Evidently.

Q   And then in your response on February 9th, you said "I can probably slip a roofie in his sweet tea when we see

Page 191

him in Deadwood, then relocate him out into the woods."  Do you see that, sir?

A   Yes.

Q   And that was your response to Mr. Pope asking if you could go run over Dave, correct?

A   It appears to be, yes.

Q   All right.  And then Mr. Baniecke, in a further response, on February 9th, to you and Mr. -- you and Mr. Pope and Ms. Sandahl said "He told me he has a bunch of acreage in SD that he wants to retire at?  Good place for him to 'get away' to!"  Do you see that?

A   Yes.

Q   And you received that email from Mr. Baniecke as well?

A   It appears so, yes.

Q   Did you have any discussions with Mr. Pope concerning his asking you if you could go run over Dave?

A   No, not that I recall.

Q   Do you recall any discussions with Mr. Pope concerning your offer to slip a roofie in his sweet tea, meaning Mr. Hangsleben, and then relocate him out into the woods?

A   No, I don't.

Q   Do you recall any conversations with Mr. Baniecke concerning his response that Mr. Hangsleben apparently has a bunch of acreage in South Dakota?

Page 192

A   No, I don't.

Q   Okay.

(Exhibit 117 is marked for identification.)

BY MR. ANDERSON:

Q   Going to hand you what's been marked as Exhibit 117, sir.  It has production numbers NCIC 00 -- excuse me -- 011873 to 877.  Please take a moment to look at the emails which comprise the threads shown on Exhibit 117 and tell me whether you recall having sent or received them.

A   They look familiar.

Q   And the top email is from you to Mr. Pope, with a copy to Mr. Baniecke, on February 13th of 2024.  Do you see that?

A   Yes, sir.

Q   And in it you tell Mr. Pope "Let us --" in part, "Let us know if we can provide any support."  Do you see that?

A   Yes, sir.

Q   First off, was the "we" referring to you in what we call the royal sense or you and Mr. Baniecke?

A   Presumably NCIC as a whole, potentially.  Certainly mean Scott as the account representative.

Q   Well, it was sent to Mr. Pope.  You sent it to Mr. Pope, not to Mr. --