# EXHIBIT I

*Reliance Telephone, et al. v.*
*Yankton County, et al.*

Preston Crissey
July 9, 2025



*Audrey M. Cook, RPR*
*audrey@paramountreporting.com*
*605.321.3539*

**Min-U-Script® with Word Index**

Page 49

Q   Just seeing this document, this exhibit, sir.  That's what I'm trying to find out, is whether you recall seeing it on or about April 15th of 2023.

A   I believe that there was an email sent to me by Jail Administrator Brandt.

Q   That attached this?

A   I believe so.

Q   Okay.  Let me ask you this:  Were you aware that NCIC had prepared this draft termination notice for Mr. Brandt?

A   Not initially, no.

Q   Did there come a point in time where you became aware that NCIC was drafting documents, termination documents, for Mr. Brandt's use?

A   Yes.

Q   Do you recall when you became aware that NCIC was drafting those documents?

A   It's hard for me to tell you a specific time frame.  I am aware that it happened, but I didn't know the initial part of it.

Q   Okay.  I'll take that back.

A   Oh, yep.  Sorry.

Q   I'm going to show you now what's been marked previously as Exhibit 31, and you can actually look back at Exhibit 30.  It's essentially the same as Exhibit 30,

Page 50

except now the fill-in-the-blanks on Exhibit 30 have been filled in with the name of Mr. Hangsleben.  Do you see that, sir?

A   Yes, sir.

Q   Okay.  Do you recall seeing Exhibit 31, which is also dated April 15th but with Mr. Hangsleben's name filled in?

A   This is the one that I'm -- that I saw.

Q   When you say "this is the one," it's Exhibit 31?

A   Correct.

Q   Okay.  Do you recall when you saw Exhibit 31?

A   Probably when he just sent me -- or forwarded it to me in email form.

Q   Okay.  And do you recall when that email was sent by Mr. Brandt?

A   It was probably at the end of April or -- it's hard for me to tell you exactly the date, to be honest with you.  I know that I did see it in an email at some point.

Q   Did you have any conversation with Mr. Brandt concerning this termination notice that had been drafted for him by NCIC?

A   Jail Admin Brandt has had a lengthy career with report writing and all that stuff.  I didn't question anything.  I believed in -- what he was doing was probably the right move for Yankton County.  It was for

Page 51

the employees, for the inmates.  So, I mean, he -- Brandt was always a chain-of-command guy.  So he would -- he would come to his -- it was weird that I used to work for him and then he works for me.  But he never really went outside the scope of just doing something without asking.

Q   When you say that you believe that he probably was making the right move for Yankton County, was he the one who was making the decision?

A   Ultimately it was my decision.

Q   Did he provide you with a "Here's why I want to do this" or any sort of explanation for why?

A   You know, some conversations there would be the issues of the iPads going down.  I spoke earlier about his investigator tools that he has, and he -- going to the Apple website and saying "This is what an Apple iPad is versus what you guys are providing."  So I don't really -- I didn't really question a lot of it because of the merit of his skills and what he brought to the table for -- for me and then for Yankton County.

Q   Do you recall whether he provided you with any sort of written, if you will, memorandum of here's what he wants to do and why?

A   Like a -- no, I never -- I mean, we'd had discussions, you know, where he had dis- -- you know, discussed,

Page 52

like, these are a magnitude of reasons, you know.  And we'd go back to the supervisor meetings.  You know, "If you guys have issues with Reliance, let's document some of those things, because it needs to be documented."  You know, like, he just -- that's the type of person that Todd Brandt is.

Q   Okay.  Did you -- but again, you didn't drill down to see whether -- what these issues were that they were claiming they had with Reliance?

A   I personally did not.

Q   Okay.  And when you saw Exhibit 31 with Mr. Hangsleben's name, did you know who he was?

A   I have never spoken to Mr. Hangsley.

Q   Hangsleben?

A   Or Hangsleben.  See, I -- that's -- and refer to him as Dave because I only really learned more about him towards -- towards the end.

Q   Towards the end of what?

A   Well, when -- with his name on here.

Q   Okay.

A   With the termination thing.

Q   Okay.  During the first four months that you were sheriff, did you make any effort to reach out to him?

A   I did not.

Q   Did you make any effort to reach out to anyone else

Page 53

from Reliance?

A    That was a Todd Brandt issue.

Q    I'll take that.

A    You want this one?

Q    I'm just trying to keep things in order as best I can.

I'm going to hand you now what's been marked previously as Exhibit 32.  This is an email thread that Mr. Brandt forwarded to you on April 17th of 2023, if you look at the top email.  Please take a moment to look at Exhibit 32 and tell me whether you have seen this email thread previously.

A    (Examines document.)

Q    Have you had a chance to look at it, sir?

A    Yep.

Q    Do you recall having seen this email thread?

A    Yeah.

Q    In the first email -- or the two emails that Mr. Brandt forwarded to you, he's got emails with a gentleman by the name of Mike Mattson from Minnehaha County.  Do you see that, sir?

A    Yes, sir.

Q    First off, do you know Mr. Mattson?

A    I don't personally know him.  I -- you know, like, taking over the jail, and Minnehaha County kind of being the leaders and the innovators of -- you know,

Page 54

like, Pennington County has a huge jail, Minnehaha County has a big jail, and we have one of the largest jails in South Dakota ourselves, that I'm sure that's why he would reach out to somebody like him, I guess.  I don't know him personally.

Q    If you look at the first email in the thread chronologically, which is on page 2, sir, Mr. Brandt tells Mr. Mattson that "We are in the process of attempting to go away from Reliance Telephone and I heard that you have separated from them as well."  Do you see that, sir?

A    Yes.

Q    So would it be fair to say that as of April 17th of 2023, you were aware that Mr. Brandt was attempting to leave Reliance Telephone on behalf of Yankton County?

A    I would say it's fair.

Q    Okay.  And he then goes on to tell Mr. Mattson "We met with NCIC and liked their platform."  Do you see that, sir?

A    Yep.

Q    Okay.  Does -- would you agree with that statement, or was that all what Mr. Brandt was doing?

A    That was essentially Jail Administrator Brandt.

Q    Okay.  Had you -- does this refresh your recollection as to whether, as of that point in time, you had had

Page 55

any conversations with Mr. Brandt concerning going -- going away from Reliance Telephone and going with NCIC?

A    Again, it was more of a, I trust Todd Brandt's decision.  That's all I can really tell you.

Q    Okay.  Mr. Brandt goes on to say in his email to Mr. Mattson "Our contract has language that says 'unless notice is given by either party at least 30 days prior to the renewal date,' which is in 2025.  NCIC sent us a boilerplate style Dear John letter to send to Reliance, but I wanted to see if you had the same issue and what you did when you switched."  Do you see that, sir?

A    Yes, sir.

Q    First question:  The "NCIC sent us a boilerplate style Dear John letter."

A    30 and 31, right.

Q    All right.  That's what I was going to ask you.  Is that 31 that you said you had seen?

A    I don't know if that -- yeah, that's the one I seen.

Q    Okay.  He -- Mr. Brandt mentions contract language.  Do you see that?

A    Yep.

Q    Had you seen the N- -- the Reliance contracts by then with that language?

A    Again, to be honest, I was a newly elected sheriff, and

Page 56

I had let Todd Brandt -- I trust- -- you know, I trusted his judgment on what he was doing.

Q    Okay.  Mr. Brandt goes -- you know, says to Mr. Mattson that he wanted "to see if you had the same issue."  Do you see that?

A    Yep.

Q    Did you understand that that issue was trying to terminate the contract prior to the renewal date which is in 2025?

A    From what I'm reading, yep.

Q    Do you recall any conversations with Mr. Brandt where he said, "Hey, we have this issue with the contract language that we may not be able to leave Reliance until 2025," or words to that effect?

A    I don't really recall digging into it that deep, to be honest with you.  Again, I was a newly elected sheriff, and I had other obligations, and that's why I delegated it to the jail administrator to handle.

Q    So you just don't recall one way or the other?

A    Correct.

Q    Did there come a point in time when you became aware that there was an issue about your ability to terminate the Reliance contracts before their renewal date in 2025?

A    Yeah.  At some point it came down to are they

Page 57

fulfilling the contract of what Yankton County had, and we believed that it wasn't happening.

Q   Do you recall when you became aware that the issue of whether you could terminate early came up?

A   You know, I'm on -- I'm on year three, and it's just -- it's all kind of a whirlwind. So I apologize. I can't tell you specifically.

Q   That's fair enough. But would you agree that at least as of April 17th of 2023, Mr. Brandt appears to be aware that that's an issue?

A   Correct.

Q   Based on his email?

A   Yep. And I'm CC'd on there --

Q   Okay.

A   -- so -- sent to me.

Q   Yep. And then in Mr. Mattson's response he says that their prior contract was with ICS. Do you see that?

A   Yep.

Q   Do you know who ICS is that he's referring to?

A   I have no idea.

Q   Okay. But he says that he sent the notice prior to the end of the term. Do you see that?

A   Yep.

Q   Do you recall whether you had any conversations with Mr. Brandt concerning waiting to term- -- try to

Page 58

terminate the Reliance contracts until the end of their term in 2025?

A   What we discussed was if they're not fulfilling the contract, then they're not doing the due diligence of what the contract states or what they're supposed to provide, so...

Q   Okay. The email then from Mr. Brandt to you, forwarding this thread on April 17th, it says "FYI. Some help but not really." Do you see that, sir?

A   Yep.

Q   Did you -- do you recall whether you had any conversations with Mr. Brandt as a result, concerning the fact that the emails from Mr. Mattson were not really helpful?

A   Well, Brandt says it, so yeah, I guess.

Q   Yes. But do you recall having any conversations with him, then, after that?

A   I mean, I'm sure there was a conversation, but I don't recall, like, the specifics and nature of it. It was -- he probably just reached out to another agency and said, you know, "What did you guys -- or what did you have," I guess, and he just referred that -- or referenced it back to me. So it's not like I said, "Hey, let's -- let's have a rebuttal and get together and --" it was a Todd Brandt thing.

Page 59

Q   Okay. By the way, you said "agency" several times. When you say "agency," do you mean, like, another county or another department?

A   Well, evidently it's Mattson from Minnehaha County.

Q   Yeah. You're using "agency" --

A   Oh, sorry. Minnehaha County.

Q   Yeah. But when you say "agency" you mean, like, another county or another department or something like that.

A   Correct.

Q   Okay.

A   Yep.

Q   Does seeing Exhibit 32 help refresh your recollection as to whether you had actually seen the Reliance contracts by this point in time, meaning April 17th of 2023?

A   I would say it's fair to say.

Q   That you had?

A   Yeah.

Q   Okay.

I'm going to hand you what's been marked previously as Exhibit 28, which is copies of the NCIC -- excuse me -- the Reliance contracts. Please take a moment to look at Exhibit 28, and then tell me when you're completed, please.

Page 60

A   (Examines document.)

Q   Okay. The first page of Exhibit 28 is a 2016 contract. Do you see that, sir?

A   Yes, sir.

Q   Do you recall having seen that contract from 2016 previously?

A   This one came out of discovery recently, right?

Q   I can't answer your question, sir.

A   I've seen -- I've seen it. I'll tell you that.

Q   Okay. You've seen it. Do you recall whether you saw it in 2023?

A   I believe the back page is --

Q   Right. I'm first asking about the --

A   Oh.

Q   -- 2016 contract, sir.

A   Oh. Not to my knowledge, no.

Q   Okay. Now, the last -- the remaining pages are the 2020 contract between Reliance Systems and Yankton County and Reliance Telephone and Yankton County. Those, you recall seeing?

A   That's correct.

Q   All right. And do you recall, looking at them, whether you were -- had seen them by April 17th, when Mr. Brandt forwarded to you the emails that we just looked at in Exhibit 32?

Page 61

A   Yeah, that's fair to say.

Q   Okay.  Do you recall whether you read them at that time?

A   Again, I -- I read through them.  I didn't dissect them.  I just -- I trust Todd Brandt, and I did read them, but I didn't, like, take notes or -- so...

Q   Okay.  Do you recall having any of the provisions, you know, come -- you know, jump out at you?

A   Yeah, there's -- let's see here.
So you just want me to find anything that stood out to me at the time?

Q   Yes, sir.

A   Okay.  I know, like, the iPad thing, we talked about.  There should never be a disconnect between services, you know.  There should always be service provided to the inmate.  Five-year contract, but...

Q   When you say "the iPad thing," you're looking at the Reliance Telephone contract there?

A   Yep.

Q   Okay.  And would you agree with me that that contract does not say that iPads are provided to every inmate?

A   In this specific contract, yeah, I mean, that's fair to say.

Q   It does not?

A   Yep.

Page 62

Q   Okay.  And did there come a point in time when you became aware that you did have iPads at the jail, supplied by Reliance Telephone, and wall-mounted units?

A   Yes.

Q   Do you recall when you became aware of that?

A   Sometime in 2023.

Q   Okay.  The five-year contract term that you mentioned, that's in both the Reliance Telephone and Reliance Systems contracts, correct?

A   Correct.

Q   And when you noticed the -- did you notice that there was no provision for early termination of those contracts prior to the end of the five-year term?

A   No, I didn't see anything.

Q   You did not see anything that allowed that?

A   Allowed that, yep.

Q   Okay.  And you mentioned the "should be service provided."  What are you referring to there?

A   I think it's D --

Q   Okay.

A   -- on the last page.

Q   Okay.  And you're looking at the Reliance Telephone contract?

A   Correct.

Q   Okay.  And what exactly does it say?

Page 63

A   Just talks about malfunction, loss of inmate voice-only service, and shall allow the lessee access to the place of business for them to come out and fix it, essentially.

Q   Okay.  And to your knowledge, would Reliance Telephone come to -- or come when they were told about it, to repair or fix any difficulties that were being had?

A   Again, that was probably a jail issue where I wasn't, probably, in that.  A lot of times when a staff member would want to say something to me, it's like, "You got your boss to talk to, so go talk to your boss."

Q   Okay.

A   So...

Q   Now having looked at these two contracts, does that refresh your recollection whether you had any conversations regarding any of these specific provisions with Mr. Brandt at about the time that you first became aware of them?

A   Yeah.  I mean, some of the ones that we've already discussed about the...

Q   Okay.  Any other provisions that you recall specifically discussing with Mr. Brandt?

A   Not -- not that I can recall.

Q   Would it be fair to say that at the -- by the time you saw Exhibit 27, which is the April 11th email thread

Page 64

from Mr. Brandt, involving Mr. Mattson, that you are aware that NCIC was a potential vendor for Yankton County?

A   Yeah, because I gave him the folder to look at.

Q   The brochure?

A   The brochure.  Sorry.

Q   Yeah.  So --

A   I'll get it at the end of the day.

Q   No worries.  No worries.
But certainly by April 11th you were aware that they were a potential supplier of product or services to the county, correct?

A   Well, yeah, with the brochure.

Q   Yep.
MR. ANDERSON: Would you mark this as the next exhibit, please.
(Exhibit 58 is marked for identification.)

BY MR. ANDERSON:

Q   Mr. Crissey, I'd like you to look at what's been marked as Deposition Exhibit 58.  It is a series of emails.  It has production numbers NCIC-002311 to 2316.  Please take a moment to look at Exhibit 58, these emails -- these series of emails, and then let me know when you're done, please.

A   (Examines document.)

Page 65

Okay.

Q    All right.  Do you recall sending or receiving of the emails that are in the email thread that's Exhibit 58?

A    Yes.

Q    Okay.  Going to the last page sir, which is the first one in time.

A    Okay.

Q    It's an email from you to Craig Storer and Scott Baniecke at NCIC.  Do you see that, sir?

A    Yep.

Q    And do you recall how it is that you had the email addresses of Mr. Storer and Mr. Baniecke?

A    How what?

Q    How did you have those emails?  How did you know who to -- how to address this email to them?

A    I believe they just sent it to my -- my personal email.  It's not a --

Q    Okay.  Why -- okay.  Why were you sending an email to them from your personal email and not your Yankton County email?

A    I believe when they -- when they did the drawing, I had to give an email address, so that's probably what happened there.

Q    This is when you wrote your name and apparently an email address on somebody else's business card back at

Page 66

the conference in Deadwood?

A    Yeah, I believe so.

Q    Okay.  And do you recall -- or in your email, which was sent on April 25th, you said that you're reaching out to them "about the trip I won in Deadwood a couple of weeks ago."  Do you see that, very last page?

A    Yep.

Q    How did you become aware that you were receiving this trip?

A    So, that sheriffs conference where I had to put the name on the business card, at the end of the conference they do -- well, it could be anytime, I guess, during the conference.  But they do drawings.  And so during the conference, they may have multiple trainings going on at one time, and as a newly elected sheriff, I went to a civil process training that was separate from the larger training, because I had a patrol captain that came out with me, and I think he was in that training, and I went to the civil-side training.

And our session got done a little earlier than the big session, so what I did is I -- I left and went to my room to check emails, to try to stay alive, you know, to stay caught up, and then I received a phone call from Matt Koll, the one that told me to put my name in the hat -- or in the bowl or whatever, saying,

Page 67

"Hey, you just won the fishing trip," because they just drew.  I didn't know they were drawing it then, but I wasn't even in the room when it happened.

Q    Okay.  So you don't know whether there was a drawing or whether they just announced you're the winner?

A    He said that they drew the name in the room or something.

Q    Okay.  But you weren't there?

A    I was not even present.

Q    Did you know what this fishing trip entailed?

A    I'm not a -- I live in Yankton, and fishing's kind of a -- well, sometimes fishing's good or bad.  I don't know.  If you want Asian carp.  But I don't fish very often, so that's why it wasn't really that intriguing to me on a fishing trip.  But my three brother-in-laws -- well, obviously, the sheriff in Yankton -- they grew up in the Yankton area.  So it was a trip for four.  I think my friend was a little hurt that he didn't get invited, but -- so, yeah, I mean, that's -- I wasn't even in the room when it happened.

Q    Okay.  You said that you were told that you had won this fishing trip.  How did you know, then, to reach out to Mr. Storer and Mr. Baniecke on April 28th -- or excuse me -- 25th?

A    So while I was back in the room, I got the phone call,

Page 68

and they said "Hey, you need to come down" or whatever --

Q    Phone call from whom?

A    Matt Koll.

Q    Okay.

A    So then -- first of all, he's a jokester too.  Law enforcement, we're always joking about stuff.  So I thought he was just playing a joke on me, essentially.  And he's like, "No, I'm dead serious.  You won, so you need to come down here."  And their session must have just got over, and that's when they were doing the drawing, but my session got done sooner, so that's why I went back to the room.

So on the way back to the room, they must have kind of broke out of their session or there was some sheriffs and chiefs that didn't attend that one but they were in a different session, and they were making comments while I'm walking down the hallway, "I like to fish," you know, "I'm a fisherman."

And so then I was like, oh, maybe I did win and maybe he isn't joking with me.  So then when I went down there, I had to give my contact information, you know, like how to contact me or whatever, and then -- or vice versa, so that's probably why that is -- that's the way it is, I guess.

Case 4:24-cv-04098-ECS    Document 201-9    Filed 06/15/26    Page 8 of 13 PageID #:
6666

Reliance Telephone, et al. v.
Yankton County, et al.

Preston Crissey
July 9, 2025

Page 69

Q   Okay.  And do you recall why you sent this email from your personal account as opposed to your Yankton County account?

A   So I reached out to our state's attorney at the time, Rob Klimisch, and I told him about the trip that I won on the drawing; and as a newly elected sheriff in the county and then winning a trip somewhere, I wanted to make sure that there was no conflicts or if I had to defer it or -- or whatever.
    So at that time he said, "No, you put your name in the hat separately from, essentially, the county," so he just reassured me that I was okay with doing that, so then I don't feel like it's official county business when it was a drawing.

Q   Did you tell him that NCIC was a potential or likely to be a vendor at that time?

A   To be honest with you, I don't -- it was -- essentially I was just -- I was to the threshold of "Hey, I just won a trip.  So it's an all -- all-paid trip.  I just want to make sure that I'm okay with -- or that it's okay with that."

Q   Okay.  So you don't recall telling him that you had -- that this was from a vendor or soon-to-be vendor?

A   No.  Hence the reason I didn't go to the steak dinner.

Q   Because you were concerned about the appearance of

Page 70

impropriety, would that be fair, why you didn't go to the steak dinner?

A   They weren't a vendor of us so --

Q   Yeah, but they were -- you knew that they were a potential vendor when you -- on the steak dinner time, right?

A   Well, I gave the folder to Brandt.

Q   Sure.

A   Yeah.  So I didn't -- I declined the --

Q   Yeah.  And certainly when you communicated to NCIC on April 25th, you knew that they were going to be a vendor.

A   Because the letter was sent on the 17th, right?

Q   The emails that we looked at previously --

A   Yep.

Q   -- were on the 17th.  So you were aware of that.  And the form termination letters from NCIC were April 15th.

A   Correct.

Q   Yeah.  So.
    Before you reached back out to NCIC on April 25th, did you go back to Mr. Klimisch and tell him, "Hey, NCIC is now going to be a vendor.  Can I still go"?

A   I did not, because I had -- that's why I called ahead of time of what I believe as -- it was a drawing, and so I wasn't even there when it happened, so -- I guess

Page 71

at that point it didn't really matter.

Q   Okay.  Do you recall when you contacted Mr. Klimisch?

A   It was probably shortly after the trip.

Q   So sometime after you got back from the conference on April --

A   Yeah.

Q   It ended on, what, the 13th or 14th?

A   Yeah.  Yeah.

Q   Did you send him any emails?

A   Nope.  It was a phone call.

Q   Okay.  Do you recall how long the phone call lasted?

A   With Rob it could be forev- -- no, just kidding.  It was probably just a couple minutes.

Q   Okay.  You said he was -- he was the -- used to be the state's attorney --

A   Yes.

Q   -- the county attorney.  Do you know when he left?

A   So he turned over the reins to one of his deputy state's attorneys, so Rob is still currently a state's attorney, but he's a deputy state's attorney now, and his -- the new state's attorney was working for him prior.

Q   Okay.  So is he still with Yankton County?

A   Correct.

Q   Okay.  And then the rest of the emails in Exhibit 68

Page 72

[sic], they're all with your personal email account, correct?

A   Correct.

Q   And why were you using your personal email account if Mr. Klimisch told you the -- it was all right?

A   Why?

Q   Yes.

A   Because it wasn't a -- it wasn't a county -- I wouldn't -- I wasn't going to use my county work email for a trip, I guess.

Q   Okay.  Even though you say that Mr. Klimisch had said, "Nah, that's fine"?

A   Yeah.

Q   Okay.
    MR. ANDERSON: Next exhibit, please.
    (Exhibit 59 is marked for identification.)
BY MR. ANDERSON:

Q   I'd like you to look, sir, what's been marked as Exhibit 59.  It's a photograph of a, you know, announcements board from NCIC.  Do you see that, sir?

A   Yes, sir.

Q   And it describes a fishing trip on Sabeen -- Sabin? -- Sabine Lake in Port Arthur, Texas, with a value of $12,000.  Do you see that?

A   Correct.

Page 81

And so, you know, I was informed that there's envelopes that get soaked in drugs, and so this was a good way for us to eliminate not only our employees being exposed to any type of drugs, our inmates -- and it actually saved time because the inmate -- or employees don't have to look through all the mail all the time, you know. So I think it was a big time-saving, too, for the employee, besides the safety part of it. And NCIC wasn't going to charge, from what I was informed.

Q   And this was a conversation with Mr. Brandt?

A   Correct.

Q   Do you recall whether that was before or after this July 17 draft termination letter?

A   I'm assuming it had to be before, because if he was talking to NCIC, they were -- like a pamphlet, telling you what their services could provide.

Q   Okay. You say you're assuming it was before. Do you recall whether it was before or after this July --

A   Sometime in 2023.

Q   Okay. Now, you mentioned law library. Were you aware that Reliance was providing an online law library?

A   I was aware. Again, it goes back to the -- the size of the screen. I'm different from other people, but to me, I wouldn't want to read it on a little texter.

Page 82

Just like the letters, you know, somebody sends you a letter.

Q   Okay. So you don't read things on your phone that you have, your cell phone?

A   No, I read some stuff on my --

Q   Okay.

A   But if it -- especially when I got legal paperwork from everybody or whoever, I wouldn't want to read it on my phone.

Q   So you -- you wanted the inmates to have just -- to have as much convenience as you had?

A   Yeah, and I think at -- yes, they're inmates, but some people are being held until they have their due diligence in court, so I think that they'd have that opportunity to have some type of legal access, you know.

Q   So it'd be fair to say that they had the law library access. You just wanted them to have a bigger screen to read it on.

A   Well, we get a lot of grievances about people's eyes are bad, so I think it'd be fair to say that if somebody was innocent of a crime, and let's just say their court-appointed attorney isn't doing them very much justice, that if the technology's there, allowing them to do some of their own research, it's easier for

Page 83

them, yes, to do it on a bigger screen than iPhone or --

Q   Okay. But that wasn't my question, sir. My question was --

A   Oh, sorry.

Q   -- you would agree that Reliance Telephone was providing the online access to a library. You just wanted inmates to have a bigger screen.

A   Yes.

Q   Okay. You also mentioned the FCC -- the assertion of FCC overcharging. Do you recall that, sir?

A   Yes.

Q   Was that a significant issue, in your view?

A   Well, I believe we were overcharging inmates. I didn't want to be part of a lawsuit down the road where, if we average 90 to 110 inmates at the time, to later on get -- having knowledge of possible overcharging, I didn't want to go through what we're here today for, essentially, for a bunch of other people.

So having been told that that's a possibility, that's not what I wanted to -- I didn't want to overcharge people.

Q   When you say you were told that it was a possibility, was it that you were told that it was a possibility or it was told that it was a fact?

Page 84

A   I was told that there was a strong possibility that they're overcharging.

Q   Who told you --

A   Todd Brandt.

Q   If you look at Point 3 on Exhibit 39, sir -- take a moment to look at Point 3, if you would, and tell me when you're finished.

A   (Examines document.)
I'm done.

Q   Okay. Would you agree with me that in Point 3, it's -- there's no indication that this is a strong possibility. It's stated as a fact, an assertion that Reliance is charging at rates higher than 21 cents per minute in a -- as a violation of FCC allowances?

A   I think it -- it was just referencing what Reliance had on the website.

Q   Well, that's my -- not my question, sir. My question is, would you agree it doesn't say that there's a strong possibility you were doing this; it says you are charging in violation of current FCC allowances?

A   And again, I'm -- I didn't write it, so it's hard for me to interpret something that I didn't write.

Q   Well, I understand that. But as you read it, you would agree it doesn't say it's a strong possibility. It says it's a fact.

Page 85

MR. MOSER: I'm sorry.  Where are you referencing, Alan?

MR. ANDERSON: I -- I'm asking him a question based on his reading of -- of it.

BY MR. ANDERSON:

Q   Would you agree that it doesn't indicate that --

MR. MOSER: Of which document?

MR. ANDERSON: Of paragraph 3 of Exhibit 39.

BY MR. ANDERSON:

Q   Paragraph number 3.  My question is, do you agree that it doesn't indicate that this is a strong possibility?

A   Like I said, it just -- it can be interpreted any way.  I said "strong possibility" because that's what I was told.  I didn't write it, so I -- for me to agree to something that I -- I interpret maybe different than somebody else --

Q   Well, do you interpret paragraph 3 as saying simply it's a strong possibility?

MS. JELEN: I'll object to form.  Is there a specific sentence in paragraph 3, or just the entire paragraph 3 that you're referring to?

MR. ANDERSON: No, it's the entire paragraph 3, because he said that he may interpret things differently.  So that's my question.

Page 86

BY MR. ANDERSON:

Q   Are you interpreting paragraph 3, as you read it, as simply saying it's a strong possibility?

A   What I'm reading is that based on what Jail Admin Brandt was informed, that it's relying -- it's his due diligence to confirm that they weren't.  And I --

Q   When you say -- I'm sorry.  Go ahead.

A   No.  Go ahead.  That's fine.

Q   When you say what Mr. Brandt "was informed," is it your understanding that that's what NCIC informed him?

A   I would say that they had informed him some of that, yes.

Q   Okay.  Now, you did not do any what I'll call investigation or research as to whether, in fact, Reliance was charging at a rate higher than FCC allowances, correct?

A   Correct.

Q   And do you know whether Mr. Brandt did any of his own research on that point or whether he simply relied on NCIC?

A   Again, it was a delegated task to Jail Admin Brandt that --

Q   So -- so you don't know?

A   Yeah.

Q   Okay.  Would you agree that accusing a vendor of

Page 87

violating federal regulations is a serious charge?

A   I think when something is said, that somebody could be able to defend it.

Q   But my question is, would you agree that that's a serious charge?

A   Yeah.  I believe if they're overcharging inmates federally, then it would be.

Q   Having -- you said that you were concerned that you didn't want to be part of a lawsuit for overcharging.

A   Correct.

Q   Okay.  So -- and you would agree that telling someone that they're violating federal regulations isn't a -- doesn't make them look good, right?

A   Again, Jail Admin Brandt's the one that prepared the letter.

Q   Sure.  I understand that.  But I asked about your own view personally, sir.  Would you agree that accusing someone of violating federal regulations isn't good for their reputation?

MS. JELEN: Object to the form.

You can answer if you can.

THE WITNESS: I get -- we get accused of stuff all the time, so it's --

BY MR. ANDERSON:

Q   And that concerns you, doesn't it, when you get accused

Page 88

of stuff?

A   At the end of the day, people know the type of person I am and who I -- what I stand for, so I just let it -- let it be.

Q   Sure.  But if someone accuses the Yankton County Jail of violating some federal law or rule, you agree that that's a serious accusation?

A   And we look into it.

Q   Sure.  And you agree that if it's true, that doesn't reflect well on Yankton County Jail?

A   But we can defend it.

Q   Well, whether you can -- if you can't defend it and it's true, that doesn't reflect well on Yankton County Jail, does it?

A   But if we can defend it, then it looks good that we defended it.

Q   Okay.  But if -- but if you can defend it, do you think that that cures any problem with somebody who just saw the accusation and not the defense?

A   I'm not trying to be mean, but I don't think -- there's nothing more I can say on --

Q   Okay.  Fair enough.

A   -- in regards to that.  Sorry.

Q   Fair enough.

Did you approve -- correct me -- did you

Page 117

A   Yes, sir.

Q   And that's what it was?

A   Yes, sir.

Q   Okay.  And then in the email in about the middle of page 1, Mr. Brandt suggests that you print and sign it. Do you see that?

A   Yes, sir.

Q   And then you say you'll have to do it next week, in your response on the 24th --

A   Yes, sir.

Q   -- right?  All right.
    MR. ANDERSON: 63.
    (Exhibit 63 is marked for identification.)
BY MR. ANDERSON:

Q   I'd like you to look what's been marked as Exhibit 63, sir.  It has Bates numbers YC005894-95.  Please take a moment to look at Exhibit 63, which is two emails to yourself or from yourself and an attachment, and tell me whether you recall having seen these previously.

A   (Examines document.)
    Yes, sir.

Q   Okay.  The email at the bottom of the first page is from Mr. Hangsleben to you, dated August 24, 2023.  Do you see that?

A   Yes, sir.

Page 118

Q   And in the email, Mr. Hangsleben references a report, which I believe is the second page of the exhibit.

A   Yes, sir.

Q   Okay.  About the amount of texting your inmates were doing in the month of July.  Do you see that, sir?

A   Yes, sir.

Q   Did you discuss this report with anyone, including Mr. Brandt?

A   Probably brought it up to Lanee, who does the financing part.

Q   Okay.  Does Lanee provide financial reports on the money that you're receiving to the -- to Yankton County itself?

A   Yes, sir.

Q   Monthly?

A   She does monthly, and then I do a quarterly report to the county commissioners.

Q   Okay.  And while you -- while Reliance -- while the Reliance entities were providing the payments to -- to you, you would pro- -- you would tell them in these monthly and quarterly reports, "Here's how much we got from Reliance Telephone and Reliance Systems," correct?

A   Yep.  It's always in the reports.

Q   Yeah.  So the county knew you were getting money from Reliance, correct?

Page 119

A   Yes, sir.

Q   And to the best of your knowledge, was that a practice that was carried out before you assumed office on January 3 of 2023?

A   Yes, sir.

Q   So it'd be fair to say that the Yankton County commissioners knew for a long time that you were receiving money from Reliance Telephone and Reliance Systems, correct?

A   Yeah.  I would believe that they get the same report that I present.  And I don't go in depth.  I just normally ask if they have any questions about unanticipated revenue that we brought in.

Q   While you've been sheriff, did the Reliance County commissioners ever ask you any questions about the payments being received from Reliance Telephone or Reliance Systems?
    MS. JELEN: Object to the form.  You referred to it as the Reliance County --
    THE WITNESS: Yeah.
    MS. JELEN: -- commission.
    MR. ANDERSON: I'm sorry.
BY MR. ANDERSON:

Q   At any point --
    MS. JELEN: Just wanted to make it clear.

Page 120

BY MR. ANDERSON:

Q   During the time that you've been Yankton County Sheriff, did the Yankton County commissioners ever ask you any questions about the revenue being received from the Reliance entities?

A   I don't believe that they ever asked me specifically, but I could be wrong.  And there's YouTube videos.  You can check them out.

Q   Okay.  So you appear at these monthly commission meetings?

A   Just quarterly.

Q   Quarterly?

A   Yep.

Q   Okay.  But you presented your quarterly report to them in advance of that meeting?

A   So Lanee will generate the monthly reports, and that's including our marshal holds and all that stuff, but then they'll give me a monthly -- or a quarterly report, and then I'll go to the commission and present that at the commission.

Q   Okay.  When you present this quarterly report to the commission, do you report to them that "During the last quarter, we received this much money from the Reliance Telephone and Reliance Systems"?

A   I don't think I've ever spoken on behalf of the

Page 125

A   I don't recall any specific details.

Q   Or any general things?

A   Just probably what you -- what was written in there, I guess.  But nothing to specific detail.

Q   Okay.  In the email from Mr. Brandt to you, dated September 5th, forwarding the September 5th letter, he said, quote, "Well, this doesn't sound good," exclamation point, closed quote.  Do you see that, sir, the very top of the page?

A   Yes.

Q   Okay.  Did you agree with him, "Well, this doesn't sound good," in his reaction to the September 5th letter?

A   You know, you can anticipate that this probably what was going to happen.

Q   Why could you anticipate -- well, first, what is "this probably going to happen"?  What are you referring to as "this"?

A   Well, the -- we had a contract with Reliance.

Q   And why could you anticipate that "this" was going to happen?

A   This specifically?  Just that we had a five-year contract and we're -- you know, we're cutting ties with Reliance.

Q   You're breaching the contract, right?

Page 126

A   Yeah.  We're cutting ties with the contract.

Q   Yeah.  By the way, did you ever tell NCIC -- you personally ever tell NCIC about the Reliance Telephone and Reliance Systems contracts?

A   No, I did not.  I didn't speak to those -- like I said, it was a delegated task to Todd Brandt and...

Q   Did you know that they -- that Mr. Brandt had provided copies of the contracts to NCIC?

A   I'm sure it was brought up that he did.

Q   You don't have a specific recollection?

A   I don't.

Q   Would it be fair to say that the decision to terminate the contracts or to try to terminate the contracts with Reliance was Mr. Brandt's decision and you approved it?

A   I would say that's pretty accurate.

Q   And would you agree that, based on NCIC providing drafts of the termination letters, that NCIC was pushing you to go with them?

A   I -- I wouldn't say it was the draft letters.  It was the technology and the services that they were going to provide for the -- for the county and the employees and the inmates.

Q   Okay.  Would you agree that NCIC was pushing you to go with them as opposed to --

MR. MOSER: Objection.  Asked and answered.

Page 127

MR. ANDERSON: Can I finish my question first?

MR. MOSER: Sure.

MR. ANDERSON: Thank you.

BY MR. ANDERSON:

Q   Would you agree that NCIC was pushing you to go with them?

MR. MOSER: Objection.  Asked and answered.

BY MR. ANDERSON:

Q   You may answer.

A   Going back to the pamphlet folder, they're a business, just like Reliance.

Q   So you would agree that NCIC was pushing you to go with them?

A   I wouldn't say "pushing."  It was a, this is a service that they provide and these are the options, so -- like the pamphlet thing we talked about.  They're a business.

Q   They were marketing hard?

A   Much more than Reliance.

Q   And Reliance had had a long-term -- do you know how far back the Reliance relationship with Yankton goes?

A   Well, now I -- the things that were produced the other day, 2017.

Q   Okay.  Well, we looked at one contract from --

A   Oh.

Page 128

Q   -- 2016 earlier.  My question is, do you -- are you aware that it went back even before then, to 2010?

A   No, I don't.

Q   You just don't know one way or the other?

A   No.

Q   Okay.

A   I saw -- I found some old folders at the sheriff's office that had, like, you know, marketing folders from Reliance, but it didn't have any contracts or anything like that, so...

Q   Do you recall, with respect to the contract, someone handing you a folder or a file that had the Reliance contracts?

A   No.

Q   Okay.

MR. ANDERSON: 65?

(Exhibit 65 is marked for identification).

BY MR. ANDERSON:

Q   I'd like you to look what's been marked as Exhibit 65, sir.  It has production numbers YC004469 to 81.  Please take a moment to look at Exhibit 65, and tell me whether you recall having seen it previously.

A   (Examines document.)

What was your question?

Q   Okay. My first is, first off, do you recall having seen

Page 153

Q   In the bottom email on the first page, Mr. Storer indicates that you had called him on December 1st. Do you see that?

A   Yes, sir.

Q   Do you recall calling him?

A   I must have.

Q   You don't have a recollection of it?

A   It's just so hard with so much stuff going on.

Q   Okay.

A   I apologize.

Q   If you look at the middle email, Mr. Pope writes "Sheriff Crissey just called and is bummed he got sued, but I assured him that I am on top of this and told him to give his insurance company my cell number." Do you see that?

A   Yes, sir.

Q   Do you recall calling Mr. Pope on December 1st?

A   Yeah. I believe -- just since Jail Administrator Brandt is -- was no longer there, now I'm the -- I'm the primary person. So...

Q   And why did you call Mr. Pope as opposed to any of the other individuals who we've seen from NCIC during the previous exhibits?

A   I don't know if there was a specific reason, if, like, Craig said, you know, "Talk to Bill." I don't recall,

Page 154

I guess. That'd only be the logical reason.

Q   Okay. Do you recall indicating to Mr. Pope that you were bummed that you had gotten sued?

A   I was just more surprised, but it is what it is.

Q   Why were you surprised?

A   Just based on the contract that we had and what was being provided, I was surprised that Reliance wanted to pursue it.

Q   Why were you surprised that Reliance wanted to pursue it?

A   Based on the services that we were getting.

Q   Well, you were aware that the contracts with Reliance and Reli- -- with Reliance Telephone and Reliance Systems didn't have a termination provision prior to the end of the term of the contracts, correct?

A   Yeah.

Q   Okay. Do you recall Mr. Pope telling you or asking you to give him -- give his cell phone -- his cell phone number to your insurance company?

A   Yeah.

Q   Did you?

A   I believe I gave it to the attorney in -- North Dakota? Right?

Q   Mr. Harrie?

A   Yeah.

Page 155

Q   H-a-r-r-i-e.

A   Yeah.

(Exhibit 71 is marked for identification.)

BY MR. ANDERSON:

Q   I'd like you to look next, sir, at what's been marked as Exhibit 71. It has production numbers NCIC-012178 to 81, series of emails. What I'm interested in is the email at the bottom of the first page. It's from Mr. Pope to you. Do you recall having received that email from Mr. Pope on or about February 9th of 2024?

A   Yes, sir.

Q   And in the email, Mr. Pope asks to speak with the attorneys handling the case. Do you see that?

A   Yes, sir.

Q   And then he says that the case in North Dakota "is not the direction we want to be going with this case." Do you see that?

A   Yes, sir.

Q   Do you recall whether you provided him with any contact information so that he could speak with the attorneys handling the case?

A   Yeah, I must have. I believe I did.

Q   Okay. you don't -- you're -- you're just assuming that you did. You don't --

A   I --

Page 156

Q   -- have a specific recollection of that?

A   Correct.

Q   Okay.

A   Yeah.

Q   By the way, your conversation with Mr. Pope on December 1st, which we just looked at in the previous exhibit, was that the first time that you had ever had any direct conversation with Mr. Pope, to the best of your recollection?

A   It's hard with the timeline of events, but I'm -- I don't know if it was after the contract. I don't recall.

Q   Okay. Fair enough.

(Exhibit 72 is marked for identification.)

BY MR. ANDERSON:

Q   I'd like you to look next, sir, at what's been marked as Exhibit 72. It has production numbers NCIC-000073 to 75. Please take a moment to look at Exhibit 72. It is a court pleading filed in the United States District Court for the District of North Dakota on March 4, 2024, and it's headed Affidavit of Sheriff Preston Crissey.

A   (Examines document.)

Q   Do you recognize Exhibit 72, sir?

A   Yes, sir.