# EXHIBIT M

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

----------------------------------------------------

RELIANCE TELEPHONE OF GRAND FORKS
INCORPORATED and RELIANCE SYSTEMS, INC.,

          Plaintiffs,

    vs.            File No. 4:24-CV-04098

NETWORK COMMUNICATIONS INTERNATIONAL CORP.,

          Defendant.

----------------------------------------------------

      The Videotaped Deposition of DAVID

HANGSLEBEN, taken pursuant to Notice of

Taking Deposition, before Staci A. Heichert,

RDR, CRR, CRC, and a Notary Public in and for

the County of Scott, State of Minnesota, on

May 14, 2026, at 11100 Wayzata Boulevard,

Hopkins, Minnesota, commencing at

approximately 9:00 a.m.

Magna Legal Services
866-624-6221
www.MagnaLS.com



Page 10

30(b)(6). But I'm -- just so I'm clear, what is the partnership, if any, between Reliance Telephone and Reliance systems?

MR. ANDERSON: Object to the form of the question.

THE WITNESS: There -- there is no formal partnership. It's just that I own both.

BY MR. MOSER:

Q. Do those companies operate in conjunction with one another?

MR. ANDERSON: Object to the form of the question.

THE WITNESS: We do share things between the two.

BY MR. MOSER:

Q. Does -- does -- does the revenue that, for example, Reliance Systems bring in, does that have any impact on Reliance Telephone?

A. No.

Q. So I am looking at the amended complaint in this case. Are you familiar with the amended complaint in this case?

A. I've looked at it.

Q. Okay. And you're familiar with the fact that

Page 11

Reliance Telephone is the plaintiff in this case that we're dealing with today, correct?

A. Yes.

Q. Okay. And are you familiar with the claims that Reliance Telephone is making against NCIC in this litigation?

A. Pretty much. There's a lot, but I'm pretty familiar with it.

Q. So what's your understanding of the claims that are being made against NCIC by Reliance Telephone?

A. Well, first is tortious interference, is, is that they -- they went into Yankton County, they encouraged them to break the contract. They actually -- they actually did a lot, I mean, more than you would need to prove tortious interference. They -- they actually wrote the letters to me for the county and they made up false accusations and -- and they wrote those letters to me to break the contract, and they basically told lies about us. They created things that weren't real. And so -- and you know, that, I guess --

The other thing that -- that they did was, is they gave a free trip, which I

Page 12

consider a bribe, to the sheriff and -- and I feel that's why they broke the contract in how they encouraged them to do that.

Q. When --

A. Yeah, go ahead.

Q. When you say they created things that weren't real, what do you mean by that?

A. Well, I guess number one is that they said that they were charging illegal rates. That, you know, and -- and if you wanted to, if you want to give me the letter, that -- that you have, that Craig Storer wrote and gave to Todd Brandt.

Q. Are you referring to the July 17th, 2023, letter?

A. Yeah, I think that's the right date.

Q. So I'm showing you what has previously been marked as Exhibit 44 in prior depositions, and I will represent to you this is a letter drafted on Yankton County Sheriff's Office letterhead dated July 17th, 2023, and it is a letter addressed to you, Mr. Hangsleben, and signed by Todd Brandt, the jail administrator.

A. Okay. So this letter is a letter that

Page 13

in -- in the interrogatories and in their email conversations, Craig Storer stated that he -- he created this letter. So the thing is, is that --

MR. ANDERSON: There's no question.

THE WITNESS: Yeah.

MR. ANDERSON: There's no question pending.

THE WITNESS: Okay.

BY MR. MOSER:

Q. Is that -- is that the letter that you were referring to?

A. Yes.

Q. Okay. When you said they made stuff up, is that the letter you were referring to?

A. Correct.

Q. Okay. So my question was, what were the things that they made up?

A. Okay. Well, the -- first off is the calling rates. They said that we were -- that we had illegal calling rates. The other thing that they say is that we were fee harvesting, is that was another.

Q. What is fee harvesting?

A. Well, you'd actually have to ask them because

Page 14

I assume that he means charging extra fees not listed or something. I don't really know.

Q. And is that -- did you get that from the letter that you're looking at right now that --

A. Yeah, it says calling rates and fees, so that reminded me that they accused us of fee harvesting.

Q. What -- how did they accuse you of fee harvesting? Was it -- was it verbal or was it in a letter?

A. I think it was email, and then it was also in the deposition that they said they did it.

Q. Okay.

A. They said they said it, yeah. And then it says nondelivery of technology and programming. That's false. We had that information there. We were -- we were delivering that.

And it says utility of the handheld. Actually, to be honest with you, the utility of the handheld, our device is the best. It is the same reason why you use -- we have a tablet phone rather than a

Page 15

full-size tablet, is, is that we -- we experience through our system is inmates prefer that, you know, they like the smaller -- just like you prefer a phone instead of a tablet, inmates prefer that. And so he's saying the utility of our device is -- is bad, and that was created by Craig Storer.

Continued failing of visitation is, is that, this he created is, is that is -- we -- we immediately respond to any problems and we have, and the previous jail administrator said we do a good job or a great job, that is, that if -- if there was a failure in visitation, we would have immediately fixed it. We go after it hard. We would fix it same day. We try to fix everything within the hour, you know, while we're talking to people on the phone. That's our goal. And if that doesn't work, we'll send a guy out. So, you know, saying that the visitation doesn't work or, you know, him saying failing on visitation, if there's any failures, they didn't call us and tell us, you know? So that's not us, and he's accusing us of that.

Page 16

And they didn't call us. You know, in fact, you know, and I remember this is that is -- is like when Todd Brandt sent me a letter in April, he was talking about that he wanted iPads for everybody and -- and in that -- and that's April, and this is supposedly before that, you know, that they're having this trouble, and -- and Brandt doesn't mention it until May or, you know, then he mentions it then, but why wouldn't you just call us so we could fix it? We would have fixed it. We would have fixed it immediately. So there's just -- there's no, I don't know, credence to that statement. It is a false statement that -- and you can look at our records. We delivered the records and we showed, you know, when they contacted us, we took care of it immediately. It's all -- I delivered all of that information. Let's see.

Q. Oh, I thought you were still looking at that document.

A. I was looking at it. I was just going to make that point, but I was trying to read if they actually said it in this letter, but is

Page 17

-- is the utility of the -- of the devices is we did have 18 iPads on the wall, so anybody that wanted a bigger screen for, like, reading law library or something like that, they could sit and watch -- they could do it on a wall unit if that was an issue. But anyways, that -- I don't really see where they, but.

Q. So is it your position, is it Reliance Telephone's position that the things in that letter were just not true? Is that your position?

A. They are not true. They are not.

Q. So you -- so you believe that Todd Brandt just made those things up?

A. No, Craig Storer made these up. Craig Storer admits in his deposition that he's the one who made these up. He made them up. Todd signed his name on it. Craig Storer wrote this letter, or he wrote the majority of it, handed it to Todd and had him finish it off and send it to me. That -- that's right in the depositions. I mean, okay. Yeah, I'll -- okay. It's in the depositions.

Q. But the issues that he talks about in that

MAGNA
LEGAL SERVICES

Page 18

letter, is it your position that those issues never existed?

A.   Correct.

Q.   Can I have that letter back?

So your position is that Yankton County never expressed concern over the size of the handheld devices?

A.   The -- in April, he sent me a letter saying that he would like a larger device, and he said that, yep, in April.

Q.   And you're saying at no point prior to that did Yankton County ever express that they wanted larger devices?

A.   Correct.  It wasn't until after they talked to NCIC.  They talked to NCIC on the 11th, any got a demonstration from them on the 11th, and it was after that that he decided that he wanted to have iPads.  It wasn't in the contract, you know -- I'm sorry.

Q.   But when Yankton County asked Reliance Telephone about iPads, what was Reliance Telephone's response?

A.   I told him that we had iPads on the wall, is -- is that we had 18 iPads on the wall, you know, for those -- for those situations

Page 19

that -- where a guy wanted to read some text or whatever.

Q.   But didn't Reliance Telephone tell Yankton County they weren't going to provide iPads to all the inmates?

A.   I had a conversation with them.  I told them I would look into it, but I -- I didn't feel the need to do it because the best device was a tablet phone, just like me and you use.

Q.   In your opinion?

A.   Well, it's in a lot of people's opinions. It's not just mine.

Q.   But it wasn't Yankton County's opinion?

A.   Well, Yankton County never had a problem with it until NCIC showed up on the 11th and then Storer wrote this letter.  I apologize.

Q.   Well, I guess what I'm having trouble with is it appears to me to be awfully demeaning to Todd Brandt.  I've known Todd Brandt for a long time.  It sounds to me like what your position is, is Craig Storer came in and said Yankton County should have larger devices and Todd Brandt just said, okay, Craig, I'm going to write this letter.  Is that what your position is?

Page 20

MR. ANDERSON:  Object to the form of the question, argumentative.

MR. MOSER:  I don't think it is. It is exactly what you're testifying to.

MR. ANDERSON:  No, you're arguing when you're saying that you've known Todd Brandt for a long time.  That's your commentary, Counsel.  Just ask a direct question and not commentary.  It's argumentative.  My objection stands.

BY MR. MOSER:

Q.   Okay.  You can answer the question.

A.   Okay.  So here's the deal.  Todd Brandt and Preston, they had zero experience in a jail. None.  They were -- they were police people, you know, and so they have no experience. So -- so they just counted on Storer's opinion or his sales pitch and bought into it.

Q.   Okay.  And are you -- so are you completely discounting the testimony of Sergeant Poppe when she says I told these guys right away that we've been having problems with visitations and this technology?

A.   She --

Page 21

MR. ANDERSON:  Objection, argumentative.

BY MR. MOSER:

Q.   You just --

MR. ANDERSON:  Objection, argumentive.  It's not a question of whether he's discounting.  You may answer, but it's argumentative and objectionable.

THE WITNESS:  If she had a problem, she should have called us.  We would have fixed anything.

BY MR. MOSER:

Q.   But that's not my question.

A.   Okay.

Q.   She testified that she expressed these problems almost immediately upon Preston Crissey coming into office.  Preston Crissey testified that he had a letter from her within a week of taking office expressing concerns about this technology.  My question is, when you are saying that this is all Craig Storer, are you considering that testimony?

MR. ANDERSON:  Object to the form of the question, argumentative, and also not

MAGNA
LEGAL SERVICES

Page 22

within the scope of the 30(b)(6) deposition. He here's to testify about facts, not accounted on by other --

BY MR. MOSER:

Q. And I'm asking if you are considering that when you're making the statement that Craig Storer made all this up.

MR. ANDERSON: Objection to the form of the question, argumentative.

THE WITNESS: I honestly don't know where to go with it because I have my own opinion. You know, is, is I think if you look back, you will see that Craig Storer had talked to her at a previous jail administration show. I don't know that for sure, but I believe that happened, and I believe that that's where she got this motivation. But the thing is, is if -- if she had a problem, she knows our 800 number. We would have totally fixed it, you know, what -- just like we -- we went out there to -- the day that -- the 17th, we drove out there on the 18th of July, we went out there --

Q. Wait, who went out there?

Page 23

A. Reliance Telephone.

Q. Not you, though, correct?

A. No. Mike Baranik went out there. Our whole team was on it. Because when we found out that there was a problem, we jumped on it, you know. We drove out there. He went through every device on there, and he -- and if remember correctly, he found two devices that didn't update properly. So there a probblem, but, you know, it was a fixable problem. We could have fixed it probably with a phone call but instead we drove out there to check everything out. You know, so -- so her statement, I don't put a lot of credence in it. You know, if she works there, she knows our number, she could call us. We would fix it immediately. That's the way we operate. That's the way we operate at the other 169 jails. That's the way we worked.

Q. And you --

A. We fix immediately.

Q. And your testimony on behalf of Reliance Telephone is that Yankton County never expressed issues with your technology prior

Page 24

to April of 2023? Is that your testimony?

A. My testimony is they did not.

Q. Did Reliance Telephone have calls from inmates or jails or their family about the rates for interstate calls starting in 2022 onward that you're aware of?

A. I'm not aware.

Q. You're not aware of whether there were calls from users or from jails about -- confused about the rates that are being charged?

MR. ANDERSON: Asked and answered.

THE WITNESS: I -- I don't know if -- if there was. I know that my people handle it. If -- if there's a question, we explain it to them, exactly what we know about, you know, the rates, and we have a system where the inmates contact us directly, you know, and -- and we take their complaints directly.

BY MR. MOSER:

Q. And -- and have those complaints -- have any of those complaints revolved around confusion about the amount of fees being charged?

A. No, not that I know of. To be honest with you, is, is we have the most simplistic fee

Page 25

schedule by using the 25 cents.

Q. In your opinion.

A. I'm pretty confident. Like I said yesterday --

Q. I know you are.

A. -- I've been in it 37 years. I've answered the phone calls. I used to take -- three years ago, I took all of the customer service calls on the weekend, so I do understand this business really well. I understand our customers really well. To be honest with you, people actually thank us, you know, they thank us, so.

Q. Okay. So you took all of the customer calls on the weekends three years ago, so that's right about the time we're talking about.

A. Sure.

Q. Were any of those calls related to confusion about the fees being charged?

A. No. I --

MR. ANDERSON: Just stick to the questions.

THE WITNESS: Oh.

BY MR. MOSER:

Q. So in this July 17th letter, Todd Brandt

MAGNA
LEGAL SERVICES

Page 26

says, "We are in need of a proven reliable mail scanning program to help combat incoming contraband."

Had you ever had a conversation with Todd Brandt prior to this letter about mail scanning?

A. No.

Q. To your knowledge, had anybody at Reliance Telephone ever had a conversation with Todd Brandt about mail scanning?

A. I don't know of any.

Q. And did Reliance offer mail scanning at the time of this letter?

A. It was on their system.

Q. What does that mean?

A. All you had to do was turn it on.

Q. And what -- what was the mail scanning program that was on the system?

A. Mail scanning. You put it in a scanner, you scan it, and you -- you send a message to the inmate and attach the mail with it and the inmate has a copy of it and we record it and keep it.

Q. So the jail would open the mail, scan the mail?

Page 27

A. Sure.

Q. And then, what, it goes to the inmate that way?

A. It -- it arrives on his device.

Q. It arrives on the handheld device?

A. Correct.

Q. But the staff, under what you offered -- or under what Reliance offered, the staff would have to still physically open the mail and scan the mail. Is that correct?

A. That was one of the ways that we do it, yes.

Q. Okay. Was there other ways that you did it?

A. Yeah. I'm not sure at that time, but, yeah, we do remote scanning, too.

Q. So as you sit here today, do you know if remote scanning would have been available to Yankton County in July of 2023?

A. I don't know.

Q. Have you had a lot of your customers, if you know, that have gone to remote scanning?

A. Probably ten. Maybe less. Maybe eight.

Q. In this July 17th letter, is it Reliance Telephone's position that Yankton County was accusing Reliance Telephone of overcharging rates in this letter?

Page 28

A. Like I said, I'll take a look at it. It's the last paragraph, right? Yeah, I took it as they're charging -- they're saying that we overcharge.

Q. Can you -- can you show me in there what -- what led you to that belief?

A. I guess one of the items is back-end fees and --

Q. And I'm just asking what -- again, what in that letter made you think that Yankton County was alleging that you violated any FCC regulations?

A. The last sentence that says, "Reliance is aware of any calls in a prepaid format currently being charged at a rate higher than 21 cents a minute is in violation of the current FCC."

Q. And you took that as Yankton County is accusing Reliance of violating FCC regs?

A. Because we do have prepaid rates above that but for the in-state calls, so he's accusing us of that.

Q. That's the way you took that paragraph?

A. Well, that's what it says.

Q. "As Reliance is aware, any calls in prepaid

Page 29

format currently being charged at a rate higher than 21 cents a minute is a violation of current FCC allowances."

A. So we -- we're --

MR. ANDERSON: There's no question pending.

THE WITNESS: Okay.

MR. ANDERSON: That was a statement.

THE WITNESS: Okay.

BY MR. MOSER:

Q. And you took that as an accusation of wrongdoing against Reliance?

A. Yes.

Q. And why is that?

A. Because we had prepaid rates greater than 21 cents.

Q. Did you agree with the statement that any calls in prepaid format currently being charged at a rate higher than 21 cents a minute is a violation of current FCC allowances?

MR. ANDERSON: Object to the form of the question.

BY MR. MOSER:



8 (Pages 26 to 29)

Page 30

Q. Do you --
A. That's a -- that's a false statement.
Q. What is false about that statement? "Any calls in prepaid format currently being charged at a rate higher than 21 cents per minute is a violation of current FCC allowances."
       What's the false statement there?
A. The whole sentence. I mean, the whole sentence is tied together.
Q. Well, I thought we established clearly throughout this case that the maximum rate is 21 cents a minute.
A. That's for interstate calls.
Q. So you're saying that statement is a misstatement of law because there are prepaid in-state calls that can be charged above 21 cents a minute?
       MR. ANDERSON: Object to the form of the question, calls for a legal conclusion. He's here to testify facts, not law.
       THE WITNESS: I'll agree with him.
BY MR. MOSER:
Q. I'm asking if you believe this is an accurate

Page 31

statement of the law.
A. But --
Q. You're accusing them of saying you violated the law. I'm trying to understand if you believe this is an accurate statement of the law.
A. Well, you're picking it apart, and I'm not an attorney.
Q. I'm not picking it apart. I'm asking if the sentence that reads exactly like this, in full, "As Reliance is aware, any calls in prepaid format currently being charged at a rate higher than 21 cents a minute is a violation of current FCC allowances." Do you --
A. That --
Q. Do you believe that's an accurate statement of the law?
A. No.
       MR. ANDERSON: Well, it --
       THE WITNESS: Wait.
       MR. ANDERSON: No, wait, that's -- if you ask is that an accurate statement. It's when you say "in the law" is the problem. That's my objection. To the extent

Page 32

you drop off the "accurate statement of the law," and you just say "accurrate answer," he can answer, and I think he just had.
BY MR. MOSER:
Q. Do you believe that's an accurate statement?
A. No.
Q. Okay. What about it do you believe makes it in inaccurate statement?
A. The whole sentence is tied together. I can't just pick one apart, you know.
   The -- there -- it's tied, I mean, the whole thing -- you need the whole statement to make any sense out of it.
Q. So you need the whole sentence to make any sense about it, but you just testified that that specific sentence is your basis for saying that NCIC said false things about you. You just testified to that, that this --
A. Yeah.
Q. -- sentence was your basis for that? Now I'm simply just asking you, what is not true about this, and you don't seem to be able to answer.
       THE WITNESS: Well, here.
       MR. ANDERSON: Object to the form,

Page 33

argumentative.
       THE WITNESS: So if you look at it, it says, "being charged at a rate higher than 21 cents per minute is a violation of the FCC." That's not true. That's a false statement.
BY MR. MOSER:
Q. Okay. Why is it not true?
A. Because the in-state calls were 25 cents, and that's totally legal.
Q. Other than that, with that caveat, is there anything false about that statement?
       MR. MOSER: Object to the form of the question.
       THE WITNESS: I don't know -- I -- excuse me. I've explained what I --
BY MR. MOSER:
Q. Let me ask it this way. As it applies to interstate calls, would that statement be accurate?
A. It --
Q. As it solely applies to interstate calls.
A. Interstate calls are 21 cents a minute.
Q. So would that statement that we've been talking about solely as it applies to

MAGNA
LEGAL SERVICES

Page 34

interstate calls, would that be accurate?

A. But that's not what it says.

MR. ANDERSON: No, answer the question.

THE WITNESS: Oh.

MR. ANDERSON: Stick to the questions.

THE WITNESS: No.

BY MR. MOSER:

Q. So solely applied to interstate calls, you don't believe that statement is accurate?

A. It would be accurate for interstate calls.

Q. So he also says in number four, "Since my inception into jail -- into jail administrator position, we have had weekly issues with the Reliance visitation system."

So I will represent that Todd Brandt came into the jail administrator position in January of 2023. Are you aware of any issues with the Reliance visitation system from the beginning of 2023 till the date of this letter in July of 2023?

A. I believe there was like a ticket that -- that we fix something.

Q. And that's the extent of your knowledge of

Page 35

any issues with the Reliance visitation system from between January 1st, 2023, and July 17th of 2023?

A. Yes.

Q. So when the letter says they've "had weekly issues with the Reliance visitation system," when you looked at this letter, did you believe that that was true? Did you --

A. I believe it was a false statement.

Q. Okay. So you believed when you read this from Todd Brandt that he was making up the statement that Yankton County has had weekly issues with the Reliance visitation system since his inception into the jail administrator position?

MR. ANDERSON: Objection, argumentative.

BY MR. MOSER:

Q. You think he was making that up?

MR. ANDERSON: Objection, argumentative.

THE WITNESS: I don't know, I think he was coached by Craig Storer.

BY MR. MOSER:

Q. So the beginning -- the first count in this

Page 36

complaint is breach of contract, and I think that's against Yankton County. Are you familiar with Reliance Telephone's breach of contract claim against Yankton County?

A. Do you got a copy of it?

Q. I have a copy of it.

MR. ANDERSON: I'm going to object to the relevance as Yankton County has been dismissed.

MR. MOSER: Well, they were a part of the lawsuit for an awful long time.

MR. ANDERSON: That may be, but they are no longer a part of the lawsuit, and if you look at our objections, I think we objected to questions relating to the claims against Yankton, and, again --

MR. MOSER: Are you going to instruct him not to answer?

MR. ANDERSON: I'm not going to instruct him not to answer.

MR. MOSER: Okay. Well, your objection --

MR. ANDERSON: But I --

MR. MOSER: -- your objection is noted.

Page 37

THE WITNESS: Okay. I asked for a copy of it.

BY MR. MOSER:

Q. You can look at a copy of the amended complaint.

A. Okay. What's your question?

Q. My question is, are you aware that Reliance Telephone made a claim against Yankton County in this lawsuit?

A. Yes, I'm aware.

Q. Okay. And the claim that Yankton County breached its contract with Reliance Telephone? Are you aware that that was a claim made by Reliance Telephone in this lawsuit?

A. Yes.

Q. Okay. And are you aware that Reliance Telephone has dismissed that claim against Yankton County?

A. Yes.

Q. Okay. Do you know why that claim was dismissed?

A. I'm not sure.

Q. As you sit here today, do you -- is it your belief that Yankton County breached its

Page 70

make sure that I understand.

MR. ANDERSON: And just for the record, then, we will designate this portion of the transcript beginning here confidential, attorneys' eyes only, to protect work.

BY MR. MOSER:

Q. So -- and maybe this is clear from the record now, but in your deposition, you were asked what percentage of the commission were you paying to Yankton County for interstate calls and you say 35 percent. I think that question should actually have been, what percentage of the revenue?

A. Yeah.

Q. Is that how you would see it as well?

A. Yeah.

Q. So you were paying Yankton County 35 percent of the revenue?

A. Correct.

Q. Okay. And then the USAC fee changes quarterly, correct, we've established that?

A. Yes.

Q. And it runs generally between 29 to 33 percent. Is that a fair statement?

Page 71

A. It is actually more than that now, but.

Q. Is it? What is it now?

A. The highest one I've seen was 36.

Q. 36. Okay. So those percents, 29 and 33 percent, now up to 36 percent --

A. Yeah.

Q. -- is that a percent of the revenue as well?

MR. ANDERSON: Object to the form of the question.

BY MR. MOSER:

Q. What is that a percent of is what I'm asking.

A. The 21 cents.

Q. It's a percentage of the 21 cents that's applied only to interstate calls, correct?

A. Correct.

Q. So that extra percentage, the 29 to 33 or 36, that does not get applied to intrastate calls, correct?

A. Correct.

Q. It doesn't get applied to any kind of -- I don't think Reliance Telephone does any text messaging, does it?

A. The telephone does not.

Q. But it wouldn't apply to text messaging if Reliance Telephone did do text messaging,

Page 72

correct?

A. It would not apply.

Q. So what is the profit margin on interstate calls for Reliance?

MR. ANDERSON: Object to the form of the question.

BY MR. MOSER:

Q. And I'll just say in -- at Yankton County Jail in 2023, what would be the profit margin on the interstate phone calls?

MR. ANDERSON: Same objection to form of the question.

THE WITNESS: I would have to do a little bit of work to calculate that.

BY MR. MOSER:

Q. Okay. But the percent, the USAC percent, would be applied to your total revenue for the interstate calls and video messaging, correct?

MR. ANDERSON: Object to the form of the question.

THE WITNESS: Back in those days it was just telephone.

BY MR. MOSER:

Q. When you say "just telephone," you're saying

Page 73

not video messaging?

A. No, video was a recent add.

Q. Video came on with the 2026 --

A. Yeah.

Q. -- regulations?

A. Yeah.

Q. Okay. But for the telephone -- the interstate telephone calls, the USAC percentage would be on the revenue generated for those calls, right?

MR. ANDERSON: Object to the form of the question, mischaracterizes testimony.

THE WITNESS: Yeah, the USAC only applies to the interstate calls.

BY MR. MOSER:

Q. So if I'm -- I'm a user and I make $100 worth of calls, interstate calls, how much of that hundred dollars is going to USAC fees?

MR. ANDERSON: Object to the form of the question.

THE WITNESS: Well, we showed you the different ways that we bill. We have a direct bill and we have the inmate wallet. Which one are you referring to?

///

MAGNA

LEGAL SERVICES

Page 74

BY MR. MOSER:

Q. Let's say the inmate wallet.

A. Okay. So the inmate wallet is, is that four cents out of every 25 cents goes to FUSF fees, is dedicated for that.

Q. And then Reliance Telephone picks up the rest of the tab?

A. Correct.

Q. So I don't know if you answered this question yesterday, but I'll ask it again because I think it is most appropriate for this deposition. Why does Reliance Telephone use a different model for the direct calls as composed -- as compared to the inmate wallet calls?

A. Well, the direct calls, we have the billing information and we know exactly where they live, so we know exactly where the call is going to.

Q. You know where the -- the person who is receiving the call lives?

A. Yeah. A direct -- excuse me. A direct bill account sets up a telephone number. From those people we get their home address, so.

Q. So direct bill is one inmate with one

Page 75

specific user on the outside, basically?

A. Well, that's usually the way it is.

Q. What are the deviations from that?

A. Well, some of these people have multiple people, multiple family members in jail, so there could be multiple inmates calling on one number.

Q. But each inmate just gets one number that they're able to have a direct bill relationship with or can an inmate have multiple outside numbers?

A. He can have multiple.

Q. And that's really up to the jail?

A. No, it's up to the person that wants to set it up.

Q. The inmate?

A. No. It would -- most cases it's parents and grandparents, but it can be anybody. But they set up an account so that the inmate -- the inmate can call them, you know, any time.

Q. So like if my son was in jail, I could set up an account and --

A. Yeah.

Q. -- he could call me --

Page 76

A. Yeah.

Q. -- and he could call my wife and --

A. Yeah. Well, this is that it would be to your phone, you know. She would have to have a separate account if she wanted her phone. But if it's your home phone, which it is, and so then she could answer that phone and get a call from the inmate.

Q. So then in the inmate wallet setting, is that set up so the inmate can effectively call whoever they want --

A. Correct.

Q. -- within reason?

A. The only limitation would be if the jail restricted it.

Q. Okay. And that's just a padded account that somebody puts money into it and however much money is in there, that's how much activity the inmate can have?

MR. ANDERSON: Object --

BY MR. MOSER:

Q. Is that accurate?

MR. ANDERSON: Object to the form of the question.

THE WITNESS: Yeah, that's correct.

Page 77

BY MR. MOSER:

Q. Okay. So I understand the differences now. I just want to ask why. I get that the direct billing account, you don't necessarily know who the other user is, I understand that, so now my follow-up question is, why does that prompt a different payment structure?

A. Why is that a different profit structure?

Q. Yeah, I mean, I get the difference between the direct call and the inmate wallet. In the direct call, you know the location of the other person on the call.

A. Okay.

Q. But now my question is, why -- why does that difference prompt a difference in how you bill it out?

A. Are you saying between inmate wallet --

Q. Yes.

A. -- and direct bill, what's the difference? Okay.

Q. Yes.

A. Okay. So what we did was inmate wallet is, is that he -- he's making calls to people at the moment we don't know where they are.

MAGNA
LEGAL SERVICES

Page 98

we can tell them what our services are, we can hear that they're getting, you know, in their opinion, not good service, we can compare and contrast, but as long as -- we can do all of that stuff, but we just can't say, you should break your current contract, that's the --

A.  If you have a --

MR. ANDERSON:  Object to the form of the the question, calls for a legal conclusion, also calls for an opinion and hypothetical.

THE WITNESS:  Well, if they have a contract, they should back off.

BY MR. MOSER:

Q.  But didn't you -- didn't we just establish that all of these situations have contracts?

A.  Well, I should -- I'll add to that, they should back off and wait until the contract ends.

Q.  So what about, what if you a scenario where the provider or the jail really wants to break their contract, they're just very unhappy with the services, they don't want to stay in this contract for another 2 years or

Page 99

5 years or 15 years?  Your providers just -- they just have to sit silent there?  They can't say anything?

MR. ANDERSON:  Object to the form --

BY MR. MOSER:

Q.  Is that Reliance Telephone's policy for its salespeople?

MR. ANDERSON:  Object to the form of the question, hypothetical, and calls for an opinion on a legal conclusion.

THE WITNESS:  If they have a contract, they have a contract.

BY MR. MOSER:

Q.  So I'm looking at this -- pull back up this July 17th letter that we talked about, and I know you don't believe these things are true in this letter.  You've already testified to that.

A.  That's correct.  They're false.

Q.  But if they were true, if it is the case that there were problems with visitations and problems with video calling, and I know you think there wasn't, that's been your testimony, that that stuff didn't happen, but

Page 100

if those things were happening, would Reliance Telephone ever consider allowing one of its customers out of its contract if the customer just wasn't satisfied with the service?

MR. ANDERSON:  Object to the form of the question, calls for an opinion, also hypothetical.

THE WITNESS:  Okay.  We would continue to work on fixing the problem all day, every day, until we got it fixed.  That's our policy is there's nothing that we have that's not fixable, and we would have stayed on it, we would have -- if they would have informed us, we would have stayed on it until we had it completely taken care of.

BY MR. MOSER:

Q.  And so there's no real service issue -- or amount of service issues, in your mind, that would justify Yankton County terminating its contract early?

MR. ANDERSON:  Object to the form of the question, calls for an opinion and hypothetical.

THE WITNESS:  Not with our company.

Page 101

I mean, our company would stay on it until it's done if -- so, no.

BY MR. MOSER:

Q.  So when somebody signs the five-year contract with Reliance, they're in that five-year contract regardless of what happens.  Is that an accurate statement?

MR. ANDERSON:  Object to the form of the question, calls for a hypothetical.

THE WITNESS:  That's true.

BY MR. MOSER:

Q.  So I think you said that your salesmen, once they find out there's a contract, they need to back off until the contract is up.  I think those were your exact words.  Does that sound accurate?

A.  Yes.

Q.  So how -- how long do your salesmen need to back up?  Do they have to wait until the contract is completely done?  Can they start contacting them 30 days before it is up, or how -- what's your policy there?

MR. ANDERSON:  Object to the form of the question, hypothetical.

THE WITNESS:  We don't have a fixed

MAGNA
LEGAL SERVICES

Page 110

relationship shortly thereafter.

A. Well, you know what I think --

MR. ANDERSON: There is not a question.

THE WITNESS: Yeah.

BY MR. MOSER:

Q. But you don't think Yankton County's termination of Reliance Telephone had any issue -- anything to do with the issue we were just talking about?

THE WITNESS: I do not.

MR. ANDERSON: Counsel, we've been going about an hour and 10-plus minutes.

MR. MOSER: Yeah.

MR. ANDERSON: Is this a good time for a break?

MR. MOSER: Yeah.

THE VIDEOGRAPHER: All right. I'll bring us off the record at 11:21.

(Whereupon, a break was taken.)

THE VIDEOGRAPHER: We are back on the record on at 11:31.

BY MR. MOSER:

Q. So I think we've covered most of the questions that I wanted to ask you today. I

Page 111

do have a couple that I want to -- I want to understand a little better. So Reliance Systems and Reliance Telephone are two separate companies, correct?

A. Correct.

Q. Completely independent of each other, correct?

A. Yes.

Q. But they do have a relationship in terms of shared customers, would you agree with that?

A. Correct.

Q. So I know that most, if not all, of the customers that Reliance Telephone has are also customers of Reliance Systems and vice versa. Is that accurate?

A. Yes.

Q. Are there any exceptions to that? Do you have any customers that just have a contract with Reliance Systems or just have a contract with Reliance Telephone?

A. Yes.

Q. Would you give me an example of what type of customer that would be and why they wouldn't have both -- both companies?

A. Well, a direct bill is telephone only.

Page 112

Q. So would it be that the jail just doesn't use texting, essentially?

A. No, it's just that the person who set up the account doesn't do texting. It's probably a grandma or mom or dad or something.

Q. Okay. But I'm talking about the jails themselves. Do you have any jails that would have a contract with Reliance Telephone but not Reliance Systems?

A. Yes.

Q. And what would be the reason for that?

A. Well, is, is that some jails we have some texting where the company they had didn't offer texting.

Q. So they just needed --

A. Texting, yeah.

Q. -- that service. So like -- like in Yankton County's situations, when their 2020 contracts were up, there were renewal provisions in both the Reliance Telephone and the Reliance Systems contracts with Yankton County, correct?

A. Yes.

Q. Both of those had provisions in them where they would be automatically renewed for

Page 113

subsequent five-year terms, correct?

A. Correct.

Q. So if Yankton County had said, we want to renew with Reliance Telephone, for example, but not with Reliance Systems, is that an option that Yankton County would have had?

A. Yes.

MR. ANDERSON: Object to the form of the question.

THE WITNESS: Yes. I'm sorry.

BY MR. MOSER:

Q. And that's an option that any similar customers would have?

A. Yes.

Q. And do you have any customers that -- that have that type of relationship where they're a jail like Yankton County and they just have Reliance Telephone but not Reliance Systems?

MR. ANDERSON: Object to the form of the question.

THE WITNESS: Yeah, we have some down in Alabama, Georgia, and Florida.

BY MR. MOSER:

Q. Okay. Okay. Because -- and part of the

MAGNA
LEGAL SERVICES